# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **MARCO E. TORRES JR.,** | |
| **Petitioner,** | **4:17CV3078** |
| **vs.** | |
| **ROB JEFFREYS,** | **MEMORANDUM AND ORDER** |
| **Respondent.** | |

The matter is before the Court on the motion for discovery (the "Discovery Motion") (Filing No. 70) filed by Petitioner Marco E. Torres Jr. ("Petitioner") in support of his petition for habeas relief pursuant to 28 U.S.C. § 2254, (Filing No. 1), and supplement, (Filing No. 28), (the "Petition"). While the Petition contains nine claims, the subject matter of the Discovery Motion addresses only four claims (or subparts of claims) on which Petitioner seeks discovery, all of which relate to what Petitioner contends is exculpatory and impeachment evidence allegedly withheld and suppressed by the government in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Filing No. 124 at p. 8-9). As a result, Petitioner argues he is not at fault for failing to develop any of the claims relating to the suppressed evidence, and is therefore entitled to conduct discovery to excuse and develop under the "good cause" standard set forth in *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). (Filing No. 102 at p. 32) (citing *Shinn v. Ramirez*, 596 U.S. 366 (2022); (*Michael*) *Williams v. Taylor*, 529 U.S. 420 (2000)); *see also* (Filing No. 70 at pp. 3-5).

Alternatively, Petitioner argues he is entitled to develop those same claims in this Court via the actual innocence gateway. (Filing No. 124 at pp. 8-9). Specifically, Petitioner argues that testimonial evidence of Mr. Rodney Gleason ("Gleason"), would have factually undermined the State's case against him, impeached several of the state's witnesses, and caused the jury to find Petitioner not guilty or guilty of a lesser offense. (Filing No. 1 at pp. 95-96; Filing No. 70 at pp. 23). Petitioner asserts the State was aware of Gleason and his proposed testimony prior to Petitioner's trial, but failed to disclose anything related to Gleason to Petitioner's trial counsel. Petitioner contends he did not learn about the information Gleason purported to have until Petitioner received an erroneous disclosure by his prior trial counsel's office to his current habeas counsel. (Filing No. 102 at pp. 31-36).

Respondent opposes the Discovery Motion ([Filing No. 88](#)) (the "Opposition").  Petitioner filed a reply ([Filing No. 102](#)) in further support (the "Reply").  The Court granted Petitioner's request for oral argument, ([Filing No. 109](#)), which was held on February 8, 2024.  ([Filing No. 115](#)).  Petitioner filed a supplement ([Filing No. 116](#)) following oral argument.  This Court then ordered supplemental briefing, ([Filing No. 121](#)), and in response, Petitioner and Respondent filed their respective supplemental briefs, ([Filing No. 124](#); [Filing No. 125](#)), and Petitioner filed a reply brief in clarification ([Filing No. 126](#)).  The matter is now ripe for review.  After careful consideration of the parties' oral and written arguments, and upon a full and thorough review of the record, the Court will deny the Discovery Motion.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Crimes

On March 5, 2007, police officers in Grand Island, Nebraska, found the bodies of Ed Hall ("Hall") and Tim Donohue ("Donohue") shot to death in Hall's home when responding to a welfare check call made by Gina Padilla ("Padilla").[1]  Padilla resided in Hall's house along with her boyfriend Jose Cross ("Cross").  ([Filing No. 16-20 at pp. 66-71](#)).  Hall's house was regularly used by Cross for drug dealing activities.  *See State v. Torres*, 812 N.W. 2d 213, 215 (Neb. 2012), *also at* ([Filing No. 16-2 at p. 6](#)).

In investigating the murders, DNA testing was performed on several objects found in Hall's house.  Petitioner's DNA was found in a mixture with Hall's DNA on an extension cord binding Hall, and Petitioner's DNA was a contributor to the DNA found on cigarette butts found in Donohue's room.  *Id.*  The police also interviewed Cross and Padilla, who claimed they had left Hall's house to drive to Texas with Padilla's mother to visit a sick relative of Padilla's early on the morning of March 2, 2007, and did not return until March 5.  *Id.* at 226.

In addition to providing information regarding their whereabouts during the time of the murders, Cross and Padilla informed the police that several weeks earlier on February 13, 2007, Billy Packer ("Packer"), a drug dealer, and Petitioner came to Hall's house, where Cross alleged Petitioner told him to restrain Packer.  *Id.* at 229.  Cross told police that after he complied,

---

[1] The State was unable to determine a precise time of death for either Hall or Donahue, believing that both died at or around the same time, on March 3, 2007, or possibly in the early hours of March 4.  *See State v. Torres*, 812 N.W. 2d 213, 216 (Neb. 2012), *also at* ([Filing No. 16-2 at p. 6](#)).

Petitioner took $800 from Packer and gave Packer's ATM card to Cross and Padilla, telling them to leave and get cash and food for all four of them. *Id.* Upon Cross and Padilla's return, they all smoked meth and Packer convinced Petitioner to release them.[2] *Id.*

After questioning Cross and Padilla, the police interviewed Petitioner. Petitioner admitted to using Hall's ATM card and vehicle, alleging that Hall had given him permission to use his ATM card to get money to help Petitioner get back to Texas, and that Cross' brother gave Petitioner permission to take Hall's car on March 5.[3] *Id.* at 226-27. Petitioner also admitted to abandoning the car after he learned of the murders, knowing he was a suspect, but denied any involvement. *Id.* at 227.

## B. Pre-trial

The State obtained two different indictments against Petitioner. Petitioner was charged with kidnapping in the Packer Case. In the instant case (the "Hall Case"), Petitioner was charged with two counts of first-degree murder for the deaths of Hall and Donohue, Neb. Rev. Stat. § 28-303(1); three counts of use of a deadly weapon in commission of a felony, Neb. Rev. Stat. § 28-1205(1); one count of robbery, Neb. Rev. Stat. § 28-324(1), and one count of unauthorized use of a financial transaction device, Neb. Rev. Stat. § 28-620. *See* (Filing No. 16-15 at p. 1).

The Nebraska Commission on Public Advocacy (the "Commission") was appointed to represent Petitioner in both cases with James Mowbray ("Mowbray") serving as counsel. (Filing No. 16-18 at p. 27; Filing No. 16-34 at pp. 123-24). On June 12, 2007, Petitioner was arraigned, and trial was set in both cases for November 5, 2007. (Filing No. 16-18 at p. 35). The trial for the Packer Case was held first, and, on November 7, 2007, a Hall County jury convicted Petitioner of robbery and kidnapping. (Filing No. 16-28 at pp. 267-68). On January 9, 2008, prior to sentencing in the Packer Case, Mowbray moved to withdraw as Petitioner's counsel in the Hall Case due to what Mowbray described as a conflict of interest. (Filing No. 16-18 at pp. 86-99). Mowbray's motion in the Hall Case was granted, and he remained as Petitioner's counsel in the Packer Case only. (Filing No. 16-18 at pp. 86-99).

---

[2] This incident shall be referred to as the "Packer Case" throughout this Memorandum and Order.

[3] Petitioner was filmed driving Hall's car and using Hall's ATM card on March 3. (Filing No. 16-20 at pp. 1873-74).

Due to Mowbray's withdrawal in the Hall Case, on January 23, 2008, Clarence Mock ("Mock") of the firm Johnson & Mock was appointed Petitioner's new counsel. (Filing No. 16-15 at p. 167). Denise Frost ("Frost"), also of Mock's firm, joined in Petitioner's representation. *See e.g.*, (Filing No. 16-15 at p. 219). At the time, Frost also represented Gleason on federal drug charges. Through her representation of Gleason, Frost became aware that Gleason knew the victims and most of the witnesses in Petitioner's case, and that Gleason was able to provide information that would be helpful to Petitioner.

Frost discovered that Gleason was personally acquainted with decedents Hall and Donohue as well as many of the witnesses in Petitioner's case including Cross, Padilla, and Packer, and that Gleason had visited the Hall house many times before the homicides. (Filing No. 69-1 at p. 3). Gleason told Frost information that contradicted the testimony of Cross and Padilla regarding the security measures (or lack thereof) utilized at the Hall house, their reason for leaving the state when the homicides occurred, and the nature of their drug dealing business.[4] (Filing No. 69-1 at p. 3).

As a result of her conversations with Gleason, Frost notified Hall County attorney Mark Young ("Young") that she may call Gleason as a defense witness, after which Young sought to depose Gleason. (Filing No. 69-1 at p. 5). Frost requested that Young grant Gleason immunity for any responses to Young's questions that went beyond the scope of the intended use of Gleason's testimony, but Young denied the request. (Filing No. 69-1 at p. 5). Frost then contacted Assistant U.S. Attorney Sara Fullerton, who appeared to already know of Frost's intention to call Gleason as a defense witness. Fullerton indicated that if Gleason did testify, the U.S. Attorney may forgo filing a motion to reduce Gleason's sentence regardless of how substantial Gleason's assistance to the government had been in his case. (Filing No. 69-1 at p. 5).

Ultimately, Frost believed that if the U.S. Attorney did not file a motion to reduce Gleason's sentence if Gleason testified at Petitioner's trial, it would be severely detrimental to Gleason; however, Frost also believed Gleason's potential testimony would be extremely helpful to Petitioner. (Filing No. 69-1 at p. 6). After conferring with ethics counsel, Frost determined that neither she nor Mock could continue their representation of Petitioner or even discuss Gleason's

---

[4] The information given to Frost from Gleason shall be referred to as the "Gleason Evidence" in this Memorandum and Order for ease of reference.

4

information with Petitioner, as Petitioner could then subpoena Gleason to obtain his testimony to Gleason's possible detriment. (Filing No. 69-1 at p. 6).

On November 10, 2008, prior to moving to withdraw as Petitioner's counsel, Mock deposed Cross and specifically asked about Gleason. Mock confirmed Cross knew Gleason, that Cross and Gleason sold drugs together, that Gleason knew Hall prior to Cross, and that Gleason had been to Hall's house many times. (Filing No. 51-18 at pp. 11-14, 42). Mock also asked Cross about conversations he may have had with Gleason about Cross' reason for his and Padilla's trip to Texas on March 2, 2007, prior to their departure; specifically, Mock asked Cross whether he told Gleason he was going to Texas "to score some dope," not to see Padilla's dying uncle, which Cross denied. (Filing No. 51-18 at p. 42).

Eventually, Mock (and Frost) moved to withdraw from representing Petitioner on December 18, 2008, pursuant to Nebraska Rules of Professional Conduct § 3-501.7 (governing conflict of interest for current clients) and § 3-501.9 (governing duties to former clients). (Filing No. 16-16 at p. 37). In support of their withdrawal, Frost provided an affidavit to the trial court (the "Frost Affidavit"), which provided in relevant part:

> 3. A substantial portion of my practice is felony criminal defense in Nebraska state and federal courts. I have defended numerous defendants on federal criminal narcotics and weapons charges originating in the Grand Island area.
>
> 4. In reviewing discovery documents provided by the State [in Petitioner's case], I found that information in some investigative reports overlapped with information I have learned in other cases. Because of that, I contacted several persons of my own acquaintance to learn more.
>
> 5. One person I contacted was "Client A", whom I defended on federal criminal drug charges in 2007-8. Client A was convicted and sentenced in 2008 . . . and he is now serving a sentence of imprisonment at a federal penitentiary in another state.
>
> 6. Client A's federal conviction occurred as a result of a cooperation plea agreement. Pursuant to that agreement Client A provided certain information to law enforcement. If the U.S. Attorney deems the information to have been of substantial assistance in effecting the arrest and conviction of other persons engaged in criminal activity, the U.S. Attorney has unilateral authority to request the federal court to reduce Client A's sentence . . . [and] has complete discretion whether a Rule 35 motion will be filed, if ever, to reduce Client A's sentence.

7. Client A was in Grand Island, and known to Grand Island law enforcement at the time the Hall and Donohue murders were investigated, but Client A was never interviewed by law enforcement.

8. Prior to his arrest Client A dealt methamphetamine and other drugs in Grand Island. Client A was personally acquainted with the decedents Ed Hall and Tim Donohue, witnesses Jose Cross, Gina Padilla and Billy Packer, and he had visited the Hall house many times before the homicides occurred. Client A told me the front door to the Hall house was never locked, and persons not residents of the house came and went at will. This directly contradicts the testimony of Cross and Padilla that the Hall house, where they lived with Hall and Donohue, was secure and that no one could gain keyless entry to the house.

9. Client A is knowledgeable about the size and nature of Jose Cross' drug dealing business. From personal experience with Cross, Client A knew that Cross' business was much larger than Cross characterized it, and that Cross dealt in large quantities of methamphetamine in addition to "user" quantities. Client A knew that the size of Cross' drug dealing business, and his drug sources, fluctuated because Cross had "burned" many people in his drug dealings.

10. Client A stated that Cross told him, a few days before Cross went to Texas, that Cross and Padilla were going to Texas for a big methamphetamine deal. Hall and Donohue were killed during that period. Client A's evidence directly contradicts Cross and Padilla's claim that they went to Texas to visit a sick relative.

11. Client A had, before his arrest, a large drug-dealing network including sources in other states and he was knowledgeable about other drug dealers in Grand Island. Client A knew that at the time Hall and Donohue were murdered, hired thugs or "Mexican Mafia" came into Grand Island periodically, beating and robbing Grand Island drug dealers who cheated or infringed on the "turf" of specific Mexican drug dealers, particularly some in Kansas. I independently already knew this, based on information I learned from another federal criminal defense client of mine, "Client B". Client B was a cocaine and methamphetamine dealer in Grand Island who was federally convicted and sentenced in 2008. Client B had been brutally assaulted and robbed in Grand Island by Mexican Mafia, which was confirmed during many proffer interviews with law enforcement officers.

12. I trust the accuracy of the information provided to me by Client A. Both Clarence Mock and I felt that the testimony Client A could provide would be important to [Petitioner's] defense in this case. In a letter sent to Hall County Attorney Mark Young in early November, 2008 we indicated we might call Client A as a defense trial witness. Mr. Young asked to depose Client A, and we arranged to do so on December 17, 2008.

13. On or about Tuesday, December 9, 2008 I spoke with Mr. Young about the limited matters about which we might question Client A at trial in this case. I asked Mr. Young to grant immunity to Client A for any information he provided in response to Mr. Young's questions beyond the scope of my intended use of Client A's information. Mr. Young declined to do so. We discussed the ethical bind that could create for me, as attorney for Client A and also as one of [Petitioner's] attorneys.

14. On Friday morning, December 12, 2008 I spoke with Assistant U.S. Attorney Sara Fullerton, the federal prosecutor assigned to Client A's case. She appeared to already know that I might call Client A as a defense witness in this case, albeit for the limited purposes set forth in this Affidavit. Ms. Fullerton indicated if I did so, it could cause the U.S. Attorney to forgo filing a motion under F.R.Crim.P. 35(b) to reduce Client A's sentence, regardless of how substantial his prior assistance to the federal government had been.

15. Ms. Fullerton is aware, as am I, that whether and when a Rule 35 motion is filed is completely within the discretion of the U.S. Attorney. As an experienced federal criminal defense attorney, I reasonably believe the detriment to Client A would be very substantial if the U.S. Attorney did not request a Rule 35(b) sentence reduction for him.

16. The positions expressed by Ms. Fullerton and Mr. Young pose a conflict between the interests of Client A, and [Petitioner]. My co-counsel Clarence Mock and I feel the information Client A could provide as a defense witness in this case could be very helpful to Mr. Torres. However, if Client A testifies he may jeopardize the opportunity to cut months, perhaps years, off his federal sentence of imprisonment, a situation I cannot advocate.

17. After speaking with Ms. Fullerton, I contacted attorney John Steele, an Assistant Counsel for Discipline for the Nebraska Supreme Court. I explained the matters set forth above and asked Mr. Steele for his counsel. Mr. Steele stated that the interests of Client A and [Petitioner] conflict, and I cannot ethically advance the interests of either at the expense of the other. Mr. Steele indicated there was no means by which Johnson & Mock or I could continue to represent [Petitioner], or even to explain to him all the information known by Client A, as that could enable [Petitioner] to subpoena Client A as a trial witness, to Client A's possible detriment.

18. I immediately conveyed this information to my colleague Clarence Mock, and we jointly discussed it with the Court in this matter the same day, December 12, 2008.

19. For all the forgoing reasons, Mr. Mock and I believe we cannot ethically continue to represent [Petitioner] in this matter, and we have asked leave of this Court to allow us to withdraw as his counsel.

7

(Filing No. 69-1 at pp. 1-7).[5]

The court granted Mock and Frost's motion to withdraw on December 30, 2008, (Filing No. 16-16 at pp. 39-40), resulting in Peter Blakeslee ("Blakeslee") and Kirk Naylor ("Naylor") being appointed as Petitioner's new trial counsel.

Naylor filed a motion to continue the trial because of the time required review the voluminous file, and because of delays in receiving the file due to Mock's desire to copy the file before providing it to Naylor. The motion was granted, and Petitioner's trial was continued to August 17, 2009. (Filing No. 16-16 at p. 48). On May 13, 2008, Naylor provided a letter to the prosecutor including a list of witnesses whom he intended to call, on which Gleason was listed as the first "lay" witness. (Filing No. 16-16 at pp. 52-53).

A week before the trial was scheduled to start, on August 9, 2009, Blakeslee sent a letter to Gleason informing Gleason of his representation of Petitioner in the Hall Case, and indicating he learned Gleason might know something about the Hall and Donahue murders. (Filing No. 124-1 at p. 1). In his letter to Gleason, Blakeslee indicated he learned that Gleason was a regular visitor at the Hall residence and was acquainted with Cross. (Filing No. 124-1 at p. 1). Blakeslee further indicated he had learned that Cross told Gleason that Cross was going to Texas to engage in a drug transaction, not to visit a sick relative as Cross planned to testify. Blakeslee asked if Gleason had any other information concerning Cross; Cross' brother, Carlos Ponce; Packer; "Bam Bam (Andrew) Weddie; and/or MJ Gosch"; and sought any information Gleason may have about the security measures in place at the Hall house generally. (Filing No. 124-1 at pp. 1-2).

On August 18, 2009, Gleason responded to Blakeslee's letter, confirming that Cross told him on March 2 (prior to the Hall and Donahue murders), that Cross was going to Texas to complete a drug transaction. Gleason also confirmed he was at Hall's house a week before the murders to complete a drug transaction with Cross and to talk about future business opportunities. (Filing No. 124-2). Gleason explained he was unable to confirm any details regarding the Packer Case other than he had heard that the dispute between Packer and Petitioner was over a cocaine debt, but that he could not confirm any details first-hand. (Filing No. 124-2). It does not appear from the record that Blakeslee or Naylor spoke with or otherwise learned any more of the information Gleason possessed prior to or following Petitioner's trial.

---

[5] Frost also provided a second affidavit in support of Petitioner's Discovery Motion, "reaffirming" the accuracy of the Frost Affidavit as true and accurate (the "Renewed Frost Affidavit"). (Filing No. 69-1 at pp. 8-10).

## C. Trial and Conviction

The trial in the Hall Case was held from August 17 to August 27, 2009, in the District Court of Hall County Nebraska. *See* (Filing No. 16-20 at pp. 24-234; Filing No. 16-21; Filing No. 16-22; Filing No. 16-23; Filing No. 16-24; and Filing No. 16-25 at pp. 24-103). The State's theory of the case presented in its closing argument at Petitioner's trial was that Petitioner really wanted to get to Texas, and that Petitioner murdered both Hall and Donohue so that Petitioner could steal Hall's money (via accessing Hall's bank account via his ATM card) and steal Hall's car and drive himself there. (Filing No. 16-25 at 29-48). The State argued that Petitioner planned to get a ride to Texas with Cross and Padilla, but that on the morning of March 2, Cross backed out because Cross did not want Petitioner riding with them while Petitioner had a gun in his possession. Therefore, Petitioner had to find a different way to get to Texas without a vehicle and without much money, but with a gun. And that ultimately, Petitioner used his gun to murder Hall to take his money and car, and also shot Donahue, who was at Hall's house, to avoid being caught. *See* (*Id.*).

Petitioner was convicted on August 27, 2009, by a jury in the District Court of Hall County, Nebraska, of two counts of first-degree murder, one count of robbery, three counts of use of a deadly weapon to commit a felony, and one count of unauthorized use of a financial transaction device. Petitioner was sentenced to death on each count of murder and prison terms for the other felonies. *See* (Filing No. 1 at pp. 6-7; Filing No. 88 at p. 2; Filing 16-16 at pp. 193-208).

## D. Direct Appeal

Petitioner, still represented by Naylor and Blakeslee, appealed his conviction and sentence to the Nebraska Supreme Court. (Filing No. 16-8). Petitioner argued the trial court erred by overruling his Motion to Suppress Statements, admitting evidence of the alleged kidnapping of Packer addressed in the Packer Case, and admitting the alleged hearsay testimony of several witnesses regarding Petitioner's alleged efforts to get witnesses to testify falsely on his behalf. (Filing No. 16-8 at p. 19). Petitioner also argued the sentencing panel committed the following errors resulting in the sentencing panel receiving the trial bill of exceptions (which allegedly contained inadmissible hearsay): (1) overruling Petitioner's objections to the three-judge sentencing panel's allowance of the retroactive application of Nebraska's death penalty statutes;

(2) failing to find the death penalty statute and aggravators unconstitutional; and (3) for making several other allegedly erroneous factual findings. (Filing No. 16-8 at pp. 19-21).

The Nebraska Supreme Court affirmed Petitioner's convictions and sentences, (Filing No. 16-2), and the mandate was issued in April of 2012, (Filing No. 16-3).

## E. Post-Conviction

### 1. First postconviction motion

Petitioner, *pro se*, first moved for postconviction relief in the District Court of Hall County in May of 2013, raising claims of prosecutorial misconduct and ineffective assistance of counsel. (Filing No. 16-17 at pp. 5-13). On May 28, 2013, Petitioner moved for appointment of counsel. (Filing No. 16-17 at p. 25). The motion was granted, and John Marsh ("Marsh") was appointed as Petitioner's counsel. (Filing No. 16-17 at p. 28).

Petitioner through counsel filed an amended motion for postconviction relief and request for an evidentiary hearing on September 16, 2013, which he again amended on October 30, 2013, (the "First PCM"). (Filing No. 16-17 at pp. 41-42; Filing No. 16-17 at pp. 73-75). In the First PCM, Petitioner alleged the following ineffective assistance of trial counsel claims: (1) failure to address 404 evidence regarding the Packer Case, including the failure to present mitigation evidence regarding the testimony of Ellis, Parker, and Weddell, and a failure to adequately raise issues regarding Packer's phone records; (2) failure to raise issues regarding destruction and contamination of the crime scene; (3) failure to present DNA evidence including the presentation of testimony by Dr. Robert Pyatt; (4) failure to retain evidence including video and a sign-in sheet from the Salvation Army; and (5) failure to retain a mitigation specialist. He also alleged ineffective assistance of appellate counsel for failing to argue *State v. Glazebrook*, 803 N.W.2d 767 (Neb. 2011), regarding 404 error evidence. And finally, he argued the State of Nebraska and its agents withheld evidence, failed to preserve evidence, and engaged in prosecutorial misconduct. (Filing No. 16-17 at pp. 73-75).

In the course of developing the First PCM, Petitioner obtained the depositions of former trial counsel Mowbray (Filing No. 16-34 at pp. 119-62), Mock (Filing No. 16-34 at pp. 193-232), Blakeslee (Filing No. 16-34 at pp. 54-89), and Naylor (Filing No. 16-34 at pp. 9-51), all of which were taken by Marsh. In his deposition, Mock testified about the reason he and Frost withdrew from representing Petitioner prior to his trial:

There was a conflict of interest that occurred because of representation by our Firm of a federal client who we believed may have had favorable information to provide on [Petitioner]'s behalf, but who was placed into a predicament related to the provision of that information in [Petitioner]'s case by the US Attorney's Office, in that the US Attorney's Office had a pending, possible Rule 35, which as you know, is a - - is a motion that can be filed by federal prosecutors to reduce a federal defendant's criminal sentence postconviction for cooperation.

And their opinion was that if Mr. - - if - - if this particular informant/client of ours provided the information in the [Petitioner's] matter, it would jeopardize his right to or I should say jeopardize their willingness to go forward with the Rule 35 motion.

That, of course, placed us into a square conflict between [Petitioner] and the client, current existing client, to the point where after conducting our own individual research, consulting with Counsel for Discipline, and - - and discussing the matter at length within the Firm, we just felt there really wasn't any ethical way that we could proceed because we were putting one client's interest against the interest of the other client and it just - - we couldn't be in the middle of that, so that necessitated our withdrawal.

And I believe we made an application to the court setting forth by affidavit form all the facts related to that conflict and we were then granted leave to withdraw.

(Filing No. 16-34 at pp. 203-04).

On cross examination, Young, counsel for the state, revisited the issue of Mock's and Frost's withdrawal, where Mock confirmed Frost had drafted the Frost Affidavit in support of the motion to withdraw, which was sealed by the trial court. (Filing No. 16-34 at p. 221). Mock also confirmed the other basis for his (and Frost's) withdrawal was a motion Petitioner filed in the Packer Case. (Filing No. 16-34 at p. 222). Young then asked Mock if he had disclosed Gleason as a potential witness to Naylor and Blakeslee, and if Mock made "all the information in [his] possession available" to Naylor and Blakeslee, to which Mock agreed he had. (Filing No. 16-34 at pp. 222-23). Mock then stated that he had spoken with Naylor and Blakeslee about additional avenues they may want to pursue, including deposing Dr. Pyatt and obtaining a handwriting expert, but indicated that Frost was more apt to know what other tasks they had intended to perform as they had divided the work on Petitioner's case. (Filing No. 16-34 at pp. 223-25). Mock also confirmed he (or Frost) had intended to travel to Kansas to speak with Gleason prior to their withdrawal, but he was not asked if he passed on that information to Naylor and Blakeslee. (Filing No. 16-34 at p. 222).

The district court denied Petitioner's First PCM on February 17, 2016.  (Filing No. 16-17 at pp. 87-95).

### 2. Second postconviction motion

In his second postconviction proceeding filed in the District Court of Hall County on June 14, 2017, Petitioner proceeding *pro se*,[6] claimed that his death sentences were unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016), and *Johnson v. U.S.*, 576 U.S. 591 (2015) (the "Second PCM").  (Filing No. 120-1 at pp. 5-39).  The district court found that Petitioner's motion for postconviction relief was time barred under the 1-year limitations period of Neb. Rev. Stat. § 29-3001(4) (Reissue 2016) and denied relief without conducting an evidentiary hearing.  (Filing No. 120-1. at pp. 58-60).  The Nebraska Supreme Court affirmed in *State v. Torres*, 915 N.W.2d 596 (Neb. 2018).

### 3. Third postconviction motion

Petitioner filed a third postconviction motion on December 4, 2017, again proceeding *pro se*,[7] alleging he was entitled to relief based on the proposition that L.B. 268 changed his sentence from the death penalty to life imprisonment and the 2016 public referendum which "reject[ed]" L.B. 268 changed it back to a death sentence (the "Third PCM").  (Filing No. 120-2 at pp. 2-36).  Specifically, Petitioner alleged that the referendum reimposed the death penalty on him and that such imposition was cruel and unusual punishment, violated due process, constituted an unconstitutional bill of attainder that targeted the individuals on death row, and violated separation of powers.  (Filing No. 120-2 at pp. 2-36).  The district court rejected Petitioner's claims based on the insufficiency of allegations in the motion and denied the third postconviction motion without an evidentiary hearing.  (Filing No. 120-2 at pp. 69-71).  Petitioner appealed.  (Filing No. 120-2 at p. 74).

---

[6] Although Petitioner was proceeding pro se, Robert B. Creager made a limited appearance to electronically file Petitioner's Motion to Proceed In Forma Pauperis, a Motion to Appoint Counsel, and a Pro Se Verified Motion for Post-Conviction Relief prepared by Susanne Bales and Stephen Ferrell via the Federal Defender Services of Eastern Tennessee, Inc.  (Filing No. 120-1 at p. 2).

[7] *See* (Filing No. 120-2 at p. 69-71) (denying the Third PCM and denying Petitioner's motion to appoint counsel).

**F. Federal Habeas**

On June 22, 2017, Petitioner filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 with this Court. (Filing No. 1).

## II.  LEGAL STANDARD

Rule 6(a) of the Rules Governing § 2254 Cases provides that a judge may, "for good cause," authorize a federal habeas petitioner to conduct discovery. *See* 28 U.S.C. § 2254 Rule 6(a). Good cause exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The scope and extent of discovery in a given case are matters vested to the discretion of the district court. *See Bracy*, 520 U.S. at 909.

## III.  DISCUSSION

Petitioner seeks to conduct the following discovery:

1. Claim 1, Subpart A.  Petitioner seeks discovery to prove that trial counsel ineffectively failed to investigate and present evidence rebutting the evidence offered as aggravation during the sentencing phase. (Filing No. 124 at p. 2). He argues that this claim is not procedurally defaulted, but that discovery is available under *Martinez/Trevino* because of the withholding of the Gleason Evidence by the State and the actual innocence exception. (Filing No. 124 at p. 8).

2. Claim 6, Subparts A2 and D2.  Petitioner alleges ineffective assistance of counsel for failing to present evidence that would have undermined, rebutted, or impeached the credibility of the State's other acts evidence including: (1) failure to investigate and present the Gleason Evidence which would have contradicted "essential points of the State's case against [Petitioner]," and (2) failure to investigate and present the Gleason Evidence that would have undermined the testimony regarding the alleged Packer kidnapping. See (Filing No. 124 at p. 6; Filing No. 126 at p. 2). Petitioner argues that, while a portion of these general claims were raised and exhausted in the state courts,

the Gleason Evidence was not presented and therefore that portion of the general "failure to present" claim is procedurally defaulted.

3. Claim 8. Petitioner alleges the government withheld the Gleason Evidence in violation of *Brady v. Maryland* (the "Brady Claim"), that the claim is procedurally defaulted, and discovery for the claim is available under *Martinez*/*Trevino* and the actual innocence gateway. See (Filing No. 124 at pp. 6, 9).

Petitioner contends that in relation to his ineffective assistance of counsel claims he is not at fault for his prior counsels' failure to develop those claims, and is therefore entitled to an evidentiary hearing to develop them under the "good cause" standard set forth in *Bracy v. Gramley*, (Filing No. 102 at p. 32) (citing *Shinn*, 596 U.S. at 433; *Bracy*, 520 U.S. at 904 (1997); *Williams*, 529 U.S. 420)); *see also* (Filing No. 70 at pp. 3-5). Petitioner further contends that the holding in *Shinn* does not apply to his *Brady* Claim both because *Shinn* only applies to procedurally defaulted ineffective assistance of counsel claims, and even if it did, where evidence is purposely withheld by the government a criminal defendant and his counsel cannot be at fault for the failure to develop it. And finally, Petitioner argues that the Gleason Evidence "would have shown he is actually innocent of the crime such that it would excuse any procedural default pursuant to *Schlup v. Delo*, 523 U.S. 298 (1995)." (Filing No. 124 at pp. 7-8).

The parties disagree regarding what claims for which Petitioner seeks discovery, are, or are not, procedurally defaulted. (*See e.g.* Filing No. 125 at p. 1) (disagreeing with Petitioner's claim that Claim 1A is not procedurally defaulted). However, because this Court finds that Petitioner is not entitled to discovery for any of the claims discussed in the Discovery Motion, regardless of whether or not they were procedurally defaulted, the Court need not make any findings at this time as to whether any of the claims at issue in the Discovery Motion are or are not procedurally defaulted.

## A. The Ineffective Assistance Claims

The Gleason Evidence is the crux of Petitioner's argument as to why he should be entitled to develop his ineffective assistance of counsel claims. Petitioner alleges the receipt of the Frost Affidavit alerted him to the testimonial evidence Gleason could have provided, which he contends would have factually undermined the State's case against him, impeached several of the State's witnesses, caused the jury to find him not guilty or guilty of a lesser offense, and supported a

sentence of less than death, and he is now entitled to develop those claims in this Court. (Filing No. 1 at pp. 95-96; Filing No. 70 at pp. 23; Filing No. 102 at pp. 31-36). Petitioner argues that because his prior trial counsel, Mock and Frost, were unable to disclose what they had discovered from Gleason to his subsequent counsel, and because the government did not disclose anything about Gleason in any of his state court proceedings, his prior counsel (and, by extension, Petitioner) are not at fault for failing to discover the Gleason Evidence sooner, thereby entitling him to discovery if he can meet the "good cause" standard set forth in *Bracy v. Gramley*. (Filing No. 102 at p. 32; Filing No. 70 at pp. 3-5).

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904. While Rule 6 of the Rules Governing § 2254 Cases allows petitioners to conduct discovery if they show good cause, *Holt v. Howard*, 806 F.3d 1129, 1133 (8th Cir. 2015), before analyzing whether good cause has been shown to facilitate the development of new evidence, a district court must first consider the requirements set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *Shoop v. Twyford*, 596 U.S. 811, 821 (2022); *see also Marcyniuk v. Payne*, 39 F.4th 988, 999-1000 (8th Cir. 2022) (affirming district court's denial of request for discovery and evidentiary hearing where the petitioner could not demonstrate either that § 2254(e)(2) did not apply to him or that he could satisfy § 2254(e)(2)'s requirements).

AEDPA directs how federal courts must consider petitions for habeas relief under § 2254, and generally limits a federal habeas court's review of the evidence and corresponding record to that which was developed in the state court. *Twyford*, 596 U.S. at 819. Therefore, where a claim was adjudicated on the merits in state court, pursuant to § 2254(d)(1) and the United States Supreme Court's holding in *Cullen v. Pinholster*, further evidentiary development of the claim in federal court is barred, limiting review of the claim "to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 181 (2011).

Conversely, where a claim was not adjudicated on the merits in state court because a petitioner failed to raise it before the state courts while state-court remedies were available, that claim is procedurally defaulted. The merits of the procedurally defaulted claim may not be considered by the federal court on habeas review unless a petitioner shows cause for and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case. See *Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977); *Picard v.*

15

*Connor*, 404 U.S. 270, 275-78 (1971). And, factual development of the merits of the procedurally defaulted claim in the federal courts usually cannot occur unless the prisoner can satisfy certain stringent requirements delineated at § 2254(e)(2) as follows:

(A)    the claim relies on - -

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Section 2254(e)(2).

The United States Supreme Court recently clarified the ability of federal habeas petitioners to obtain discovery on procedurally defaulted claims in *Shinn v. Ramirez*. *See Shinn*, 596 U.S. 366. Prior to *Shinn*, under *Martinez*, 566 U.S. 1, federal courts would sometimes hold evidentiary hearings in cases where a criminal defendant had failed to raise ineffective assistance of counsel claims postconviction, where postconviction (as opposed to direct appeal) was their first opportunity to do so. As a result, post-*Martinez*, federal courts could "excuse" the failure to exhaust a claim of ineffective assistance of trial counsel in a postconviction proceeding by holding evidentiary hearings, even though the evidence had not previously been before the state courts. *Black v. Falkenrath*, 93 F.4th 1107, 1109 (8th Cir. 2024) (citing *Sasser v. Hobbs*, 735 F.3d 833, 853-54 (8th Cir. 2013)).

This practice was addressed in *Shinn*, where the Supreme Court held that when a prisoner has failed to develop the factual basis of a claim and cannot satisfy the stringent requirements of § 2254(e)(2)(A), federal habeas courts can no longer simply "excuse" the failure to raise and develop ineffective assistance of counsel claims, and therefore cannot hold an evidentiary hearing or otherwise consider new evidence, either on the merits of the claim or to assess cause and prejudice under *Martinez*. *Shinn*, 596 U.S. at 389. However, the holding in *Shinn* did not wholly preclude evidentiary development of a procedurally defaulted claim in federal court. Indeed, as advocated by Petitioner, under *Shinn*, when a federal habeas petitioner is not at fault for failing to develop an

16

ineffective assistance of counsel claim that could have only been raised for the first time postconviction, the limitations of § 2254(e)(2) do not apply. And in such instances, the applicable standard for determining whether an evidentiary hearing may be held is good cause.

The *Shinn* Court explained that, because on postconviction a state prisoner does not have a constitutionally protected right to counsel, "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record," and is therefore at fault for failing to develop the factual basis of a claim in state-court proceedings for purposes of § 2254(e)(2) even if the failure resulted from the negligence of post-conviction counsel. 596 U.S. at 371, 382-83. But, a prisoner must satisfy the criteria of § 2254(e)(2), only if he is "'at fault' for the undeveloped record in state court.'" *Shinn*, 596 U.S. at 382; *see also Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause and he will be excused from showing compliance with the balance of the subsection's requirements."). As such, courts post-*Shinn*, largely relying on the language from *Shinn* and *Williams*, have considered allowing evidentiary development of procedurally defaulted claims in federal proceedings where a federal petitioner (either on his own or through postconviction counsel) was not "at fault" for the failure to develop his claims, either because he was diligent in his efforts to develop a claim in the state courts but was unable to do so, or because he was otherwise precluded from doing so through no fault of his own. *See e.g. Powell v. Hudson*, No. CV 13-357-GBW, 2024 WL 5262988, at *3 (D. Del. Dec. 31, 2024); *Wholaver v. Wetzel*, No. 1:11-CV-0164, 2022 WL 17082094, at *4 (M.D. Pa. Nov. 18, 2022); *Taylor v. Valentine*, No. 118-CV-00182, 2022 WL 21852199, at *3 (W.D. Ky. July 27, 2022), *report and recommendation adopted*, No. 118-CV-00182, 2023 WL 8788970 (W.D. Ky. June 1, 2023); *Hubbell v. Reagle*, No. 1:20-CV-02217, 2023 WL 3886372, at *6 (S.D. Ind. June 8, 2023).

A prisoner fails to develop a claim for purposes of § 2254(e)(2) when "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. 432. "If there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause." *Id.* at 437. "Diligence in this context 'depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue the claims in state court; it does not depend . . . upon whether those efforts could have been successful.'" *Marcyniuk v. Payne*, 39

F.4th 988, 999 (8th Cir. 2022) (quoting *Williams*, 529 U.S. at 435).  However, "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." *Williams*, 529 U.S. at 432.  Therefore, when a claim goes undeveloped in state court due to something other than the neglect of a federal habeas petitioner, such as the prosecution's concealment of facts or the inability to develop the claim through utilization of the state process, then "§ 2254(e)(2)'s restriction on evidentiary hearings would not apply." *Thompson v. Lumpkin*, --- U.S. ----, 141 S. Ct. 977, 977 (2021) (mem.) (Kagan, J., joined by Breyer & Sotomayor, JJ., concurring in denial of certiorari) (quoting *Williams*, 529 U.S. at 434).

Petitioner argues that, because Mock and Frost did not disclose the specific details regarding the Gleason Evidence contained in the Frost Affidavit, all counsel who followed could not have obtained the information it contained with any level of diligence.  See (Filing No. 124 at pp. 13-14).  While the Court agrees with Petitioner that the record strongly suggests that the specifics of the Frost Affidavit were never given to successor counsel, that fact alone does not preclude the ability of successor counsel from obtaining the Gleason Evidence from another source, such as Gleason himself.

Blakeslee and Naylor were appointed as Petitioner's trial counsel following the voluntary withdrawal of Mock and Frost on December 30, 2008, (Filing No. 16-16 at pp. 39-40), due to the unresolvable conflict arising from Frost's representation of both Gleason and Petitioner arising out of information Gleason appeared to have regarding Petitioner's case.  The Frost Affidavit submitted in support of Mock and Frost's motion to withdraw outlined the information Frost believed Gleason had that was helpful to Petitioner's case, and why Frost and Mock could not utilize such information in Petitioner's case, ultimately necessitating their withdrawal from Petitioner's representation.  *See* (Filing No. 69-1).

Naylor and Blakeslee were not provided a copy of the Frost Affidavit, nor was it available to them from the trial court; however, Mock testified that during the transition of the case he informed Blakeslee that Gleason had information that was of potential value to Petitioner's case, and that Gleason had already been disclosed as a potential witness.  (Filing No. 16-34 at pp. 222-23).  This alone put Naylor and Blakeslee on notice of Gleason's potential value as a witness from the beginning of their representation.  Additionally, on May 13, 2008, Naylor sent a letter to the prosecutor that included a list of proposed trial witnesses, on which Gleason was listed as the first

"lay" witness, (Filing No. 16-16 at p. 52-53), again indicating Naylor and Blakeslee understood that Gleason existed and had potentially valuable information.[8]

Then, a week before trial was scheduled to begin, Blakeslee sent a letter to Gleason dated August 9, 2009, informing Gleason that he was representing Petitioner, and had learned Gleason was a regular visitor to the Hall house and may have information about its security measures and Cross' real reason for going to Texas. Blakeslee also asked Gleason for whatever information Gleason might have about the Hall and Donahue murders and persons potentially involved. Gleason responded in a letter dated August 18, 2009 (the day after Petitioner's trial in the Hall Case started), confirming that Cross told him he was going to Texas to complete a drug transaction and that he was at Hall's residence a week before the murders to complete a drug transaction with Cross and to talk about future business opportunities. Gleason explained he was unable to confirm any details first-hand regarding the Packer Case, other than he had heard that the dispute between Packer and Petitioner was over a cocaine debt, but indicated he was willing to talk if any further questions developed. (Filing No. 124-2).

It is impossible to determine from the record how much of the Gleason Evidence contained in the Frost Affidavit (or elsewhere) that Naylor and Blakeslee knew or understood Gleason may have, or what other attempts they made to obtain the Gleason Evidence prior to Blakeslee's August 9, 2009, letter to Gleason. However, what is clear is that Naylor and Blakeslee did not attempt to raise any claims relating to Gleason with the courts. This is significant because in the usual case diligence requires that the prisoner, "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437.

Mock's testimony and Naylor's inclusion of Gleason on the defense witness list establishes Naylor and Blakeslee knew of Gleason's potential value as a witness, and their later attempt to contact Gleason indicates they were aware that Gleason may possess some of the more specific information contained in the Frost Affidavit that was potentially helpful to Petitioner's defense. It is also clear from Gleason's letter to Blakeslee that all Blakeslee and/or Naylor had to do to obtain the remainder of the Gleason Evidence was to follow up with Gleason. However, it appears from the record that, after receiving the response from Gleason, no attempts were made by Blakeslee

---

[8] Mock testified that Naylor and Blakeslee were solely involved in choosing the witnesses after his and Frost's withdrawal. (Filing No. 16-34 at p. 227).

and/or Naylor to further communicate with Gleason during the trial or during their representation of Petitioner on direct appeal.

Indeed, the record establishes that multiple counsel for Petitioner knew about Gleason and knew at least part of the information Gleason purportedly had relating to Petitioner's case, yet apparently no attempts to obtain information from Gleason were made, aside from one letter to Gleason written a week before Petitioner's trial. While "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla v. Beard*, 545 U.S. 374, 374 (2005), according to Petitioner, the Gleason Evidence was of significant value to Petitioner's case. Regardless of whether Naylor and Blakeslee may have been deficient for failing to further develop the Gleason Evidence or whether they made a strategic decision to not pursue Gleason as a witness, it appears Naylor and Blakeslee could have obtained the Gleason Evidence far sooner than the inadvertent disclosure of the Frost Affidavit to current habeas counsel.

Moreover, even if Naylor and Blakeslee could not have discovered the Gleason Evidence with reasonable diligence, Petitioner's First PCM counsel Marsh certainly could have. In the course of developing the First PCM, Petitioner obtained the depositions of former trial counsel Mock (Filing No. 16-34 at pp. 193-232), which was taken by Marsh. Petitioner notes that Mock testified during his deposition that he and Frost withdrew from Petitioner's case due to a conflict of interest with another client, but points out that Mock does not name Gleason as the other client. (Filing No. 124 at p. 12). Specifically, Petitioner argues that "[a]lthough Gleason's name comes up toward the end of the deposition, Mock does not specify that Gleason is the federal client at the heart of the conflict of interest. [And] Gleason is also not named during the hearing where the trial court allowed Mock and Frost to withdraw." (Filing No. 124 at p. 13 (citing Filing No. 16-18 at pp. 195-99)).

While Petitioner is correct about the factual record, his argument that Mock's deposition does not supply enough of a connection between Mock and Frost's withdrawal and Gleason as the potential witness who necessitated it is a bit of a stretch. Mock specifically mentioned Gleason by name, indicating Gleason was the witness that caused his and Frost's withdrawal, and discussed some of the information Gleason was purported to have in the following exchange between Young, as counsel for the State, and Mock:

> Mock: Gleason had information we thought could be favorable, related to the theory that there were other drug gangs coming into Grand Island that were committing violent acts against certain drug distributors that [Gleason] was

20

aware of. And [Gleason] also had some knowledge about, claimed to have knowledge about, some activities in the house where [the murders] occurred, for example, whether the door was always locked or not.

State:  And by that that would be Ed Hall's house; right?

Mock:  At Ed Hall's. And so - - so - - but he couldn't testify without jeopardizing his Rule 35.

State:  Right.

Mock:  And so that's why we had to get out.

State:  And let me just clarify a little bit, Mr. Mock. He, Mr. Gleason, had - - and you've represented a lot of people who have been involved or at least have been accused of being involved in drug trafficking at various levels - -

Mock:  I have.

State:  - - in the drug enterprise; is that fair?

Mock:  I have.

State:  From the reports in [Petitioner's] file, it would appear that many people involved in the drug trade like to talk about big conspiracies and it seems like it just goes with that, would that be fair? I mean the people that - -

Mock:  Sure. I mean I'm - - I'm not - - I'm not - - I'm not here to say that I know whether or not our client, Mr. Gleason, was telling the truth or not.

State:  Right.

Mock:  It - - it - - it's just that - - that he claimed to have information.

State:  Sure.

Mock:  And - - and it was often - -

State:  Much of the information was about rumors or things he knew - -

Mock:  Right.

State:  - - that had not happened to Ed Hall or Billy Packer or Tim Donahue or to Jose Cross?

Mock:  And - - and others.

State:   It was stuff that had happened to other people - -

Mock:   That's right.

State:   - - that were other drug dealers: is that right?

Mock:   That's right.  But he also had that specific, he'd been - -

State:   About the door being locked?

Mock:   - - over - - he'd been over to the house and he knew, in his opinion, is he
        could testify that  - - that he'd been over there on a number of occasions
        where the door was not locked.

State:   Okay.  In terms of the actual scene of the crime, that's what he had?

Mock:   That's right.

State:   He didn't say they were cooking meth in the basement or anything like that
        did he?

Mock:   I don't remember him saying that.

(Filing No. 16-34 at pp. 229-31).

Marsh's attendance at the deposition alone should have tipped him off that Gleason was the potential witness necessitating Mock's and Frost's withdrawal and provided him with some of the information Gleason was prepared to provide, to the extent he did not already know.  Again, similar to Naylor and Blakeslee, while it is unclear to what extent Marsh knew of Gleason and the information he was purported to have before Mock's deposition, it is clear from Gleason's listing as a potential trial witness for the defense and from Mock's deposition that Marsh was on notice that Gleason had information that was potentially relevant to Petitioner's defense.  Indeed, Marsh could have attempted to develop the claim of ineffective assistance of trial counsel for failure to investigate and present Gleason as a witness at Petitioner's trial since the First PCM was the first opportunity to raise such a claim.  However, no such claim was raised.

It is clear from the record that had either Blakeslee and Naylor as Petitioner's trial counsel, or Marsh as Petitioner's counsel handling his First PCM, acted with reasonable diligence, they could have discovered the Gleason Evidence much sooner than after he filed the instant federal habeas petition.  And, to the extent Marsh failed to raise such a claim, under *Shinn* that failure is

22

also Petitioner's. For these reasons, Petitioner cannot obtain discovery on his ineffective assistance of counsel claims without meeting the requirements of § 2254(e)(2). Finally, because Petitioner makes no argument that he is able to meet the standards set forth in § 2254(e)(2), Petitioner is not entitled to an evidentiary hearing in this Court to excuse or prove any of the ineffective assistance of counsel claims he seeks in the Discovery Motion.[9]

## B. The Brady Claim

Petitioner further argues the Gleason Evidence "was suppressed when the State worked with an Assistant United States Attorney to create a conflict of interest with [Petitioner's] attorneys [ ] Frost and [ ] Mock." (Filing No. 124 at p. 7). Petitioner submits that despite the procedural default of this claim, he is entitled to discovery because the suppression of exculpatory evidence through state action provides the cause for his default. (Filing No. 124 at p. 10) (citing *Strickler v. Green*, 527 U.S. 263, 276 (1999)). Therefore, Petitioner argues he need only meet the cause/prejudice standard to obtain discovery on the Brady Claim. (Filing No. 69 at pp. 151-52).

The Fourteenth Amendment's Due Process Clause protects individuals against the deprivation of life, liberty, or property without due process. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). To establish a due process violation under *Brady*, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. However, "*Brady* is concerned only with cases in which the government possesses information which the defendant does not." *United States v. Mullins*, 22 F.3d 1365, 1371 (1994)). "Furthermore, the *Brady* rule only applies to 'the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). However, "[e]vidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence." *United States v. Deavault*, 190 F.3d 926, 929 (8th Cir. 1999) (quoting *United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998)). As such, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in

---

[9] While Petitioner also argues that he is entitled to an evidentiary hearing on those same claims via his gateway actual innocence argument, as shall be discussed further in this Memorandum and Order, that argument also fails.

question, or if the information was available to him from another source." *See e.g. United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).

This Court does agree with Petitioner that *Shinn's* holding only applies to procedurally defaulted ineffective assistance of counsel claims, and therefore does not apply to claims alleging governmental withholding of exculpatory evidence under *Brady*. However, as discussed in the prior section addressing discovery for Petitioner's ineffective assistance of counsel claims, it is clear that all of Petitioner's counsel after Mock and Frost's withdrawal, with the exercise of reasonable diligence, could have obtained the Gleason Evidence from an alternative source: Gleason himself. Because the allegedly withheld evidence was available from an alternative source, with what appears to be little effort on part of counsel (especially as Gleason indicated he was willing to assist the defense), under Eighth Circuit law there was no suppression of evidence and therefore no claim under *Brady*. *See Strickler*, 527 U.S. at 281-82. As a result, this Court may not grant an evidentiary hearing to determine if the Gleason Evidence was exculpatory or impeaching, if it was withheld, or if the alleged failure of the State to disclose was prejudicial.

### C. Discovery Under the Actual Innocence Gateway

Petitioner submits that he is entitled to discovery on all claims raised in the Discovery Motion under the gateway of actual innocence. (Filing No. 124 at pp. 8-9). Petitioner asserts he has pled facts that, if true, would show that he is "actually innocent" under *Schlup v. Delo*, 513 U.S. 298 (1995), and is therefore entitled to have any procedural default excused, which in turn establishes good cause for proceeding with discovery under *Bracy*. (Filing No. 70 at p. 13).

Respondent cites to *Jones v. Whitmire*, No. 8:20CV275, 2022 WL 2703131 at *16 (D. Neb. July 12, 2022), for the requirements for obtaining review of a procedurally defaulted claim based on actual innocence. Respondent contends Petitioner is unable to meet the actual innocence standard required to excuse procedural default. (Filing No. 88 at pp. 6-7). The Court agrees with Respondent.

The United States Supreme Court has articulated two circumstances in which a federal habeas petitioner can overcome a state procedural default: a prisoner must demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. See *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "To fit within the fundamental miscarriage of justice

exception, a petitioner must make a showing of *actual innocence*." *Weeks v. Bowersox*, 119 F.3d 1342, 1350 (8th Cir. 1997) (emphasis added) (citing *Schlup*, 513 U.S. at 321). The Supreme Court has explained that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (quotations and citation omitted).

The Supreme Court addressed the standard of proof governing review of actual innocence claims, stating that a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. A claim of "gateway" innocence must meet "less of a burden" than actual innocence because it must "establish sufficient doubt about [a criminal defendant's] guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." *Id.* And, in considering such a claim, the reviewing court "is not to make an independent factual determination about what likely occurred" but instead should consider the impact of the new evidence on reasonable jurors. *House v. Bell*, 547 U.S. 518, 538 (2006) (citing *Schlup*, 513 U.S. at 329). Finally, "[b]ecause such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

After review, the Court finds that Petitioner cannot make such a showing. While Petitioner argues the Gleason Evidence combined with the "weak" case against him will establish that he is actually innocent of the crimes for which he was convicted, (Filing No. 70 at p. 13), the Gleason Evidence does no such thing. Petitioner argues that the Gleason Evidence, now supported by Gleason's Declaration, see (Filing No. 69-2), would likely have cast doubt on the credibility of Cross, Packer, and Padilla by providing impeachment evidence regarding Cross' and Padilla's stated reason for leaving for Texas; would have provided information regarding the lack of security at the Hall house; and may have also supported a theory that an alternative perpetrator was to blame for the murders. Although the Court does tend to agree that the Gleason Evidence could potentially accomplish the things Petitioner asserts it could, it is a far cry from establishing that no juror acting reasonably would find Petitioner guilty beyond a reasonable doubt when presented with the Gleason Evidence. *Schlup*, 513 U.S. at 329 ("[A] petitioner does not meet the threshold

requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.").

Finally, it is unclear if Petitioner argues that the standard for obtaining an evidentiary hearing to determine if a federal habeas petitioner may proceed through the actual innocence gateway to present an otherwise procedurally defaulted claim is different than obtaining review of a claim of actual innocence. However, to the extent Petitioner intended to raise such an argument, the Eighth Circuit addressed such an argument in *Weeks* and determined there was not a separate standard for obtaining evidence to prove a gateway actual innocence claim. See *Weeks*, 119 F.3d at 1353 (finding the "[a]doption of a rule that would allow a waiver of a state procedural default based on mere allegations of actual innocence is not only contrary to the express language of *Schlup*, 513 U.S. at 324 . . . but also runs counter to the spirit and purpose of the actual innocence gateway.").

Accordingly, for the foregoing reasons,

**IT IS ORDERED:**

1.     Petitioner's Discovery Motion, (Filing No. 70), is denied.

2.     If Petitioner does not file a timely objection to this Memorandum and Order on or before **March 7, 2025,** Petitioner's Petition will be deemed fully submitted to the Court. No further briefing on the underlying Petition shall be filed without first obtaining leave of Court. Failure to timely object to this Memorandum and Order may constitute a waiver of any objection. See NECivR 72.2.

3.     If Petitioner timely files an objection to this Memorandum and Order, this matter will be held in abeyance pending resolution of any such objection.

Dated this 21st day of February, 2025.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge