IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARCO E. TORRES, JR., | |
| Petitioner, | **4:17CV3078** |
| v. | |
| ROB JEFFREYS, | **MEMORANDUM AND ORDER** |
| Respondent. | |

This matter is before the Court on a Petition for Writ of Habeas Corpus (Filing No. 1) and supplement (Filing No. 28) filed by Marco E. Torres, Jr. ("Torres"). For the reasons that follow, Torres's habeas petition is dismissed with prejudice in its entirety.

## I.   CLAIMS

The Court primarily used the numbered claims and subparts set forth in Torres's supplemental filing, *see* (Filing No. 124 at 2-6), rather than the initial petition, *see* (Filing No. 1), in addressing Torres's claims in this Memorandum and Order.

Claim 1:      Ineffective Assistance of Trial Counsel at Sentencing.[1]

Subpart 1(A):      Failure to investigate and present evidence rebutting the aggravation evidence.

Subpart 1(B):      Failure to investigate, present and argue mitigation and proportionality evidence at the determination hearing.

Subpart 1(B)(1):      Failure to adequately investigate/prepare for the determination phase of Torres's trial.

---

[1]The headings for Claims 1, 4, 5 and 6 are to be read in conjunction with the subparts that follow and are not individual claims. As a result, the headings for Claims 1, 4, 5 and 6 shall be addressed in conjunction with the subparts that follow them and not as individual claims.

Subpart 1(B)(2):    Failure to present adequate evidence at the determination phase of Torres's trial.

Subpart 1(B)(3):    Failure to conduct an adequate mitigation and proportionality investigation resulted in prejudice to Torres in sentencing.

Claim 2[2]:    Nebraska's Capital Sentencing Scheme Requiring a Three-Judge Panel is Unconstitutional in light of *Hurst v. Florida*, 577 U.S. 92, 94 (2016).

Claim 3:    Torres's Death Sentences Rest in Part upon the Unconstitutionally Vague Prior Conduct Circumstance.

Claim 4:    Torres's Death Sentences Are Unconstitutional.

Subpart 4(A):    Torres's death sentence rests upon a prior conduct aggravating circumstance set forth in Neb. Rev. Stat. § 29-2523(1)(a).

Subpart 4(A)(1):    The exhausted claim.

Subpart 4(A)(2):    The newly arising claim.

Subpart 4(B):    Torres's death sentence rests upon the concealment aggravator set forth in Neb. Rev. Stat. § 29-2523(1)(b).

Subpart 4(C):    Torres's death sentence rests upon the aggravator set forth in Neb. Rev. Stat. § 29-2523(1)(d).

Subpart 4(D):    The three-judge panel's reliance upon the subsequently invalidated factor renders his sentence arbitrary and capricious.

Subpart 4(D)(1):    The exhausted claim.

Subpart 4(D)(2):    The newly arising claim.

---

[2]All subparts of Claim 2 listed as Claim 2(A), (A)(1), (A)(2), (B), (B)(1), and (B)(2) are not individual claims but are arguments supporting Claim 2. *See* (Filing No. 124 at 2-3). Therefore, this Court will address Claim 2 as a single claim in conjunction with the arguments made in each listed subpart.

Subpart 4(E):          The State Court unreasonably found [sufficient] evidence supporting the aggravating circumstances.

Subpart 4(E)(1):       Aggravator 1(a), prior conduct under Neb. Stat. Rev. § 29-2523(1)(a).

Subpart 4(E)(2):       Aggravator 1(b), concealment under Neb. Stat. Rev. § 29-2523(1)(b).

Subpart 4(E)(3):       Aggravator (1)(d), heinous, atrocious, cruel, or exceptional depravity under Neb. Stat. Rev. § 29-2523(1)(d).

Subpart 4(E)(4):       Concurrent murders aggravating circumstance under Neb. Stat. Rev. § 29- 2523(1)(e).

Subpart 4(F):          Torres's death sentences are arbitrary, cruel and unusual, and a denial of due process because the three-judge panel refused to give mitigating weight to evidence of Torres's escalating drug use and its effects on his behavior and reasoning abilities.

Subpart 4(G):          Torres's death sentence is unreliable and arbitrary and was procured in violation of his confrontation and due process rights.

Subpart 4(H):          Torres death sentences are arbitrary and capricious because race and/or ethnicity were contributing factors.

Subpart 4(I):          Torres's death sentences do not comport with evolving standards of decency, and are cruel, unusual, arbitrary, and capricious.

Subpart 4(J)(1):       Torres's execution violates the United States Constitution's ban against cruel and unusual punishment.

Subpart 4(J)(2):       Torres's execution violates the United States Constitution's due process clause.

3

Subpart 4(J)(3)[3]: The Repeal of Neb. Legis. B. 268 was an unconstitutional bill of attainder imposing new death sentences without additional judicial process because it:

Subpart 4(J)(3)(a): Specifies affected persons.

Subpart 4(J)(3)(b): Inflicts punishment.

Subpart 4(J)(3)(c): Lacks a judicial trial.

Subpart 4(J)(4): The Referendum Process denied Torres due process and equal protection of the laws.

Claim 5: Torres's Due Process Rights and His Right to a Fair Trial Were Violated When the Nebraska Trial Court Admitted Evidence of Other Criminal Acts.

Subpart 5(A): The admission of extensive and inflammatory evidence of the "Packer incident"[4] prejudiced Torres's right to a fair trial.

Subpart 5(B): The admission of testimony about Torres's alleged efforts to obtain fabricated testimony violated Torres's due process right to a fair trial.

Claim 6: Ineffective Assistance of Counsel During the Guilt Phase of Torres's Capital Trial.

Subpart 6(A):[5] Failure to present available evidence that would have undermined, rebutted, or impeached the credibility of the State's other-acts evidence.

---

[3]Subpart 4(J)(3) is also to be read in conjunction with Subparts 4(J)(3)(a)-(d) and is not an individual claim. Therefore, Subpart 4(J)(3) shall be addressed in conjunction with the subparts that follow and not as an individual claim.

[4]Torres refers to the events which eventually lead to him being charged with and convicted of the robbery and kidnapping of William Packer as the "Packer Incident" throughout his briefing. The Court will utilize that definition throughout this Memorandum and Order.

[5]Torres lists a Claim 6(A) and a Claim 6(A)(2) in his supplemental brief. (Filing No. 124 at 5-6). However, he later clarifies that Claim 6(A)(2) is not a freestanding claim

Subpart 6(B):        Failure to call their retained expert on the contamination of the DNA evidence, to raise issues about the destruction of evidence, and to contest the State's failure to produce exculpatory evidence.

Subpart 6(C):        Multiple failures by counsel undermined confidence in the outcome of Torres's guilty verdict.

Subpart 6(D):[6]      Failure to investigate and present evidence from Rodney Gleason that would have contradicted essential points of the State's case against Torres.

Claim 7:        Torres's Right to a Fair Trial Was Denied When He Was Convicted by a Conviction-Prone Biased Jury and When the Jury Convicted based upon Improper Factors.

Claim 8:        The State of Nebraska Denied Torres's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments When It Failed to Provide Exculpatory and Impeachment Evidence and Committed Other Misconduct.

Claim 9:        Torres Was Denied His Fifth Amendment Right Against Self-Incrimination When the Nebraska Trial Court Admitted Certain Statements Made After He Had Invoked His Right to Silence.

(Filing No. 124 at 2-6).

---

and instead is "an argument that would allow this [C]ourt to consider additional evidence in support of an infectiveness claim that was presented in [Torres's] post-conviction." (Filing No. 126 at 2). Therefore, the Court has omitted Claim 6(A)(2) from the list of claims here and shall not address it individually.

[6]This Claim is listed as "Claim 6(D)(2)" in Torres's supplemental briefing, however there is no (D)(1). *See* (Filing No. 124 at 6). For clarity this Court renumbers this claim as Subpart 6(D) for purposes of this Memorandum and Order. Further, in his supplemental briefing, Torres attempts to clarify that the now-renumbered Subpart 6(D) is actually a subpart of "that same claim" but was listed individually because the argument presented in Subpart 6(D) was "a crucial part of his request for discovery and because they make clear what arguments [Torres] is seeking to support with any evidence obtained by discovery." (Filing No. 126 at 2). Because it is unclear what Subpart of Claim 6 Torres's "same claim" reference is to, this Court shall address Subpart 6(D) individually.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Crimes

Ed Hall ("Hall"), Tim Donohue ("Donohue"), Jose Cross ("Cross"), and Gina Padilla ("Padilla") all resided at a house belonging to Hall in Grand Island, Nebraska (the "Hall residence"). Cross and Padilla were in a romantic relationship and shared one of the upstairs bedrooms of the Hall residence. (Filing No. 16-20 at 66-71). The Hall residence was regularly used by Cross to deal drugs. *See* (Filing No. 16-2 at 6). Cross was acquainted with another drug dealer named William Packer ("Packer"). (*Id.*). It was through Packer that Torres met Cross, Padilla, and Donohue. (*Id.*).

On March 5, 2007, police officers went to the Hall residence in response to a welfare check call made by Padilla. (Filing No. 16-23 at 39). Upon their arrival, the police met with Cross and Padilla who were outside the Hall residence. (Filing No. 16-20 at 50-51). Padilla informed the police she and Cross had not entered the Hall residence because all of the lights were off in the house, which they believed was strange. (Filing No. 16-23 at 39). Upon entering the Hall residence, the police found the bodies of two Caucasian males later determined to be Hall and Donohue. (Filing No. 16-20 at 65-71). Both had been shot to death.[7] (Filing No. 16-2 at 6; Filing No. 16-20 at 67-68). Hall's body was found on the first floor, where Hall had been tied up with an extension cord, gagged, and shot. (Filing No. 16-20 at 67-68). Donohue's body was found a few minutes later in the upstairs bedroom he had been living in, also having been shot. (Filing No. 16-20 at 71-73).

### B.    The Investigation

Padilla and Cross were taken to the police station that same day where Padilla gave the police their phones and cameras but made no mention of Torres. (Filing No. 16-23 at 40). Cross and Padilla informed the police that they had left to drive to Texas with Padilla's mother to visit a sick relative of Padilla's early on the morning of March 2, 2007, and did

---

[7]Investigators were unable to determine a precise time of death for either Hall or Donahue, believing that both died at or around the same time on March 3, 2007, or possibly in the early hours of March 4. *See* (Filing No. 16-2 at 6).

not return until March 5, when they returned to the Hall residence, found the scene suspicious, and called the police. (Filing No. 16-2 at 7).

The police spoke with Padilla and Cross again in the days following the murders. At that time, the couple provided details about their prior interactions with Torres and Packer, mentioning the Packer incident for the first time, which the Nebraska Supreme Court described as follows:

> On February 12, 2007, Packer called Cross and asked Cross for permission to stop by [the Hall residence], where Cross was living. Cross agreed. But, Cross said, when Packer arrived, Torres was with Packer, holding Packer at gunpoint. Torres then forced Cross and Packer into Cross and Padilla's room. Torres made Cross bind Packer with duct tape. Torres took Packer's ATM card, obtained the personal identification number for the card, and ordered Cross and Padilla to withdraw nearly $800 from the account. Cross gave the money to Torres. Eventually, Torres released Packer, Cross, and Padilla, but took and kept Packer's money and Packer's cellular telephone. Cross testified that Torres let Packer go after Cross agreed to provide transportation for Torres to Texas.
>
> During this event, Torres made Packer contact the Lincoln and Omaha airport authorities, as well as two airlines and various other individuals, in order to obtain a plane ticket to get Torres to Texas. Apparently, Torres planned to fly to Texas to meet with some associates. Meanwhile, Cross was to drive to Texas to deliver a package of "ice," a potent form of methamphetamine, for Torres. Though apparently Packer was unable to provide the "ice" to Torres, Torres attempted to fill the order so it could be taken to Texas. Though the record is not clear about the details, Torres apparently kidnapped Packer in an attempt to make him fill the order for "ice," which Torres needed to be delivered to Texas. Cross testified that during the kidnapping and the days following, he made certain promises to Torres involving driving Torres to Texas because Cross wanted to "get rid of the problem, which was to take [Torres] back to [Texas]."

(Filing No. 16-2 at 11). As a result of the police conversations with Cross and Padilla, the police sought out Torres for questioning in the Hall and Donohue murders. Torres admitted to using Hall's ATM card and vehicle, alleging that Hall had given him permission to use the card to get money to help Torres get back to Texas, and that Cross's brother gave Torres

7

permission to take Hall's car on March 5.[8]  (Filing No. 16-2 at 7-8).  Torres also admitted to abandoning the car after he learned of the murders, knowing he was a suspect, but denied any involvement.  (*Id.* at 8).

In investigating the Hall and Donohue murders, investigators ordered DNA testing on several objects found in the Hall residence.  Torres's DNA was found in a mixture with Hall's DNA on the extension cord binding Hall, and Torres's DNA was a contributor to the DNA found on cigarette butts found in Donohue's room.  (Filing No. 16-2 at 6).

### C.    Pre-trial

As a result of the investigations, prosecutors filed two separate cases in Hall County, Nebraska.  In the first case, Torres was charged with kidnapping, robbery, and two associated use-of-a-firearm counts resulting from the Packer incident (the "Packer case"). In the second case, which is the subject of the petition before this Court, Torres was charged with two counts of first-degree murder for the deaths of Hall and Donohue, *see* Neb. Rev. Stat. § 28-303(1); three counts of use of a deadly weapon in commission of a felony, *see* Neb. Rev. Stat. § 28-1205(1); one count of robbery, *see* Neb. Rev. Stat. § 28-324(1), and one count of unauthorized use of a financial-transaction device, *see* Neb. Rev. Stat. § 28-620 (the "Hall case").  *See* (Filing No. 16-15 at 1).

The Nebraska Commission on Public Advocacy (the "Commission") was appointed to represent Torres in both the Packer and Hall cases with James Mowbray ("Mowbray") serving as counsel.  (Filing No. 16-18 at 27; Filing No. 16-34 at 123-24).  On June 12, 2007, Torres was arraigned, and trial was set in both cases for November 5, 2007.  (Filing No. 16-18 at 35).  The Packer case trial was held first.  On November 7, 2007, a Hall County jury convicted Torres of robbery and kidnapping.  (Filing No. 16-2 at 11).  Later,

---

[8]Torres was filmed driving Hall's car and using Hall's ATM card on March 3. (Filing No. 16-20 at 167-68).

Torres was sentenced to consecutive terms totaling 90 to 140 years' imprisonment (the "Packer conviction"). *See* (Filing No. 16-2 at 11; Filing No. 16-28 at 267-68).

On January 9, 2008, before sentencing in the Packer case, Mowbray moved to withdraw as Torres's counsel in the Hall case due to what Mowbray described as a conflict of interest. (Filing No. 16-18 at 86-99). Mowbray's motion in the Hall case was granted, and he remained as Torres's counsel in the Packer case only. (Filing No. 16-18 at 86-99).

Due to Mowbray's withdrawal in the Hall case, on January 23, 2008, Clarence Mock ("Mock") of the firm Johnson & Mock was appointed as Torres's new counsel. (Filing No. 16-15 at 167). Denise Frost ("Frost"), also of Mock's firm, joined in Torres's representation. *See, e.g.*, (Filing No. 16-15 at 219). At the time, Frost also represented Rodney Gleason ("Gleason") on federal drug charges. Through her representation of Gleason, Frost became aware that Gleason knew the victims and most of the witnesses in Torres's case and that Gleason was able to provide information that would be helpful to Torres.

Frost discovered that Gleason was personally acquainted with decedents Hall and Donohue as well as many of the witnesses in Torres's case including Cross, Padilla, and Packer, and that Gleason had visited the Hall residence many times before the homicides. (Filing No. 69-1 at 3). Gleason told Frost information that contradicted the testimony of Cross and Padilla regarding the security measures (or lack thereof) utilized at the Hall residence, their reason for leaving the state when the homicides occurred, and the nature of their drug-dealing business.[9] (Filing No. 69-1 at p. 3).

As a result of her conversations with Gleason, Frost notified Hall County attorney Mark Young ("Young") that she may call Gleason as a defense witness, after which Young sought to depose Gleason. (Filing No. 69-1 at 5). Frost requested that Young grant

---

[9]The information given to Frost from Gleason shall be referred to as the "Gleason evidence" in this Memorandum and Order for ease of reference only.

Gleason immunity for any responses to Young's questions that went beyond the scope of the intended use of Gleason's testimony, but Young denied the request. (Filing No. 69-1 at 5). Frost then contacted Assistant United States Attorney Sara Fullerton ("Fullerton"), who appeared to already know of Frost's intention to call Gleason as a defense witness. Fullerton indicated that if Gleason did testify, the U.S. Attorney may forgo filing a motion to reduce Gleason's sentence regardless of how substantial Gleason's assistance to the government had been in his case. (Filing No. 69-1 at 5).

Ultimately, Frost believed that if the U.S. Attorney did not file a motion to reduce Gleason's sentence if Gleason testified at Torres's trial, it would be severely detrimental to Gleason; however, Frost also believed Gleason's potential testimony would be extremely helpful to Torres. (Filing No. 69-1 at 6). After conferring with ethics counsel, Frost determined that neither she nor Mock could continue their representation of Torres or even discuss Gleason's information with Torres, as Torres could then subpoena Gleason to obtain his testimony to Gleason's possible detriment. (Filing No. 69-1 at 6).

On November 10, 2008, before moving to withdraw as Torres's counsel, Mock deposed Cross and specifically asked about Gleason. Mock confirmed Cross knew Gleason, that Cross and Gleason sold drugs together, that Gleason knew Hall before Cross, and that Gleason had been to Hall's house many times. (Filing No. 51-18 at 11-14, 42). Mock also asked Cross about conversations he may have had with Gleason about Cross's reason for his and Padilla's trip to Texas on March 2, 2007, before their departure. Specifically, Mock asked Cross whether he told Gleason he was going to Texas "to score some dope," not to see Padilla's dying uncle, which Cross denied. (Filing No. 51-18 at 42).

Eventually, Mock (and Frost) moved to withdraw from representing Torres on December 18, 2008, pursuant to Nebraska Rules of Professional Conduct § 3-501.7 (governing conflict of interest for current clients) and § 3-501.9 (governing duties to former

10

clients).   (Filing No. 16-16 at 37).   In support of their withdrawal, Frost provided an affidavit to the trial court (the "Frost Affidavit").[10]

(Filing No. 69-1 at 1-7).[11]

The court granted Mock and Frost's motion to withdraw on December 30, 2008, (Filing No. 16-16 at 39-40), resulting in Peter Blakeslee ("Blakeslee") and Kirk Naylor ("Naylor") being appointed as Torres's new trial counsel.

Naylor filed a motion to continue the trial because of the time required to review the voluminous file, and because of delays in receiving the file due to Mock's desire to copy the file before providing it to Naylor.   The motion was granted, and Torres's trial was continued to August 17, 2009.   (Filing No. 16-16 at 48).   On May 13, 2008, Naylor provided a letter to the prosecutor including a list of witnesses whom he intended to call, on which Gleason was listed as the first "lay" witness.   (Filing No. 16-16 at 52-53).

A week before the trial was scheduled to start, on August 9, 2009, Blakeslee sent a letter to Gleason informing Gleason of his representation of Torres in the Hall case, and indicating he learned Gleason might know something about the Hall and Donahue murders. (Filing No. 124-1 at p. 1).   In his letter to Gleason, Blakeslee indicated he learned that Gleason was a regular visitor at the Hall residence and was acquainted with Cross.   (Filing No. 124-1 at 1).   Blakeslee further indicated he had learned that Cross told Gleason that Cross was going to Texas to engage in a drug transaction, not to visit a sick relative as Cross planned to testify.   Blakeslee asked if Gleason had any other information concerning Cross; Cross's brother, Carlos Ponce; Packer; "Bam Bam (Andrew) Weddie; and/or MJ

---

[10] The details of the Frost Affidavit were described by the Court.   *See* (Filing No. 128 at 5-7).

[11]Frost also provided a second affidavit in support of Torres's Discovery Motion, "reaffirming" the accuracy of the Frost Affidavit as true and accurate.   (Filing No. 69-1 at 8-10).

11

Gosch"; and sought any information Gleason may have about the security measures in place at the Hall residence generally. (Filing No. 124-1 at 1-2).

On August 18, 2009, Gleason responded to Blakeslee's letter, confirming that Cross told him on March 2 (before the Hall and Donahue murders), that Cross was going to Texas to complete a drug transaction. Gleason also confirmed he was at the Hall residence a week before the murders to complete a drug transaction with Cross and to talk about future business opportunities. (Filing No. 124-2). Gleason explained he was unable to confirm any details regarding the Packer case other than he had heard that the dispute between Packer and Torres was over a cocaine debt, but that he could not confirm any details first-hand. (Filing No. 124-2). It does not appear from the record that Blakeslee or Naylor spoke with or otherwise learned any more of the information Gleason possessed before or following Torres's trial.

### D.    Trial, Conviction and Sentence

The trial in the Hall case was held from August 17 to August 27, 2009, in the District Court of Hall County, Nebraska. *See* (Filing No. 16-20 at 24-234; Filing No. 16-21; Filing No. 16-22; Filing No. 16-23; Filing No. 16-24; and Filing No. 16-25 at 24-103). The State's theory of the case presented in its closing argument at Torres's trial was that Torres really wanted to get to Texas, and that Torres murdered both Hall and Donohue so that Torres could steal Hall's money (via accessing Hall's bank account via his ATM card) and steal Hall's car and drive himself there. (Filing No. 16-25 at 29-48). The State argued that Torres planned to get a ride to Texas with Cross and Padilla, but that on the morning of March 2, Cross backed out because Cross did not want Torres riding with them while Torres had a gun in his possession. Therefore, Torres had to find a different way to get to Texas without a vehicle and without much money but with a gun. And that ultimately, Torres used his gun to murder Hall to take his money and car, and also shot Donahue, who was at Hall's house, to avoid being caught.

12

A jury convicted Torres in the Hall case on August 27, 2009, of two counts of first-degree murder, one count of robbery, three counts of use of a deadly weapon to commit a felony, and one count of unauthorized use of a financial-transaction device.

A three-judge panel consisting of the trial judge and two other judges who were previously uninvolved in Torres's case (the "panel") was appointed by the Nebraska Supreme Court pursuant to Neb. Rev. Stat. § 29-2521 (1)(a) to conduct sentencing in the Hall case.  The panel conducted a sentencing hearing on November 13, 2009, where the prosecution offered the trial record of the guilt proceedings into evidence to establish the following four aggravating circumstances as set forth in Neb. Rev. Stat. § 29-2523(1):

> (a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial prior history of serious assaultive or terrorizing criminal activity;[12]
>
> (b) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of such crime;[13]
>
> . . . .
>
> (d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;[14]
>
> (e) At the time the murder was committed, the offender also committed another murder[.][15]

*See* (Filing Nos. 16-25 at 112, 16-30, and 16-31).

---

[12]Neb. Rev. Stat. § 29-2521(1)(a) will be referred to as the "Prior Conduct Aggravator" throughout this Memorandum and Order.

[13]Neb. Rev. Stat. § 29-2521(1)(b) will be referred to as the "Concealment Aggravator" throughout this Memorandum and Order.

[14]Neb. Rev. Stat. § 29-2521(1)(d) will be referred to as the "HAC/Depravity Aggravator" throughout this Memorandum and Order.

[15]Neb. Rev. Stat. § 29-2521(1)(e) willl be referred to as the "Concurrent Aggravator" throughout this Memorandum and Order.

13

Torres was sentenced to death on each count of murder and given prison terms for the other felonies. *See* (Filing No. 1 at 6-7; Filing No. 88 at 2; Filing 16-16 at 193-208).

### E.     Direct Appeal

Torres, still represented by Naylor and Blakeslee, appealed his conviction and sentence to the Nebraska Supreme Court (the "direct appeal"). (Filing No. 16-8). Torres argued the trial court erred by overruling his Motion to Suppress Statements, admitting evidence of the alleged kidnapping of Packer addressed in the Packer case, and admitting the alleged hearsay testimony of several witnesses regarding Torres's alleged efforts to get witnesses to testify falsely on his behalf. (Filing No. 16-8 at p. 19). Torres also argued the panel committed the following errors resulting in the sentencing panel receiving the trial bill of exceptions (which allegedly contained inadmissible hearsay): (1) overruling Torres's objections to the three-judge sentencing panel's allowance of the retroactive application of Nebraska's death-penalty statutes; (2) failing to find the death-penalty statute and aggravators unconstitutional; and (3) for making several other allegedly erroneous factual findings. (Filing No. 16-8 at 19-21).

The Nebraska Supreme Court construed Torres's claims as claims of trial court error and sentencing panel error. (Filing No. 16-2 at 9-10). Specifically, the Court found that Torres raised the following trial court error claims: (1) admission of evidence of prior acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27–404(2), (2) admission of testimony of two witnesses regarding Torres's efforts to obtain false testimony from those witnesses, and (3) overruling Torres's motion to suppress. (Filing No. 16-2 at 9). The court found that Torres raised the following sentencing-panel errors: (1) receiving, over Torres's objection, the trial court's bill of exceptions for purposes of the State's proof of aggravating circumstances, (2) retroactive application of Neb. Rev. Stat. §§ 83–964 to 83–972, (3) not finding that § 83-964 is unconstitutional in violation of the distribution of powers clause of the Nebraska Constitution, Nebraska case law, and the Due Process and Equal Protection Clauses of the 14th Amendment to the U.S. Constitution; (4) not finding Neb. Rev. Stat. §§ 29–2519 to 29–2546 unconstitutional on their face; (5) not finding the Prior Conduct,

14

Concealment, and HAC/Depravity Aggravators as facially unconstitutional or as applied to Torres; (6) using "the victim's 'mental suffering' and the 'victim's uncertainty as to [his] ultimate fate'" as support for finding that Hall's murder was "especially heinous, atrocious, cruel" under the HAC/Depravity Aggravator and also finding that the State proved this aggravator beyond a reasonable doubt; (7) finding that the State proved beyond a reasonable doubt the existence of the Prior Conduct and Concealment aggravators; and (8) concluding that no statutory or non-statutory mitigating factors existed. (Filing No. 16-2 at 9-10).

The Nebraska Supreme Court affirmed Torres's convictions and sentences (hereinafter "*Torres I*"), (Filing No. 16-2), and the mandate was issued in April of 2012, (Filing No. 16-3).

### F.    Postconviction
#### 1.    First Postconviction Motion

Torres, *pro se*, first moved for postconviction relief in the District Court of Hall County in May of 2013, raising claims of prosecutorial misconduct and ineffective assistance of counsel. (Filing No. 16-17 at 5-13). On May 28, 2013, Torres moved for appointment of counsel. (Filing No. 16-17 at 25). The motion was granted, and John Marsh ("Marsh") was appointed as Torres's counsel. (Filing No. 16-17 at 28).

Torres through counsel filed an amended motion for postconviction relief and request for an evidentiary hearing on September 16, 2013, which he again amended on October 30, 2013, (the "First PCM"). (Filing No. 16-17 at 41-42; Filing No. 16-17 at 73-75). In the First PCM, Torres alleged the following ineffective-assistance-of-trial-counsel claims: (1) failure to address "404" evidence regarding the Packer case including the failure to call several witnesses and a failure to adequately raise issues regarding Packer's phone records; (2) failure to raise issues regarding destruction and contamination of the crime scene; (3) failure to present DNA evidence including the presentation of testimony by Dr. Robert Pyatt ("Dr. Pyatt"); (4) failure to retain evidence, including video

15

and a sign-in sheet from the Salvation Army; and (5) failure to retain a mitigation specialist. He also alleged ineffective assistance of appellate counsel for failing to argue *State v. Glazebrook*, 803 N.W.2d 767 (Neb. 2011), regarding "404" evidence. Finally, he argued that the State of Nebraska and its agents withheld evidence, failed to preserve evidence, and engaged in prosecutorial misconduct. (Filing No. 16-17 at 73-75).

In the course of developing the First PCM, Torres obtained the depositions of former trial counsel Mowbray (Filing No. 16-34 at 119-62), Mock (Filing No. 16-34 at 193-232), Blakeslee (Filing No. 16-34 at 54-89), and Naylor (Filing No. 16-34 at 9-51), all of which were taken by Marsh. The main focus of the Mock deposition was why he and Frost withdrew from representing Torres before trial. On that topic, Mock provided the following testimony:

> There was a conflict of interest that occurred because of representation by our Firm of a federal client who we believed may have had favorable information to provide on [Torres's] behalf, but who was placed into a predicament related to the provision of that information in [Torres's] case by the US Attorney's Office, in that the US Attorney's Office had a pending, possible Rule 35, which as you know, is a - - is a motion that can be filed by federal prosecutors to reduce a federal defendant's criminal sentence postconviction for cooperation.
>
> And their opinion was that if Mr. - - if - - if this particular informant/client of ours provided the information in the Torres matter, it would jeopardize his right to or I should say jeopardize their willingness to go forward with the Rule 35 motion.
>
> That, of course, placed us into a square conflict between [Torres] and the client, current existing client, to the point where after conducting our own individual research, consulting with Counsel for Discipline, and - - and discussing the matter at length within the Firm, we just felt there really wasn't any ethical way that we could proceed because we were putting one client's interest against the interest of the other client and it just - - we couldn't be in the middle of that, so that necessitated our withdrawal.

> And I believe we made an application to the court setting forth by affidavit form all the facts related to that conflict and we were then granted leave to withdraw.

(Filing No. 16-34 at 203-04).

On cross examination, Young, counsel for the state, revisited the issue of Mock's and Frost's withdrawals, where Mock confirmed Frost had drafted the Frost Affidavit in support of the motion to withdraw, which was sealed by the trial court. (Filing No. 16-34 at 221). Mock also confirmed the other basis for his (and Frost's) withdrawals was a motion Torres filed in the Packer case. (Filing No. 16-34 at 222). Young then asked Mock if he had disclosed Gleason as a potential witness to Naylor and Blakeslee, and if Mock made "all the information in [his] possession available" to Naylor and Blakeslee, to which Mock agreed he had. (Filing No. 16-34 at 222-23). Mock then stated that he had spoken with Naylor and Blakeslee about additional avenues they may want to pursue, including deposing Dr. Pyatt and obtaining a handwriting expert, but indicated that Frost was more apt to know what other tasks they had intended to perform as they had divided the work on Torres's case. (Filing No. 16-34 at 223-25). Mock also confirmed he (or Frost) had intended to travel to Kansas to speak with Gleason before their withdrawals, but he was not asked if he passed on that information to Naylor and Blakeslee. (Filing No. 16-34 at 222).

The focus of Blakeslee's and Naylor's depositions related to various ineffective-assistance-of-counsel claims, including their actions in preparing for and addressing the sentencing phase of Torres's trial. Specifically, they answered questions about Torres's mental competence, plea offerings, defense guilt-phase strategies, including collection of evidence and investigation and experts who were consulted with and why they were used at trial (or why not), Torres's theories about who committed the Hall and Donohue murders and his innocence, Torres's drug use and drug-dealing activities, and penalty-phase strategies. (Filing No. 16-34 at 9-54 and 54-89). In relation to mitigation efforts, Naylor testified that he was unfamiliar with the term "mitigation specialist" but that he and

17

Blakeslee "wanted to develop anything that would be a mitigator . . . stress[ing] the theory of intoxication as it related to methamphetamine use . . . [as i]t ran through both – the – Packer [conviction] . . . and the [Hall case]." (Filing No. 16-34 at 27-28).

The district court denied Torres's First PCM on February 17, 2016, (Filing No. 16-17 at 87-95), and its denial was affirmed a year later on February 17, 2017, by the Nebraska Supreme Court (hereinafter "*Torres II*") (Filing No. 16-6).

### 2.    Second Postconviction Motion

In his second postconviction proceeding filed in the District Court of Hall County on June 14, 2017, Torres, proceeding *pro se*,[16] claimed that his death sentences were unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016), and *Johnson v. United States*, 576 U.S. 591 (2015) (the "Second PCM"). (Filing No. 120-1 at 5-39). The district court found that the Second PCM was time barred by the one-year limitation period in Neb. Rev. Stat. § 29-3001(4) and denied relief without conducting an evidentiary hearing. (Filing No. 120-1. at 58-60). The Nebraska Supreme Court affirmed in *State v. Torres*, 915 N.W.2d 596 (Neb. 2018) (hereinafter "*Torres III*"). (Filing No. 51-1).

### 3.    Third Postconviction Motion

Torres filed a third postconviction motion on December 4, 2017, again proceeding *pro se*,[17] alleging he was entitled to relief based on the proposition that L.B. 268 changed his sentence from the death penalty to life imprisonment and the 2016 public referendum which "reject[ed]" L.B. 268 changed it back to a death sentence (the "Third PCM"). (Filing No. 120-2 at 2-36). Specifically, Torres alleged that the referendum reimposed the death

---

[16]Although Torres was proceeding pro se, Robert B. Creager made a limited appearance to electronically file Torres's Motion to Proceed In Forma Pauperis, a Motion to Appoint Counsel, and a Pro Se Verified Motion for Post-Conviction Relief prepared by Susanne Bales and Stephen Ferrell via the Federal Defender Services of Eastern Tennessee, Inc. (Filing No. 120-1 at 2).

[17]*See* (Filing No. 120-2 at 69-71) (denying the Third PCM and denying Torres's motion to appoint counsel).

penalty on him and that such imposition was cruel and unusual punishment, violated due process, constituted an unconstitutional bill of attainder that targeted the individuals on death row, and violated the separation of powers. (Filing No. 120-2 at 2-36). The district court rejected Torres's claims based on the insufficiency of allegations in the motion and denied the third postconviction motion without an evidentiary hearing. (Filing No. 120-2 at 69-71). Torres appealed, (Filing No. 120-2 at 74), and the Nebraska Supreme Court denied all relief sought in Torres's Third PCM (hereinafter "*Torres IV*"), *see* (Filing No. 51-2).

### G.   Federal Habeas

On June 22, 2017, Torres filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 with this Court (the "petition"). (Filing No. 1 at 2-5).

On October 6, 2017, the respondent filed the state court record (Filing No. 16) and his answer (Filing No. 17). On October 16, 2017, Torres filed an unopposed motion seeking additional time to file a motion for additional documents in designation of relevant state court record (Filing No. 18), which the Court granted the following day, allowing the extension and requiring Torres to explain the reasons the documents are relevant to his claims (Filing No. 19).

On November 1, 2017, Torres filed a motion to stay the proceedings (Filing No. 20) and on November 6, 2017, Torres filed a motion requesting that the respondent file additional relevant state court documents (Filing No. 21). On December 4, 2017, Torres filed a motion to amend his petition (Filing No. 26). The respondent did not oppose Torres's motion to amend or motion requesting the respondent to file additional state court documents, and on January 10, 2018, the Court granted both motions. (Filing No. 27). The Court directed Torres to file the amendment to the petition on or before January 19, 2018; set the respondent's responsive-pleading deadline for thirty days after the amended petition was filed; and ordered the respondent to file the additional state-court documents by February 28, 2018. (Filing No. 27).

Torres filed his amendment on January 19, 2018, supplementing Claim 4 of the petition with several additional subparts (the "supplement"). (Filing No. 28). On February 20, 2018, the respondent filed an answer to the supplement. (Filing No. 29). On February 28, 2018, the respondent filed an unopposed motion requesting an extension of time to file the supplemental state-court records until the conclusion of the Nebraska Supreme Court review of the denial of Torres's successive postconviction motion. (Filing No. 30). The Court granted the motion and stayed the respondent's deadline to file the supplemental state-court records until the conclusion of the Nebraska Supreme Court appeal.

On June 29, 2018, the Court granted Torres's motion to stay this case pursuant to *Rhines v. Weber*, 544 U.S. 269, 273 (2005). (Filing No. 32). The Court granted two subsequent motions to continue the stay (Filing No. 35; Filing No. 37). On October 19, 2020, the Court lifted the stay after Torres notified the Court that the United States Supreme Court denied his petition for a writ of certiorari and ordered the respondent to file a response by November 18, 2020. (Filing No. 42). On November 18, 2020, the respondent filed an unopposed motion for an extension of time to file a responsive pleading (Filing No. 43), which the Court granted (Filing No. 44).

On December 21, 2020, the respondent filed an answer to the petition and supplement. (Filing No. 45). On January 20, 2021, the Court entered a Progression Order (Filing No. 46), ordering the respondent to file an additional designation of state-court records relevant to the petition and supplement within sixty days. On March 19, 2021, the Court granted (Filing No. 50) the respondent's unopposed motion (Filing No. 49) to extend the deadline to file the additional designation of state court records. The respondent filed the supplemental designation of state court records on April 21, 2021. (Filing No. 51).

On March 31, 2022, Torres filed his "initial brief addressing all matters germane to the case and Torres' habeas claims pursuant to court order" (Filing No. 69) and the discovery motion (Filing No. 70). The respondent filed his opposition (Filing No. 88) on

January 9, 2023, addressing both Torres's brief and the discovery motion. Torres filed a reply (Filing No. 102) on December 6, 2023, also addressing both the merits of his petition and his discovery motion. Oral argument on the merits of the petition and the discovery motion was held on February 8, 2024. *See* (Filing No. 115) (containing a recording of February 8, 2024, hearing). The respondent again supplemented the state-court record on February 15, 2024. (Filing No. 120).

After argument, the Court ordered additional briefing requiring Torres to file a three-part supplement providing: (1) a numbered list of all claims raised in the petition and supplement, listing the subparts of each claim by letter, consistent with the numbered claims previously utilized in the petition and supplement and a page reference to where the claim is set forth in the petition or supplement, (2) clarification (utilizing the numbered list of claims) as to whether Torres seeks discovery on each claim/subpart, if each claim is or is not procedurally defaulted, and why he contends he is entitled to discovery on the claims he sought to obtain it, and (3) the basis for allowing discovery for Torres's *Brady*[18] claim and for each ineffective-assistance-of-counsel claim or subpart for which he sought discovery. (Filing No. 121 at 13-15). This Court ordered the respondent to file a two-section supplement addressing: (1) Torres's procedural default arguments for each claim, and (2) responding to Torres's substantive arguments relating to the claims for which Torres sought discovery. (Filing No. 121 at 15-16).

Each party complied (Filing Nos. 124, 125, and 126), and on February 21, 2025, the magistrate judge issued a Memorandum and Order (Filing No. 128) denying Torres's discovery motion. Torres filed objections to the denial (Filing No. 129), all of which the Court overruled (Filing No. 130).

---

[18]*See Brady v. Maryland*, 373 U.S. 83 (1963).

21

## III.   OVERVIEW OF APPLICABLE LAW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition "for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  An application for a writ of habeas corpus filed in federal court by a person in custody pursuant to the judgment of a State court generally may not be granted unless the applicant has *exhausted the remedies available in the courts of the State*.[19]  28 U.S.C. § 2254(b)(1)(A).  Therefore, for a federal court to consider each federal claim raised in an application on its merits, the state courts must have been given a "full and fair opportunity" to resolve the claim "by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Moreover, habeas relief is available only when a claim *adjudicated on the merits in state court* resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *Smith v. Titus*, 958 F.3d 687, 691 (8th Cir. 2020) (emphasis added) (citing 28 U.S.C. § 2254(d)).  Conversely, federal review of claims set forth in a habeas petition is precluded when a federal habeas petitioner failed to exhaust his claims by giving them a full round of review in the state courts or if the state court dismisses or rejects a prisoner's claims on independent and adequate state grounds[20] unless

---

[19]Relief is also potentially available where there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant.  *See* 28 U.S.C. § 2254(b)(1)(B).

[20]Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'"

22

a petitioner can demonstrate either (1) cause and prejudice or (2) actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## IV.    DISCUSSION

### A.    Claim 1

Claim 1 sets forth the following claims of ineffective assistance of counsel at sentencing: Subpart 1(A) alleging failure to investigate and present evidence rebutting the State's aggravation evidence; Subpart 1(B)(1) alleging failure to adequately investigate potential mitigation evidence for the determination hearing; Subpart 1(B)(2) alleging failure to present adequate mitigation evidence to the panel at the determination hearing; and Subpart 1(B)(3) alleging counsel's failure to conduct an adequate mitigation and proportionality investigation prejudiced Torres. (Filing No. 124 at 2). The respondent argues that the only portion of Claim 1 that is reviewable on its merits is Torres's argument that his counsel failed to obtain a mitigation specialist as generally addressed in Subparts 1(B)(1)-(3), but that the remainder of the arguments set forth in Claim 1 were not fairly presented to the state courts and are therefore procedurally defaulted. (Filing No. 88 at 12).

Torres disagrees regarding Subpart 1(A), alleging it was exhausted via fair presentment in his First PCM, *see* (Filing No. 124 at 8), but appears to agree that some of Subparts 1(B)(1)-(3) were not fairly presented (with the exception of Torres's argument relating to the failure to utilize a mitigation specialist) and require excuse to proceed to a merits review. (Filing No. 102 at 13). Torres further contends that, to the extent any claim is found to be procedurally defaulted, they are eligible for excuse and review on their merits

---

*Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

23

as "substantial" claims via *Martinez v. Ryan*, 566 U.S. 1 (2012).[21]  *See* (Filing No. 69 at 21).

Because procedural default is an issue for the majority of the arguments raised, this Court must first determine whether Torres exhausted each subpart by fair presentment to the state courts[22] or, if not, whether the failure to exhaust may be excused.

### 1.    Subpart 1(A)

The entirety of Subpart 1(A) addresses the alleged failure of Torres's counsel to adequately rebut the State's *aggravation evidence* during the penalty phase of his trial. (Filing No. 124 at 2) (emphasis added).  He argues that his counsel failed to adequately investigate the state's introduction of the trial record of the guilt proceedings, law-enforcement testimony regarding the crime scene and statements Torres made to them, and multiple prior convictions including a "Domestic Assault Conviction" and the Packer conviction.  (Filing No. 69 at 29).

In support of his argument relating to the Packer conviction, he maintains that had his counsel adequately investigated they would have been able to present evidence to: (1) establish that either the facts supporting the Packer conviction did not occur as the prosecution alleged and/or that the Packer conviction should carry little weight in

---

[21]Torres also seeks to excuse the procedural default of some his claims in the petition under the "actual innocence" gateway set forth in *Schlup v. Delo*, 523 U.S. 298 (1995). *See* (Filing No. 69 at 21-22).  To invoke the actual-innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup*, 513 U.S. at 327).  However, as this Court already found that Torres did not meet the actual-innocence standard, *see* (Filing No. 128 at 23-26), this Court will not address Torres's arguments seeking to excuse any procedural defaults under the actual-innocence gateway further in this Memorandum and Order.

[22]The exhaustion requirement is satisfied when "the federal claim has been *fairly presented* to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (emphasis added).

aggravation, *see* (Filing No. 69 at 29-30) (explaining that because his counsel failed to speak with Gleason they did not discover or present evidence that Cross, Padilla, and Packer were not credible); (Filing No. 102 at 15) (explaining that counsel failed to interview witnesses who "would have undermined the state's theory in the [Packer case]"); and/or (2) attack the credibility of witness Cross by establishing he was seeking a lesser sentence on his state and federal criminal charges in exchange for his testimony in Torres's case. (Filing No. 69 at 30).

Torres did not raise an ineffective-assistance-of-counsel claim relating to the aggravation phase of his trial to the state courts in his First PCM.[23] *See* (Filing No. 16-12). Nor did he mention the majority of the evidence he points to in Subpart 1(A) to the state courts at any time. And, to the extent some of the factual issues addressed in Subpart 1(A) were the same in the First PCM (such as his allegation that his counsel failed to adequately investigate the Packer incident and conviction), they were presented in the context of an ineffective-assistance-of-counsel claim addressing the *guilt phase* of his trial, not the penalty phase.

A claim brought in a federal habeas proceeding need not be "an exact duplicate of the one raised in the state court proceeding" to be fairly presented. *Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (internal quotation omitted). Instead, fair presentment in conjunction with the exhaustion doctrine has been described as requiring presenting the

---

[23]In Nebraska, "ineffective assistance of trial counsel claims must be raised on direct appeal when appellate counsel is different than trial counsel." *Mathiasen v. Jeffreys*, No. 8:25CV297, 2026 WL 837301, at *5 (D. Neb. Mar. 26, 2026). However, when trial counsel and appellate counsel are the same, such claims cannot be raised on direct appeal as they are "premature." *See State v. Dunster*, 769 N.W.2d 401, 410-11 (Neb. 2009) ("Claims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal."). Because Torres had the same counsel both for trial and on direct appeal, under Nebraska law, the first opportunity for Torres to raise any ineffective-assistance-of-counsel claims was in his First PCM. Therefore, this Court reviews the First PCM when considering if those claims were fairly presented to the state courts.

state-court system "with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006) (citing *Picard*, 404 U.S. at 275-77).

While it naturally follows that the failure to investigate evidence for use at trial may result in that same undiscovered evidence not being available for use during the penalty phase, they are not the same claims. *See, e.g.*, *Duplessis v. United States*, No. 21-CV-00095-JPG, 2022 WL 594857, at *5 (S.D. Ill. Feb. 28, 2022) (explaining that a failure to investigate during the guilt phase of trial is not the same claim as a claim alleging counsel failed to investigate evidence and arguments made by the prosecution to support a sentence enhancement). Clearly, Torres understands this because he raises similar arguments regarding the Packer conviction in support of separate guilt-phase ineffective-assistance-of-counsel arguments he raises in Claim 6 of his petition.[24] *See* (Filing No. 124 at 6).

Because Torres did not allege any ineffective-assistance-of-counsel claims related to the aggravation portion of the penalty phase, those claims were not fairly presented to the state courts, rendering Subpart 1(A) procedurally defaulted. While in limited circumstances to be discussed later in this Memorandum and Order the procedural default of a claim may be excused, in this instance, there is no need to perform a procedural-default excuse analysis as even if Subpart 1(A) was not procedurally defaulted it would not succeed on the merits.

Ineffective-assistance-of-counsel claims are reviewed under the two-part test of *Strickland v. Washington*, whereby a federal habeas petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Such claims

---

[24]The fact that Torres pleaded a separate claim addressing many of the same facts and arguments but in relation to the guilt phase indicates that Torres understands his guilt-phase and sentencing-phase ineffective-assistance claims are not the same.

26

are approached with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," such that "the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

In Subpart 1(A), Torres contends that his counsel failed to investigate facts supporting the Packer conviction (specifically including the facts directly related to the kidnapping and use of a firearm in the Packer case) and failed to rebut the State's version of the kidnapping with evidence that was "readily available to them." (Filing No. 69 at 30). Particularly, Torres argues that while his counsel did argue that his criminal history up until the Packer conviction was relatively minor, his counsel should have reviewed the transcripts from the trial in the Packer case, concluded that the "facts of the kidnapping [at issue in the Packer case] were dubious at best," introduced witnesses who could have undercut or at least called into doubt the nature of the events resulting in the Packer conviction, and argued for a discount of any weight given to the Packer conviction as supporting an aggravator. (Filing No. 69 at 30-31, 36).

Torres's position is not that his counsel was unaware of the Packer conviction or the facts underlying it, but that his counsel failed to adequately investigate it resulting in a failure to raise defenses to the State's evidence supporting an aggravation finding. However, *Strickland* does not require counsel to investigate every "conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require counsel to present such evidence at sentencing in every case." *Wiggins v. Smith*, 539 U.S. 510, 512 (2003). And the determination of whether to call certain witnesses is left to trial counsel as a matter of trial strategy. *See United States v. Washington*, 198 F.3d 721, 723-24 (8th Cir. 1999).

Torres's counsel testified that they were aware of the Packer incident and the Packer conviction as well as the witnesses Torres contends could potentially provide testimony contradicting some of the evidence supporting it. However, counsel also testified they did not argue against the State's use of the Packer conviction as supporting an aggravation

finding as they felt the evidence for the Packer conviction was strong. In relation to the witnesses Torres contends should have been presented to contest the kidnapping charge in the Packer case, his counsel specifically addressed this situation, explaining that they believed presenting the referenced witnesses *was not good trial strategy* as their testimony "might ultimately end up bolstering [Packer's] testimony about the kidnapping and about the robbery." (Filing No. 16-24 at 49) (emphasis added). Ultimately, in his counsel's opinion, more focus on the Packer conviction during sentencing was potentially harmful to Torres because "the evidence was clear-cut the kidnapping occurred from just too many witnesses," so "the less talked about the [Packer incident and the Packer conviction during sentencing] the better." (Filing No. 16-24 at 48). While Torres appears to disagree with this strategy, such post-hoc disagreement does not equal substandard performance.

In relation to the Domestic Assault Conviction, the state court on direct appeal noted that "given the nature of [the Packer conviction], it alone is a sufficient substantial history under [the Prior Conduct Aggravator]." (Filing No. 16-2 at 29). Therefore, even if Torres's counsel had investigated and then argued that the Domestic Assault Conviction did not meet the Prior Conduct Aggravator's requirements, such argument would not have changed the outcome of his sentencing because only one aggravator is necessary to support a death sentence in Nebraska. *See State v. Gales*, 658 N.W.2d 604 (Neb. 2003). Finally, Torres's arguments that his counsel failed to adequately investigate "the trial record of the guilt proceedings" and "the testimony of Officers Vitera and Arrants of the Grand Island Police Department regarding the crime scene and Torres' statement to law enforcement" are simply generalized statements and do not support a finding of *Strickland* prejudice.

For these reasons, Torres is not entitled to relief on Subpart 1(A).

      **2.**      **Subparts 1(B)(1)-(3) Addressing the Alleged Failure to Investigate or Present Mitigation Evidence or Utilize a Mitigation Specialist Resulting in Prejudice Under *Strickland*.**

In Subparts 1(B)(1) and (2), Torres contends that his counsel "conducted almost no mitigation investigation in preparation for the penalty phase of [his] case" and because of their failure to perform an adequate mitigation investigation they failed to present adequate mitigation evidence to the panel. (Filing No. 1 at 22, 26). The portion of Subpart 1(B)(3) relevant to these claims addresses the prejudice portion of *Strickland*, arguing that because of his counsel's substandard performance as set forth in Subparts 1(B)(1) and (2) Torres was prejudiced and is therefore entitled to relief (collectively the "General Mitigation Claim"). Imbedded in Torres's more generalized arguments regarding ineffective assistance of counsel in addressing mitigation is a more specific one that the parties agree is exhausted and reviewable on its merits: that Torres's counsel failed to utilize a mitigation specialist in preparing for and presenting mitigation evidence to the panel (the "Mitigation Specialist Claim"). *See* (Filing No. 88 at 12). The respondent's position is that the arguments contained in the General Mitigation Claim are not part of the Mitigation Specialist Claim and instead represent a new, unexhausted and therefore procedurally defaulted claim. *See* (Filing No. 88 at 12). This Court agrees.

In his First PCM, Torres argued that his trial counsel failed to provide adequate representation during the guilt phase of his trial by failing to call necessary witnesses, and failing to present arguments about evidence that was either withheld or destroyed, and during the penalty phase by failing to use a mitigation specialist. (Filing No. 16-12 at 8). While it is clear that the first two assignments of error in the First PCM relate to the guilt phase of his trial and are not applicable here, Torres's third assignment directly addresses counsel's mitigation performance. *See* (Filing No. 16-12 at 19).

In the relevant portion of his First PCM, Torres argued that his counsel failed to investigate and present mitigation evidence to the panel. However, the basis for his claim was the district court's finding that the American Bar Association Guidelines in Mitigation

29

Capital Defense (the "Guidelines") (stating that in capital cases a mitigation specialist must be used) are not mandatory under Nebraska law. (Filing No. 16-12 at 20). Citing to the Guidelines, Torres contended that his counsel's mitigation efforts were extremely deficient as they failed to investigate and present evidence on his medical background, educational background, employment history, prior record, religious and cultural influences, and social and family history. (Filing No. 16-12 at 21) (citing *Wiggins*, 539 U.S. at 513) (utilizing the Guidelines when discussing what actions counsel in death-penalty cases should undertake in preparation for sentencing)). However, Torres did not elaborate on what specific evidence his counsel could have found if they had performed the investigation he deemed necessary, nor did Torres make any attempt to introduce such evidence into the state-court record.[25] Instead, he pointed to *Trotter v. State*, 609 N.W.2d 33, 38 (Neb. 2000), to support his position that his counsel was "ineffective for failing to use a mitigation expert" and that the state court should have presumed prejudice because, by failing to use a mitigation expert, his counsel failed to subject the State's case to meaningful adversarial testing. (Filing No. 16-12 at 22). Finally, he argued his counsel's performance was deficient and prejudicial under *Strickland* because "[his] trial attorneys failed to even investigate a mitigation specialist" and instead only presented the testimony of Gerald Jensen (who testified to the effects of methamphetamine on the body generally but had not interviewed Torres) in support of mitigation. (*Id.* at 22-23).

Turning to his petition, Torres also mentions his counsel's failure to utilize a mitigation specialist but does so more as evidence supporting the much broader General Mitigation Claim than as an independent claim. In support of his General Mitigation Claim, Torres argues that his counsel was ineffective because "[c]learly established case law from the United States Supreme Court shows that [the] professional standards in place

---

[25]During the course of Torres's first postconviction proceedings, Torres did unsuccessfully attempt to obtain the deposition of his mother "regarding mitigation issues that [were] raised in the [First PCM]." *See* (Filing No. 16-17 at 67). However, Torres did not mention his attempt to depose his mother or state what specific evidence she would have provided in his First PCM briefing. *See* (Filing No. 16-12).

at the time of [his] trial demanded [a thorough mitigation] investigation," (Filing No. 1 at 33), requiring reasonable efforts to investigate into any factor which lessens the instinct to punish (such as a defendant's disadvantaged background or other life history) which were not undertaken by his counsel.  (Filing No. 1 at 34) (citing *Wiggins*, 539 U.S. at 513); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (discussing types of evidence which may be presented in mitigation); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (same); *see also Andrus v. Texas*, 590 U.S. 806 (2020) (forgiving certain shortcomings of counsel's mitigation investigation in a capital case where the record reflected that counsel made an effort to gather and present the mitigation evidence that was available).

In both his First PCM and in his petition, Torres lists similar generalized categories of investigation which he contends his counsel did not undertake (although in his petition he greatly expands on the types of information which could be found had those categories been fully investigated).[26]  Importantly, to support his First PCM, Torres was able to obtain

---

[26]For example, in his First PCM, Torres argued that his counsel failed to investigate and present evidence "regarding his family, employment history and educational history" but  his elaboration on those categories consisted of the following single sentence: "Torres specifically states that more of his family should have been interviewed and more focus should have been on where he worked throughout his life as well as the schooling and classes he presented."  (Filing No. 16-12 at 20).

Torres greatly elaborates on the categories and information potentially available in his petition.  He argues his counsel failed to conduct any reasonable background investigation into his personal background and individual characteristics (including a failure to interview friends and family to potentially discover formative influences and traumatic events), his medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, developmental delays, history of traumatic events), affective or non-affective mental health or psychological disorders (which he contends *may* have resulted in a mental health assessment and/or testing and assessment of his "unique mental status," including potential neurocognitive dysfunction and neurological damage), his school and medical records (including his special educational needs, such as cognitive limitations and learning disabilities, and achievement), his work history and training (including types of employment and barriers to his employment), and his prior juvenile and adult correctional experiences and criminal history.  (Filing No. 1 at 22, 24, 29-27; Filing No. 69 at 39-40, 43-44).

the depositions of his trial counsel Blakeslee and Naylor. However, the questions presented to them regarding mitigation all addressed their failure to use a mitigation specialist and did not relate to additional avenues of investigation or evidence which could have been obtained by them (with the exception of the decision not to call certain witnesses or further highlight the Packer incident). *See* (Filing No. 16-34 at 27-29, 42-45 54-89). They explained that their strategy was to focus on Torres's drug usage as their investigation did not produce any other information that would have been helpful in mitigation.

In contrast, in his petition, Torres points not just to his counsel's failure to use a mitigation specialist, but he gives specifics regarding what his counsel could have found had they investigated further. For example, Torres contends that his counsel's observation of his tendency to engage in fanciful conspiracy theories about certain aspects of his case indicated a need for a mental-health assessment and mental-health investigation despite his counsel's lack of concern about Torres's mental health. (Filing No. 1 at 23-24). Torres further argues that had his counsel investigated properly they would have found that he was born prematurely, his father abandoned the family when he was a newborn (leaving his mother struggling to raise her children alone resulting in Torres being left without adult influence or supervision frequently), he struggled with dyslexia, attended special-education classes and did not complete the ninth grade (but also argues he reconnected with his father around that same time resulting in legal issues and his failure to complete high school), that he had been receiving disability payments since 2001 due to spinal cord compression from an accident (which he contends resulted in his loss of the ability to earn a living for himself), and his diabetes and related macular degeneration (which he argues further factored into his decisions to use and sell drugs). (Filing No. 69 at 40). He then alleges that although his trial attorneys could have obtained and presented the specific evidence he mentions in mitigation, thus allowing them to "tell the story of how [Torres's] life went into decline after his accident, as well as the tragic drowning death of his son," they failed to do so. (Filing No. 69 at 41). And ultimately, he concludes that "trial counsel's lack of investigation and preparation for the penalty phase constituted substandard performance,

32

as it fell below the standard of care for a capital defense attorney.  And because there is a reasonable probability that the outcome of the case would have been different, [Torres] suffered prejudice" as set forth in *Strickland*.  (Filing No. 1 at 42).  None of these specifics were mentioned in his First PCM.

"A claim is more than a mere theory on which a court could grant relief; a claim must have a factual basis, and an adjudication of that claim requires an evaluation of that factual basis." *Wilson v. Workman*, 577 F.3d 1284, 1291 (10th Cir. 2009) (en banc).  While some courts have found that where all of the deficiencies in a counsel's mitigation performance arose from sentencing-phase mitigation strategies and the reasonableness of those strategic decisions, the result is "a single claim that seeks relief for counsel's failure to investigate and present mitigation," *see Cruz v. Ryan*, No. CV-13-0389-TUC-JGZ, 2018 WL 1524026, at *19 (D. Ariz. Mar. 28, 2018) (internal quotations omitted),a federal claim must not contain significant additional facts, to be considered the same claim.  *Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997) (citing *Kenley v. Armontrout*, 937 F.2d 1298, 1302–03 (8th Cir. 1991)); *see also Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999) (explaining that to be fairly presented, the claims and arguments in a federal habeas need not be identical, but a petitioner must give state courts a meaningful opportunity to pass upon the substance of the claims later pressed in federal court).  Importantly here, as described by the Tenth Circuit, the evidence presented in support of a claim brought in a federal habeas petition must also have some commonality to the evidence which was addressed by the state courts for its introduction not to be considered as supporting a new and unexhausted claim.

> [A] habeas petitioner will be allowed to present bits of evidence to a federal court that were not presented to the state court that first considered his claim, without converting the claim into a new one.  But at a certain point, when new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, we must necessarily say that the new evidence effectively makes a new claim—one that the state court has not adjudicated on the merits.

*Fairchild v. Workman*, 579 F.3d 1134, 1148-49 (10th Cir. 2009) (cleaned up).

Although the legal arguments in Torres's First PCM and petition overlap to the extent they address ineffective assistance of counsel for failure to investigate and present mitigation evidence, the General Mitigation Claim is predicated on specific examples of arguments and potential but undeveloped evidence that fall well outside the arguments presented to the state courts in the Mitigation Specialist Claim. *See*, *e.g.*, *Fairchild*, 579 F.3d at 1155 (concluding a petitioner raised a new claim when transforming his claim from one involving only general allegations of failing to investigate potential mitigation evidence into a claim "involving a concrete reference to a qualified expert who could have been produced at trial to present significant scientific evidence regarding [the federal habeas petitioner's] mental condition"). For this reason, this Court finds that the General Mitigation Claim made up of Subparts 1(B)(1), (2), and the portions of (3) not addressing the very specific argument relating to the Mitigation Specialist Claim is a new claim which was not fairly presented to the state courts and is therefore procedurally defaulted. Because Torres contends his procedural default may be excused under *Martinez*, this Court now turns to that analysis.

In *Martinez*, the Supreme Court announced that ineffective assistance of collateral counsel may serve as cause to excuse a procedural default in the limited circumstances where: (1) a state requires a prisoner to raise ineffective-trial-counsel claims at an initial-review collateral proceeding; (2) the prisoner failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have collateral counsel or his counsel was ineffective; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim. *See Martinez*, 566 U.S. at 13-14. Later, the Supreme Court extended *Martinez's* rule to instances where state law technically permits ineffective-trial-counsel claims on direct appeal, but state procedures make it "virtually impossible" to actually raise them then. *See Trevino v. Thaler*, 569 U.S. 413, 417 (2013).

34

Here, Torres's ability to excuse the procedural default of the General Mitigation Claim under *Martinez* depends on whether he can establish the claim is substantial. The Eighth Circuit has recently described the standard for establishing whether a claim is substantial under *Martinez* as follows:

> A substantial claim is one with some merit, and *Martinez's* some-merit requirement means that whether the claimant's trial counsel was ineffective . . . must at least be debatable among jurists of reason. Thus, to demonstrate that his ineffective assistance of trial counsel claim is substantial, [the claimant] must show that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him.

*Marcyniuk v. Payne*, 39 F.4th 988, 996 (8th Cir. 2022) (cleaned up). Importantly, under *Martinez*, Torres may establish *cause* by showing that reasonable jurists could debate whether trial counsel acted ineffectively, but he then must also establish *prejudice* by showing that but-for counsel's errors, the results of the proceedings would have been different. *See Shockley v. Crews*, 696 F. Supp.3d 589, 686 (E.D. Mo. 2023) (emphasis supplied) (citations omitted).

However, only evidence from the state-court record may be used to determine whether a petitioner has demonstrated cause and prejudice to excuse the procedural default of his ineffective-assistance-of-counsel claim under *Martinez*. *See Marcyniuk*, 39 F.4th at 999. The Supreme Court recently held that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Shinn v Ramirez*, 596 U.S. 366, 382 (2022) (internal quotations omitted)).

Therefore, because this Court must rely only on the state-court record in making such a determination, and because none of the potential evidence cited to in support of the General Mitigation Claim was part of the state-court record, and because Torres did not seek to develop it in this federal case, *see* (Filing No. 124 at 8 (stating "no discovery

35

sought" for any part of Subpart 1(B)), this Court cannot consider that potential evidence when determining if the General Mitigation Claim is substantial. Without the introduction of the new arguments and potential evidence in support, Torres is left with the general unsupported argument he raised in his First PCM: that his counsel should have performed a more thorough investigation in preparation for mitigation of his family, employment and educational history, and if they had they might have found additional but undescribed evidence for consideration in mitigation. This is a far cry from establishing that but-for counsel's substandard performance the outcome of Torres's sentencing would have been different as required under *Martinez*. Therefore, as the procedural default of the General Mitigation Claim cannot be excused under *Martinez*, the claim's default cannot be excused, and Torres is not entitled to relief.

### 3.    Subpart 1(B)(3) – Failure to Investigate/Present a Proportionality Argument.

Also in Subpart 1(B)(3), Torres alleges that trial counsel failed to perform a proportionality investigation or present argument that "[Torres's] death sentences were not proportional to sentences handed down in similar cases." (Filing No. 69 at 49). This argument is procedurally defaulted as the failure of trial counsel to investigate and present a proportionality argument during sentencing was never raised to the state courts.[27] Therefore, this Court must now consider whether the portion of Subpart 1(B)(3) addressing proportionality may be excused under *Martinez*.

Again, whether Torres can excuse the procedural defaults of the relevant portion of Subpart 1(B)(3) under *Martinez* depends on his ability to establish the claim raised is substantial. However, while Torres argues that he need only establish that it is debatable

---

[27]While Torres contends this issue was addressed by the state courts, *see* (Filing No. 69 at 50 (citing Filing No. 16-2 at 32-33)), the state courts addressed the issue of proportionality in the context of a mandatory proportionality review of a death sentence under Nebraska law, *see* (Filing No. 16-2 at 32-33 (citing *State v. Ellis*, 799 N.W.2d 267, 303 (Neb. 2011)), not via the ineffective-assistance-of-counsel claim he now raises.

amongst jurists of reason whether his counsel's performance was deficient to present a substantial claim, *see* (Filing No. 69 at 23-24), Torres addresses only half of the requisite standard as he fails to address the but-for prejudice element also required to present a substantial claim.

The crux of Torres's proportionality argument is that his counsel was ineffective for failing to find and present multiple comparable cases where other defendants convicted of first-degree murder received sentences of less than death in Nebraska at the time of Torres's sentencing. (Filing No. 69 at 51) (arguing some involved multiple victims and some were "far more heinous and atrocious" than the crimes for which Torres was convicted). (Filing No. 69 at 53). He concludes that, "[h]ad counsel conducted a proper investigation, counsel would have learned that [Torres's] sentences were out of line with the punishments handed down by Nebraska courts for similar conduct." (Filing No. 69 at 54).

While Torres appears to argue there is at least some grounds to find his counsel's failure to investigate and present a proportionality argument as substandard, he makes no argument that but-for his counsel's failure to investigate proportionality he would have received a sentence less than death. Instead, he apparently invites this Court to research other similar cases and then reach the conclusion he seeks. This is far from presenting a substantial claim, rendering excuse under *Martinez* unattainable.

### 4. Subparts 1(B)(1)-(3) – Failure to Retain/Consult with a Mitigation Specialist.

The Court now proceeds to review the merits of the portions of Subparts 1(B)(1)-(3) relating to Torres's exhausted Mitigation Specialist Claim. Torres argues that the state-court decision denying these arguments was based upon both an unreasonable finding of facts and was also an unreasonable application of, or was contrary to, clearly established federal law under 28 U.S.C. § 2254(d)), (Filing No. 1 at 33), as "[i]t was unreasonable for the Nebraska Supreme Court to conclude that prejudice was lacking without considering the impact of the evidence that could have been presented." (Filing No. 102 at 13).

37

Specifically, he alleges that the state court "failed to look at the totality of the evidence that was available and could have been presented" when denying his claim. (*Id.*) (citing *Wiggins*, 539 U.S. at 534).

In denying Torres's claim, the Nebraska Supreme Court made the following findings:

> Torres claims that his counsel was ineffective for failing to hire a mitigation specialist to present evidence to the [panel]. In the district court hearing, Torres offered an excerpt from the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and also the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases. Guideline 4.1 states that in a death penalty case, "[t]he defense team should consist of no fewer than two [qualified] attorneys . . . an investigator, and a mitigation specialist."

> Under the *Strickland v. Washington* framework for ineffective assistance of counsel claims, a court may address the two elements, deficient performance and prejudice, in either order. We conclude that Torres failed to prove that he suffered any prejudice as a result of his counsel's failure to hire a mitigation specialist.

> To prove the prejudice element of his ineffective assistance of counsel claim, a prisoner must prove that his or her counsel's deficient performance was of such gravity to "'render[] the result of the trial unreliable or the proceeding fundamentally unfair,'" by establishing that but for the deficient performance of counsel, there is a "'reasonable probability'" that the outcome of the case would have been different. Torres has not met this burden.

> Torres does not explain just what a mitigation specialist would have discovered that his attorneys did not and how that would have made a difference in his sentencing. He argues that "he was prejudiced in his attorneys' failure to present a complete picture of him to the three judge panel."

> We have rejected similar claims of ineffective assistance of counsel where prisoners fail to show how a different or more thorough investigation of mitigating evidence would have made a difference in sentencing. In *State v. Hessler*, we said:

38

> Other than his alleged mental incompetence, [the defendant] presented no evidence of mitigating circumstances that counsel should have discovered and presented at his sentencing. We therefore conclude that the district court did not err when it rejected [the defendant's] claim that trial counsel was ineffective for failing to discover and present mitigating evidence at sentencing.
>
> In *State v. Palmer*, we said that "[w]hile [the defendant] asserts that the failure of his counsel to undertake these investigations is ineffective assistance of counsel, [the defendant] does not argue how any of these actions by counsel would have made a difference in [his] sentencing."
>
> In this case, the district court concluded that Torres suffered no prejudice, because the mitigating evidence "would barely have altered the sentence profile presented to the decision maker."
>
> We note that Torres did request that the district court appoint a mitigation specialist to assist him in this postconviction case, which the court denied. But Torres has not raised this denial in his assignments of error.
>
> Because Torres has failed to show a reasonable probability that the result of the sentencing would have been different had his counsel retained a mitigation specialist, he suffered no prejudice and cannot prevail on this claim of ineffective assistance of counsel.

(Filing No. 16-6 at 11-12) (footnotes omitted).

As discussed in relation to the General Mitigation Claim, Torres did not argue the existence of any specific evidence to the state courts which would support his position in his First PCM. Instead, he cited cases where the Guidelines were used as an aid in determining whether counsel's performance was substandard. While Torres now cites to multiple United States Supreme Court cases addressing the investigation and presentation of mitigation evidence in the context of an ineffective-assistance-of-counsel claim, *see* (Filing No. 1 at 30-32) (citing *Williams v. Taylor*, 529 U.S. 362 (2000), and *Porter v. McCollum*, 558 U.S. 30 (2009)), the cases cited discuss general avenues for mitigation investigation but also address specific evidence sentencing counsel did not investigate or present. Because Torres did not mention any specific evidence to the state courts (and, as

39

discussed, cannot rely upon new but undeveloped potential evidence to support his claim now), he cannot simply conclude that but-for the failure to retain/consult with a mitigation specialist, he would have received a different sentence. In his briefing to the state courts, there was no basis for them to make such a finding.

As explained by the Supreme Court in *Williams*, a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. 529 U.S. at 405-06. "[I]t is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been *objectively unreasonable*." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006) (emphasis added). Neither is the case here.

Here, the state court properly applied the but-for prejudice test from *Strickland* to Torres's ineffective-assistance claim and found that Torres had not established that the use of a mitigation specialist would have changed the outcome of his sentencing. Because this Court must give deference to the state court's factual findings, *see* 28 U.S.C. § 2254(e)(1), and Torres supplies no basis on which to rebut the presumption of correctness this Court must apply, *id.*; *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) (explaining the deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents"), Torres is not entitled to relief.

### B.    Claim 2

In his second claim, Torres challenges the constitutionality of Nebraska's three-judge panel sentencing process under *Hurst v. Florida*, 577 U.S. 92 (2016). *See* (Filing No. 1 at 54-57). Torres admits this claim is procedurally defaulted, *see* (Filing No. 69 at

40

55), and argues that its procedural default may be excused under *Schlup* as he is "actually innocent" of the crimes for which he was convicted. (*Id.* at 55-56).

Review of this claim is not necessary as Torres admits that, even if Claim 2 was not procedurally defaulted, relief is not available because the Supreme Court found in *McKinney v. Arizona*, 589 U.S. 139, 145 (2020), that *Hurst* does not apply retroactively to cases on collateral review.[28] (Filing No. 1 at 56). Therefore, this claim must be dismissed.

## C.    Claim 3

In Claim 3, Torres challenges the constitutionality of the Prior Conduct Aggravator as void for vagueness under *Johnson v. United States*, 576 U.S. 591 (2015). (Filing No. 69 at 57-64). The parties disagree as to whether this claim is procedurally defaulted. *See* (Filing No. 69 at 57 (arguing this claim is procedurally defaulted due to the lack of citation to the holding in *Johnson* in his direct appeal)); and (Filing No. 88 at 14 (arguing that the inclusion of *Johnson* in Claim 3 does not change the underlying claim, which was rejected on its merits both facially and as applied in *Torres I*)).

For the reasons that follow, this Court finds Torres's claim, as stated, is procedurally defaulted, but even if Torres could excuse his procedural default, Claim 3 would fail on its merits.

### 1.    Procedural Default

As discussed previously, the exhaustion requirement is only satisfied when "the federal claim has been *fairly presented* to the state courts." *Picard*, 404 U.S. at 275 (emphasis added). Here, the legal arguments presented in Claim 3 differ from those raised

---

[28]Torres contends he raises Claim 2 because he believes *Hurst* was wrongly decided and "maintains his legal arguments to the contrary in order to preserve this issue for future review should the state of the law change." (Filing No. 69 at 57).

41

before the state courts rendering Claim 3 not the same claim raised in Torres's direct appeal.

The panel found that the Packer conviction constituted a prior "violent" conviction under the Prior Conduct Aggravator. Torres now argues that the analysis performed by the Supreme Court in *Johnson* regarding a clause in the federal Armed Career Criminal Act ("ACCA"), should be applied to the residual clause in the Prior Conduct Aggravator, both because the residual clause at issue is similar to the residual clause in the ACCA and as *Johnson* is retroactively applicable. (Filing No. 1 at 53-57).

*Johnson* considered whether the "residual clause" of the ACCA (defining the term "violent felony" to include any crime that "involves conduct that presents a serious potential risk of physical injury to another") was so vague that it violated a prisoner's right to due process. *Johnson*, 576 U.S. at 594. Ultimately, the *Johnson* court's holding was simply that "imposing an increased sentence under the residual clause of the ACCA violates the Constitution's guarantee of due process" because the residual clause was unconstitutionally vague. *Johnson*, 576 U.S. at 606).

However, in so finding in *Johnson*, the Court set aside the use of the "categorical approach" for determining vagueness, which previously required a court to assess whether a crime qualified as a violent felony under the ACCA in terms of how the law defines an offense as opposed to how an individual offender may have committed the crime on a particular occasion. *Johnson*, 576 U.S. at 596. In describing the constitutional issue with the ACCA's residual clause and the application of an approach such as the categorical approach, the Supreme Court explained:

> The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has as an element the use . . . of physical force," the residual clause asks whether the crime "involves conduct " that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual

42

> clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence after making his demand or because the burglar might confront a resident in the home after breaking and entering.

*Id.* The Supreme Court then detailed other efforts made in addressing vagueness claims relating to the ACCA's residual clause, ultimately finding that "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy." *Id.* at 598 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)).

In his direct appeal, Torres took issue with the term "substantial history" arguing that the Packer incident and conviction was "not sufficiently removed in time or sequence from the events of the homicides to warrant a finding that the kidnapping established a 'substantial history'" under the Prior Conduct Aggravator. (Filing No. 1-1 at 46). Torres submitted that the Packer incident occurred a mere three weeks before the homicides, were all part of the same "downward spiral" his life had taken at that time due to drug dependency, and that he had "lived 31 years of his life without committing any serious assaultive or terrorizing criminal acts." (Filing No. 1-1 at 47).

Citing various Nebraska cases in his direct appeal Torres maintained that "history" in the context of Prior Conduct Aggravator did not include events or occurrences which are "part of the circumstances surrounding the current charge" and mean more than one event or act.[29] (Filing No. 1-1 at p. 47 (citations omitted)). He also argued vagueness of the language "assaultive and terrorizing" conduct as applied to him violated established United States Supreme Court precedent requiring clearly defined and applied statutory

---

[29]He also contended the other act relied upon was the Domestic Assault Conviction which occurred "many years earlier" but should not be considered "serious" due to the lack of law-enforcement reports or other evidence. (Filing No. 1-1 at p. 47).

43

aggravating circumstances to prevent a sentencing body from exercising discretion that may lead to arbitrary or inconsistent results. (Filing No. 16-8 at 97-98). He then concluded that because the panel had to decide whether the facts at issue in his case met the requirement for applying the aggravating factors contained in the Prior Conduct Aggravator, a definition of "serious assaultive and terrorizing conduct" should have been, but was not, supplied to the panel, rendering the application of this factor to Torres's sentence unconstitutional. (Filing No. 16-8 at 97-98.)

With these arguments in mind, the dissimilarities between the argument Torres raised in his direct appeal as opposed to Claim 3 are clear. Torres did not argue for a specific method of statutory construction in his direct appeal in support of his void-for-vagueness claim. In his petition, Torres's discussion of *Johnson* now relies on a new legal argument—that *Johnson* requires (or at least suggests) that legal methodology different from what was used by the Nebraska Supreme Court in deciding *Torres I* should have been used.

To be clear, Torres does not allege in Claim 3 that the state court's finding in *Torres I* that the Prior Conduct Aggravator was not void for vagueness misapplied existing law to his claim. Instead, he contends that, considering the statutory interpretation methodology utilized in *Johnson* in hindsight, that the state courts' decision misapplied federal law. While Torres may infer that prior to *Johnson*, such legal argument was unavailable to him, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White v. Woodall*, 572 U.S. 415, 426 (2014) (citation and quotation marks omitted). Therefore, without retroactive applicability, the legal reasoning in *Johnson* need not be considered by the state courts. Moreover, although Torres attempted to raise *Johnson* in his Second PCM (arguing *Johnson* should be available to his claim due to its alleged retroactive applicability), he failed to do so until 2017, which was more than a year after *Johnson* was decided, resulting in the claim's denial as procedurally defaulted

44

without an evidentiary hearing under Neb. Rev. Stat. § 29-3001(4). *See* (Filing No. 120-1. at 29-35); *State v. Torres*, 915 N.W.2d 596 (Neb. 2018)). This argument was never addressed on the merits by the state courts.

This Court finds that Claim 3 is procedurally defaulted. While, like all procedurally defaulted claims, Torres argues this procedural default may be excused, this Court need not consider such argument as, assuming arguendo an excuse to Claim 3's procedural default is available,[30] Claim 3 fails on the merits because *Johnson* is neither applicable to the Nebraska statue at issue nor retroactively applicable.

### 2. Merits

Torres concludes that the holding in *Johnson* is both substantively and retroactively applicable to cases on collateral review such as his as the unconstitutionally vague language struck down in *Johnson* falls into the same "vagueness trap" as the Prior Conduct Aggravator, by failing to provide notice of the conduct that may enhance a sentence or a standard that avoids arbitrary application. (Filing No. 69 at 62 (citing *Johnson*, 576 U.S. at 595)). It is unclear how Torres deduces that the *Johnson* Court's finding that any increase in sentence imposed under the residual clause of the ACCA violates due process also

---

[30]To the extent Torres argues that the procedural default of Claim 3 can be cured under *Martinez*, he is incorrect. *Martinez* "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *Davila v. Davis*, 582 U.S. 521, 524-25 (2017). *Martinez* does not apply because Claim 3 does not raise an ineffective-assistance-of-counsel claim but rather addresses a claim that should have been raised on direct appeal by direct appellate counsel. *See Allen v. Bowersox*, No. 4:16-CV-00920-JAR, 2019 WL 4418669, at *6 (E.D. Mo. Sept. 16, 2019) ("In *Martinez*, the Supreme Court determined that a federal habeas court may excuse a procedural default of an ineffective-assistance claim when the claim was not properly presented in state court due to the error of post-conviction counsel" not direct appellate counsel). And, as Torres cannot meet the actual-innocence standard under *Schlup* as previously noted, *see* footnote 20, *supra*, excuse of the procedural default of Claim 3 is unavailable.

45

applies to the Prior Conduct Aggravator specifically (or any retroactive application outside of cases addressing the ACCA residual clause).

Despite their purported similarities, there is no indication in the *Johnson* decision that its holding addressing the ACCA applies to state statutes, nevertheless retroactively. Indeed, other courts faced with the same issue of applying *Johnson's* reasoning to a state statute have concluded *Johnson* does not apply. *See*, *e.g.*, *Clark v. Crow*, No. CV 20-00003-TFM-B, 2021 WL 2188762, at *4 (S.D. Ala. Apr. 8, 2021) (finding that a petitioner who was not sentenced under the ACCA could not rely on *Johnson* to invalidate his sentence), *report and recommendation adopted*, No. 1:20-CV-0003-TFM-B, 2021 WL 2187353 (S.D. Ala. May 27, 2021); *Worthy v. Secretary, Dep't of Corrs.*, 2019 U.S. Dist. LEXIS 19053 *4, 2019 WL 10747147, *2 (M.D. Fla. Feb. 6, 2019) (explaining that "*Johnson* is limited to only the residual clause in the ACCA and is inapplicable to Florida's PRRA"); *Galloway v. Smith*, 2018 U.S. Dist. LEXIS 108646 *1, 2018 WL 3208162, *1 n.1 (E.D. Pa. June 29, 2018) (holding that *Johnson* did not affect the untimeliness of a petitioner's § 2254 habeas petition because the petitioner was sentenced under Pennsylvania's third-degree murder statute, not the ACCA. Moreover, while Torres points to the Supreme Court's decisions in *United States v. Davis*, 588 U.S. 445 (2019) (finding the language of a "crime of violence" in the residual clause of 18 U.S.C. § 924(c)(3)(B) as unconstitutionally vague), and *Sessions v. Dimaya*, 584 U.S. 148 (2018) (extending the same reasoning to "crime of violence" in 18 U.S.C. § 16(b)), which have used the same *reasoning* as in *Johnson* to invalidate portions of statutes as void-for-vagueness, in support of his argument that *Johnson* can be applied outside the ACCA, (Filing No. 1 at 104) (emphasis added), none of the cases cited involved retroactive application of the holding in *Johnson*.

Even if the reasoning in *Johnson* were available to Torres to address the Prior Conduct Aggravator, there is no support for retroactive applicability of that *reasoning*. Torres is not entitled to relief on Claim 3.

46

### D.    Claim 4

Claim 4 is comprised of over ten Subparts and contains a multitude of arguments relating to the constitutionality of Torres's death sentence.  Without addressing any specific Subpart of Claim 4, the respondent contends that some of the arguments raised in Claim 4 are outside the scope of this Court's jurisdiction as they are purely matters of state law or that the constitutional claims Torres now raises in conjunction with state-law claims were not raised to the state court and are therefore procedurally defaulted.  *See* (Filing No. 88 at 15 (referencing Torres's separation of powers argument set forth in Subpart 4(I) as an example of a matter of pure state law)).  The respondent further contends that the remainder of the arguments Torres did raise to the state courts on constitutional grounds were reasonably addressed on their merits in *Torres I* and *IV*.  (Filing No. 88 at 15).

Because Torres did not respond to all of the respondent's jurisdictional and procedural-default assertions, the Court will address those issues relating to each Subpart and then their merits where appropriate.  However, before addressing each argument, further background regarding Nebraska's death-penalty sentencing scheme as well as the relevant facts relating to the imposition of Torres's death sentence are provided here to assist in addressing the arguments raised in Claim 4.

In Nebraska, a person who is convicted of first-degree murder is not eligible for the death penalty unless the State proves one or more of the statutory aggravators beyond a reasonable doubt.  *See Gales*, 658 N.W.2d at 613.  The balancing of aggravating circumstances against mitigating circumstances in deciding whether to impose the death penalty is not merely a matter of number counting, but, rather, requires a careful weighing and examination of the various factors.  *See Sandoval*, 788 N.W.2d 172 (Neb. 2010).

In Torres's case, the panel conducted a sentencing hearing where the prosecution offered the trial record of the guilt proceedings into evidence to establish four aggravators: the Prior Conduct Aggravator, the Concealment Aggravator, the HAC/Depravity Aggravator, and the Concurrent Aggravator.  *See* (Filing No. 16-25 at 112; Filing

47

No. 16-30; Filing No. 16-31). In addition to the trial record, the prosecution also offered the testimony of several law-enforcement officers who testified about the crime scene and about Torres's statement to law enforcement, *see* (Filing No. 16-25 at 123); copies of the 1999 Domestic Assault Conviction for "assault-family member"; a 1998 conviction for carrying a weapon; a 1994 conviction for unauthorized use of a motor vehicle; a certified copy of a 1993 conviction for criminal mischief; and a certified copy of the Packer conviction, *see* (Filing No. 16-32 at 2, 5, 8, 16, 30-31, and 16-25 at 146-47). In support of mitigation, Torres's counsel focused on his use of drugs, presenting the testimony of Gerald Jensen regarding the effects of methamphetamine on the body generally, (Filing No. 16-25 at 151-56, 160), and arguing that Torres's actions defied logic "for somebody that's not under the influence of" drugs and that his actions were "bizarre to the extreme." They also pointed out that outside of the Packer incident, Torres did not have a significant prior criminal history, in an attempt to further connect Torres's behavior with his drug usage. (Filing No. 16-25, at 180, 185). In rebuttal, the State offered the presentence investigative report (the "PSR").

The panel found the Prior Conduct Aggravator applied to the deaths of both Hall and Donohue as the Packer incident and conviction established prior conduct and constituted a separate crime from the Hall and Donohue deaths. (Filing No. 16-15 at 6). The panel further found the HAC/Depravity Aggravator only applied to the death of Hall, reasoning Hall's anticipation of his own death supported a finding of cruelty and Torres's confession of the crimes and his statement that he "put the victims to sleep" made to a fellow inmate supported a finding of exceptional depravity. (Filing No. 16-15 at 7-9). Finally, the panel found the Concealment and Concurrent Aggravators applied to the deaths of both Hall and Donohue. (Filing No. 16-15 at 8-10).

The panel did not find any mitigating evidence, statutory or otherwise, reasoning that because Torres denied drug use in March 2007 to the PSR writer in the Packer case, his drug use was entitled to no mitigating weight. (Filing No. 16-15 at 11-12). After

48

weighing the aggravators against the mitigating circumstances, the panel found death was the appropriate punishment. (Filing No. 16-15 at 14-15).

### 1.      Subparts 4(A)(1) & (2) - the Prior Conduct Aggravator

Torres contends that the Prior Conduct Aggravator is facially unconstitutionally vague, lends itself to open-ended application, fails to narrow the class of eligible offenders, and is applied inconsistently on an ad hoc basis in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Filing No. 1 at 64). Torres breaks the claim into two Subparts, with Subpart 4(A)(1), reiterating his arguments made to and addressed by the Nebraska Supreme Court, *compare* (Filing No. 1 at 64; Filing No. 69 at 75), *with* (Filing No. 16-8 at 94-99; Filing No. 16-2 at 25-26), and Subpart 4(A)(2) introducing the new argument that *Johnson v. United States*, 576 U.S. 591 (2015), decided after Torres's sentencing, renders the Prior Conduct Aggravator as constitutionally vague, resulting in a denial of Torres's right to due process, *see* (Filing No. 1 at 66).

In his facial challenge to the Prior Conduct Aggravator in Subpart 4(A)(1), Torres argues the aggravator denies a defendant notice of what prior conduct may qualify as the phrase the "use or threat of violence" is vague and overbroad, and the terms "substantial," "history," and "serious assault or terrorizing criminal activity" are not defined. (Filing No. 1 at 64). He contends the Nebraska Supreme Court's adjudication of this argument was based on unreasonable findings of fact and that its conclusion that a vagueness review is deferential in a capital case was contrary to clearly established Supreme Court law under *Hicks v. Oklahoma*, 477 U.S. 343 (1980), *United States v. Batchelder*, 442 U.S. 114, 123 (1979), and *Connally v. General Construction Company*, 269 U.S. 385, 391 (1926). (Filing No. 69 at 75-76).

As an initial matter, a federal habeas court must look at a state's judicial decisions regarding the application and interpretation of particular state statutes when considering a facial challenge under the void for vagueness doctrine. *See Butler v. O'Brien*, 663 F.3d 514 (1st Cir. 2011) (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997)). And this

Court is bound by a state's construction of its own state law except in extreme circumstances not in play here. *See Mullaney v. Wilbur*, 421 U.S. 684, 691, n. 11 (1975) (quoting *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 129 (1945) (explaining that "[o]n rare occasions the Court has re-examined a state-court interpretation of state law when it appears to be an 'obvious subterfuge to evade consideration of a federal issue.'"). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." *Sproles v. Binford*, 286 U.S. 374, 393 (1932) (holding statute requiring trucks to follow the "shortest practicable route" was not too vague to be understood).

In addressing this argument, the Nebraska Supreme Court simply cited to its earlier decision in *State v. Ellis*, 799 N.W.2d 267 (Neb. 2011), noting it had rejected similar challenges to the Prior Conduct Aggravator as facially unconstitutional. It declined to address Torres's arguments further. (Filing No. 16-2 at 25). While the court did not detail why such challenges had not succeeded, their *Ellis* citation provides the necessary context.

In *Ellis*, the Nebraska Supreme Court explained that the terms at issue were not constitutionally vague as:

> "serious," "assaultive," and "terrorizing" are words in common usage with meanings well fixed and generally clearly understood and that the term "substantial history" is likewise reasonably clear. "History" refers to the individual's past acts preceding the incident for which he is on trial, and "substantial" refers to an actual, material, and important history of acts of terror of a criminal nature.

799 N.W.2d at 290 (citing *State v. Holtan*, 250 N.W.2d 876 (Neb. 1977), *disapproved on other grounds*, *State v. Palmer*, 399 N.W.2d 706 (Neb. 1986); *State v. Bjorklund*, 604

50

N.W.2d 169 (Neb. 2000), *abrogated on other grounds*, *State v. Mata*, 745 N.W.2d 229 (Neb. 2008); *State v. Hessler*, 741 N.W.2d 406 (Neb. 2007); *State v. Ryan*, 444 N.W.2d 610 (Neb. 1989)).  In reaching such a conclusion, the *Ellis* court explained that:

> In death penalty cases, an eligibility or selection factor is not unconstitutional if it has some commonsense core of meaning that a juror can understand. Because the proper degree of definition of eligibility and selection factors in death penalty cases often is not susceptible of mathematical precision, a vagueness review is quite deferential.

*Id.*  It is this reasoning that Torres attacks.

Specifically, Torres argues that the state court's conclusion that a vagueness review is deferential in a capital case is contrary to and an unreasonable application of *Hicks* and *Batchelder*, and that the "deferential standard" referred to in *Ellis* also "runs afoul" of Supreme Court Eighth Amendment jurisprudence as "[a]n aggravating circumstance must channel the sentencer's discretion and not be subject to the sentencer's open-ended discretion."  (Filing No. 69 at 76 (citing *Zant v. Stephens*, 456 U.S. 410 (1982); *Lewis v. Jeffers*, 497 U.S. 764 (1990))).  He contends that "rather than applying Supreme Court precedent and determining whether the Eighth Amendment was satisfied, the state court eschewed meaningful review precisely because the issue arose in a capital context." (Filing No. 69 at 76).  In support, however, Torres simply disagrees with the Nebraska Supreme Court's finding that the general usage of the language at issue is well fixed and generally understood.  *See* (Filing No. 69 at 75-76).

Summary dismissal of a habeas claim is proper where the claim is "based solely on 'vague, conclusory or palpably incredible' allegations or unsupported generalizations." *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). In Torres's case, such an unsupported disagreement in interpretation, without more, does not entitle Torres to relief.

51

Also, in Subpart 4(A)(1), Torres argues that the application of the Prior Conduct Aggravator was unconstitutional "as applied" to the facts of his case. (Filing No. 1 at 65). As in his briefing to the state court, Torres maintains that the panel lacked "adequate guidance" as to whether the events at issue in the Packer case met the "substantial prior history of serious assaultive or terrorizing criminal activity" requirement of the Prior Conduct Aggravator. (Filing No. 1 at 65). Specifically, Torres argues that it is unclear whether a kidnapping conviction where the victim also was fed by, used illegal drugs with, and was released by the perpetrator still met the Prior Conduct Aggravator's qualifications. (Filing No. 1 at 65). He also argues that the Domestic Assault Conviction should not qualify as prior conduct, because it was unsupported by law-enforcement reports. (*Id.*)

The Nebraska Supreme Court, when addressing these same arguments, first found that the Packer conviction alone, regardless of the Domestic Assault Conviction, was sufficient to meet the substantial history component of the Prior Conduct Aggravator. (Filing No. 16-2 at 29). The court then examined the assaultive or terrorizing activity component in conjunction with the specific facts resulting in the Packer conviction, finding that Torres's reference to the feeding, drug use, and release of Packer attempted to "downplay" the other evidence supporting his conviction including Torres forcing Packer to drive across town to meet Cross and Padilla, holding Packer (and Padilla and Cross) at gunpoint, forcing Padilla and Cross to tie Packer up, forcing Packer to give Torres his ATM card and PIN number, forcing Cross and Padilla to withdraw money from Packer's account, and forcing Packer to make various telephone calls to obtain transportation for Torres to Texas. (Filing No. 16-2 at 25-26). The court also noted that while Torres ultimately allowed Packer, Cross, and Padilla to leave unharmed, in exchange for doing so, Cross had promised to drive Torres to Texas, and Torres kept Packer's cell phone and $800. (Filing No. 16-2 at 26). Ultimately the court found that given the totality of the circumstances supporting the Packer conviction, the application of the Prior Conduct Aggravator was not unconstitutional as applied. (*Id.*) This Court agrees.

"An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (internal citation and quotation omitted). Prevailing on an as-applied challenge requires establishing the statute "is unconstitutional 'because of the way it was applied to the particular facts of [a] case.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 n.3 (1987)).

Here, it is clear the state court addressed Torres's specific arguments relating to the Packer conviction and the application of the Prior Conduct Aggravator. As Section 2254(d)(2) requires that this Court give substantial deference to the state trial court's findings, this Court may not simply characterize these state-court factual determinations as unreasonable, even if this Court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Moreover, Torres's arguments are nothing but unsupported conclusions—he cites to no law supporting his position that the totality of the evidence supporting the Packer conviction do not meet the "assaultive or terrorizing" component of the Prior Conduct Aggravator. Even where "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination,'" *id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)). Finally, as the state court did not address the Domestic Assault Conviction because the Packer conviction was enough on its own to meet the Prior Conduct Aggravator, and as this Court does not disagree with that finding, there is no reason for this Court to address the Domestic Assault Conviction further.

For these reasons, the Court denies Subpart 4(A)(1) in its entirety.

In Subpart 4(A)(2), Torres simply reiterates a portion of Claim 3, arguing that under *Johnson*, the Prior Conduct Aggravator is unconstitutionally vague. *See* (Filing No. 1 at 66 (stating that he raises this claim in Claim 3)). Because this Court previously addressed and denied Claim 3, finding *Johnson* did not apply retroactively, Subpart 4(A)(2) is denied for the same reasons.

53

### 2.    Subparts 4(B) & (C)

In Subparts 4(B) & (C), respectively, Torres argues the Concealment Aggravator and the HAC/Depravity Aggravator are unconstitutionally vague, invite open-ended application, fail to narrow the class of eligible offenders, and are applied inconsistently on an ad hoc basis in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.  (Filing No. 1 at 66, 68; Filing No. 69 at 77).   In support, Torres concludes that the Concealment Aggravator "denies the accused the right to be informed of the nature and cause of the accusation" but does not provide any argument as to why. Instead, Torres cites to *Hicks* for the proposition that a defendant's "'liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation . . . .,'" and *Batchelder* for the proposition that "[a] statute is unconstitutionally vague if one may "'speculate as to [its] meaning.'"   *See* (Filing No. 1 at 67 (citing *Hicks*, 447 U.S. at 346; *Batchelder*, 442 U.S. at 123)).

As neither *Hicks* nor *Batchelder* provide any support to his claim that the Concealment Aggravator should be found void for vagueness (or that the Nebraska Supreme Court's reasoning in not finding so is a misapplication of law or unreasonable factual finding) and Torres supplies no other argument, his Subpart 4(B) claim must fail.

In Claim 4(C), Torres argues that although the state court found the panel erred in relying upon Hall's mental suffering to establish this factor, *see* (Filing No. 16-2 at 27), the state court erroneously found Torres's actions met the "exceptional depravity" prong of the HAC/Depravity Aggravator anyway, *see* (Filing No. 1 at 69 (citing Filing No. 16-2 at 26-27)).  However, Torres again provides no argument as to why the state's findings were erroneous. Therefore, similar to Torres's as-applied challenge to Subpart 4(A)(1), his unsupported conclusions do not entitle him to relief for Subpart 4(C).

### 3.    Subpart 4(D)

Torres again notes in Subpart 4(D) that the Nebraska Supreme Court found the panel erred in relying upon Hall's mental suffering to establish the HAC/Depravity Aggravator.

(Filing No. 1 at 70). However, in Subpart 4(D), he now argues that the panel's erroneous reliance upon Hall's mental suffering when finding the HAC/Depravity Aggravator applied rendered utilization of the HAC/Depravity Aggravator "invalid" and required reversal of Torres's sentence unless the state court "determines that the error was harmless or reweighs the evidence." (Filing No. 1 at 70 (quoting *Brown v. Sanders*, 546 U.S. 212, 217 (2006))). Because the state courts did not make such a finding, Torres argues his sentence was arbitrary and capricious in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. (Filing No. 1 at 69). And, Torres breaks down this Subpart further into Subpart 4(D)(1), reiterating his arguments made to and addressed by the Nebraska Supreme Court addressed in *Torres I*, *see* (Filing No. 1 at 70), and Subpart 4(D)(2), arguing that *Hurst* "overruled the precedential underpinnings of appellate reweighing" rendering the Nebraska Supreme Court's action in reweighing the evidence supporting the application of the HAC/Depravity Aggravator to his death sentence as misapplication of federal law, *see* (Filing No. 1 at 71).

As an initial matter, as discussed *supra* when addressing Claim 2, *Hurst* does not apply retroactively to cases on collateral review. *See McKinney*, 589 U.S. at 145. Therefore, relief is not available to Torres on Subpart 4(D)(2).

In relation to Subpart 4(D)(1), the Nebraska Supreme Court considered the same argument finding that "the failure of [ ] one finding does not mean the failure of the entire aggravator." (Filing No. 16-2 at 27). Relying on *Sandoval*, the court noted that invalidation of a sentencing factor is appropriate where it was not possible to determine whether a sentencer's findings relating to a specific aggravator were based on an incorrect finding. (Filing No. 16-2 at 27-28). Looking to the specific language of the HAC/Depravity Aggravator, the state court found that it was possible to determine that the panel's application of the HAC/Depravity Aggravator was not only based on Hall's mental suffering but also on a finding that Torres exhibited "exceptional depravity" when murdering Hall, (Filing No. 16-2 at 28-29) (finding that sufficient evidence supported such

55

a finding beyond a reasonable doubt as Hall, having been bound and gagged to the point of asphyxiation when shot by Torres, met the definition of a "helpless victim," and that Hall's murder was senseless as Hall posed no threat to Torres in such a state), rendering the panel's reliance on Hall's mental state when applying the HAC/Depravity Aggravator as harmless.

Because the Nebraska Supreme Court did precisely what it was supposed to do under *Brown*—reweigh the evidence when finding that the HAC/Depravity Aggravator was still applicable in light of the erroneous reliance on Hall's mental state by the panel—it did not misapply federal law in so doing. As previously noted, while Torres also argues that he is entitled to relief because the "heinous, atrocious, or cruel circumstance, or exceptional depravity, factor is vague, fails to narrow the class of eligible offenders, and is susceptible to arbitrary application[,]" *see* (Filing No. 69 at 79), his argument is simply an unsupported conclusion which does not entitle him to relief.

Subpart 4(D)(1) fails.

### 4.    Subpart 4(E)

In Subparts 4(E)(1)-(4), Torres argues that the state court unreasonably found sufficiency of the evidence existed to support the Prior Conduct Aggravator, Concealment Aggravator, HAC/Depravity Aggravator, and Concurrent Aggravators respectively. (Filing No. 1 at 71-74 (citing Neb. Stat. Rev. § 29-2523(1)(a), (b), (d), and (e))). In support of each subpart, Torres effectively advances the same argument: that the events at issue to support each aggravator are insufficient and were not supported by circumstances beyond a reasonable doubt as required by *Ring v. Arizona*, 536 U.S. 584, 600 (2002). (Filing No. 69 at 80). Specifically, he contends: (1) the kidnapping in the Packer conviction was not sufficiently removed in time from the Hall and Donohue homicides to constitute a separate crime (apparently in part because the kidnapping at issue in the Packer conviction only came to light during the investigations of the Hall and Donohue murders); (2) there was no evidence of concealment because there was no evidence that Donohue knew a

robbery had occurred or any evidence that Hall's death was performed to conceal a crime; (3) that Torres's alleged statement to a jailhouse inmate which the State argued established Torres relished the murder, without more, is not enough to support a finding that a criminal defendant acted with "exceptional depravity"; and (4) the expert testimony given failed to establish the Hall and Donohue murders were committed at the same time. (Filing No. 1 at 71-74). He also reaches the same conclusion for each Subpart: that the Nebraska Supreme Court's decision finding sufficient evidence supported application of each aggravator was based on an unreasonable finding of fact and was an unreasonable application of applicable federal law. *See* (Filing No. 1 at 72-74).

What Torres asks this Court to do, without any legal basis, is to simply reweigh the evidence and find in his favor. "The Supreme Court has explained that a district court cannot reweigh the evidence on habeas review: '28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Warner v. Henderson*, 739 F. Supp. 3d 629, 638 (N.D. Ohio 2024) (applying this standard to factual determinations that are fairly supported by the record) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 435 (1983)); *see also Wilson v. Bruce*, 820 F. Supp. 585, 587 (D. Kan. 1993) (stating a federal habeas court "cannot reweigh the evidence nor pass on the credibility of the witnesses and, thereby, substitute its judgment for that of the trial court") (citing *United States ex rel. Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989)), *aff'd*, 10 F.3d 810 (10th Cir. 1993).

Because the Nebraska Supreme Court's findings are supported by the record, Torres is not entitled to relief for Subpart 4(E).

### 5.    Subpart 4(F)

In Claim 4(F), Torres argues his death sentences are arbitrary, cruel and unusual, and resulted in a denial of due process because the panel "refused to give mitigating weight to evidence of [Torres's] escalating drug use and its effects on his behavior and reasoning abilities." (Filing No. 1 at 74) (capitalizations corrected). This argument was presented to

57

and denied by the Nebraska Supreme Court in *Torres I. See* (Filing No. 16-8 at 122-26; Filing No. 16-2 at 31-32).

Mitigating circumstances which, when established, must be considered by a sentencing body under Nebraska law. *See State v. Gales*, 694 N.W.2d 124, 145 (Neb. 2005) ("To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating circumstances.") (citing *Lockett v. Ohio*, 438 U.S. 586 (1978)). In Torres's case he argued mitigating circumstance (2)(c), which states that "[t]he crime was committed while the offender was under the influence of extreme mental or emotional disturbance," applied. Neb. Rev. Stat. § 29-2523(2)(c).

The heart of Torres's argument is not that the panel failed to consider the mitigator at § 29-2523(2)(c), but that the panel "mischaracterized the evidence of Torres' drug use as a justification for not giving it mitigating weight." (Filing No. 1 at 76). Alternatively, he contends that even if he did not establish the statutory mitigating circumstances required, his drug use "is a non-statutory mitigating circumstance which explains how [Torres] came to be involved in the bizarre sequence of events at issue." (Filing No. 1 at 76).

The Nebraska Supreme Court considered Torres's argument but disagreed, questioning "Torres' implicit assumption that voluntary intoxication can form the basis for finding mitigator (2)(c)." (Filing No. 16-2 at 31). The court then reviewed the evidence, without deciding whether voluntary intoxication could be considered under this mitigator, finding that there was no evidence in the record that Torres was under the influence of methamphetamine at the time of the murders or to show that any of Torres's drug use "rose to the level of an extreme mental or emotional disturbance." (Filing No. 16-2 at 32). Finally, the court reiterated that the panel "explicitly concluded that even if such impairment were shown, it would be insufficient to outweigh the aggravating factors found by the panel." (Filing No. 16-2 at 32).

58

Similar to Subpart 4(E), Torres asks this Court to reweigh the evidence considered by the Nebraska Supreme Court and reach a different conclusion which it cannot. Therefore, Torres is not entitled to relief under Subpart 4(F).

### 6.    Subpart 4(G)

In Subpart 4(G), Torres submits that his death sentence is unreliable and arbitrary and procured in violation of his confrontation and due process rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. (Filing No. 1 at 77). He argues here, as he did to the state courts, that the admission of the trial bill of exceptions (which Torres contended contained inadmissible hearsay) for the panel's review without live testimony[31] resulted in his sentence being based on "incomplete information," denying him the right to confrontation and violating his due process rights. (Filing No. 1 at 77; Filing No. 1-1 at 30-36).[32] Unlike his state court briefings, Torres now also argues that *Gardner v. Florida*, 430 U.S. 349, 358 (1977), supports his position that his decision to utilize the panel as opposed to a jury for sentencing resulted in the denial of his due process rights because the panel did not rely on live testimony when rendering his sentence (and that the state courts misapplied federal law at set forth in *Gardner* in so doing). (Filing No. 1 at 77; Filing No. 69 at 70).

---

[31]Torres waived his right to sentencing by a jury, thereby allowing the panel to determine whether an aggravating circumstance (or circumstances) existed warranting a death sentence. (Filing No. 1-1 at 30). The State offered the entire bill of exceptions from the guilt phase of the trial as support for establishing multiple aggravators, to which Torres objected, arguing to do so would deprive the two members of the panel who were not present for the guilt phase of the trial any opportunity to see and hear the witnesses who provided testimony at his trial, rendering it impossible for those two panel members to assess their credibility. (Filing No. 1-1 at 30).

[32]The Court cites to Torres's brief supplied by Torres as opposed to the state court record provided by the respondent as the document filed in the state court record is missing two pages, *see* (Filing No. 16-8 at 71-72) (skipping from page 59 to page 62), which omits the opening paragraph and part of the second paragraph of Torres's briefing on this issue to the Nebraska Supreme Court.

The state courts found that the right to confrontation is inapplicable to sentencing proceedings and the statutory language at issue requires a sentencing panel to consider the trial record (rendering the panel's review of the trial bill of exceptions when sentencing Torres appropriate). The court further found that Torres's right to due process was not violated because:

> the capital sentencing statutes make it clear that the sentencing panel is to make the determination of aggravating circumstances based upon the trial of guilt and a sentencing hearing. Torres waived his right to have the jury determine the aggravating circumstances. In doing so, he waived many of the rights that are present during such a hearing, but not available at sentencing. A defendant's decision to waive a jury finding of aggravating circumstances obviously implicates procedural differences, the advantages and disadvantages of which can be weighed by the defendant. Moreover, Torres was permitted to introduce whatever evidence and witnesses he chose during the sentencing determination proceeding.

(Filing No. 16-2 at 20-23).

Torres's reliance on *Gardner* is misplaced. *Gardner* relates to the use of confidential information in sentencing, particularly in capital cases, and the due process implications of relying on such information without disclosure to the defense or to an advisory sentencing jury. *Gardner* does not stand for the proposition that due process requires a sentencing body to rely on evidence presented directly to them or otherwise address the specific issue of assessing witness credibility solely from live testimony. Moreover, there is no constitutional requirement that credibility determinations must be made from assessing live testimony. *See Stuppy v. United States*, 560 F.2d 373 (1977) ("This court is not bound by the district court's credibility evaluation of witnesses where the evidence is submitted by deposition or in other documentary form."). The state courts did not misapply *Gardner* in denying Torres's claim.

Torres also contends that he was denied his right to due process as he was unable to rebut the allegedly suppressed Gleason evidence which Torres argues would have

supported his defense. (Filing No. 69 at 70). In support, he cites to the Eighth Circuit case of *United States v. Manko*, 772 F.2d 481, 482 (8th Cir. 1985). However, *Manko* addressed a case where the presentence report contained an error, and the Eighth Circuit ultimately denied Manko's claim because he had the opportunity to correct the error at issue (or at least raise the error) before his sentencing. Here, Torres's argument is not about the PSR (or other evidence at Torres's sentencing) being inaccurate as in *Manko*, but instead that it was incomplete because certain evidence was never presented at his trial. *Manko* is of no assistance.

Torres is not entitled to relief on Subpart 4(G).

### 7.    Subpart 4(H)

Torres argues his death sentences violate the United States Constitution because his race and/or ethnicity were impermissible contributing factors. (Filing No. 1 at 78; Filing No. 69 at 83). Specifically, he contends that he is part of an unjust sentencing scheme that is applied in an arbitrary and capricious manner by disproportionately sentencing a larger percentage of non-Caucasian people to death than are represented in the Nebraska population. (Filing No. 69 at 83) (explaining that of the eleven condemned Nebraska inmates at the time of Torres's sentencing, four were Hispanic (approximately 36%) while Hispanic people only comprised approximately 9.2% of the Nebraska population).

It does not appear this claim was raised to the state courts at any time rendering it procedurally defaulted and subject to dismissal. However, even if it had been raised, Torres would not be entitled to relief.

Torres argues that the Equal Protection clause of the Fourteenth Amendment forbids discrimination based on race and that the imposition of a death sentence based in any part on race violates the Eighth Amendment. (Filing No. 69 at 84) (citing *Gregg v. Georgia*, 428 U.S. 153 (1976); *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Zant v. Stephens*, 456 U.S. 410 (1982); *McLaughlin v. Florida*, 379 U.S. 184, (1964)). While Torres's citations point

61

to a general issue which may arise in sentencing, the only connection Torres makes between his own sentencing and his race is the percentage of Hispanic people sentenced to death in Nebraska compared to the number of Hispanics who are members of Nebraska's population.  These bare statistics are simply not enough to establish an Equal Protection claim.   While statistics showing a potentially disproportionate impact are not irrelevant, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  *United States v. Johnson*, 28 F.3d 1487, 1494 (8th Cir. 1994) (cleaned up) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65 (1977) .

Because there were only eleven individuals sentenced to death in Nebraska at the time of Torres's sentencing, the variance in and statistical significance of the percentage of such sentences in cases involving white and Hispanic defendants is not all that revealing and Torres fails to address any alleged discriminatory purpose.  *Id.*  Therefore, a review of the merits shows Torres would not be entitled to relief for Subpart 4(H) even if it were not procedurally defaulted.

### 8.      Subparts 4(I) & 4(J)

In Subpart 4(I), Torres alleges his death sentences do not comport with evolving standards of decency, are cruel and unusual, arbitrary and capricious, and violate the separation of powers, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Filing No. 1 at 79).  Torres later supplemented his petition with Subpart 4(J), designed to clarify and expand the arguments contained in Subpart 4(I) relating to an attempt to repeal the death penalty by the Nebraska legislature in 2015.  (Filing No. 26 at 1).  Because Subpart 4(J) simply expands upon the claims set forth in Subpart 4(I), the Court will address the arguments presented in Subparts (I) and (J) together in this section under each 4(J) subpart.

Torres's arguments in Subpart 4(J), which are broken further into four sub-sub-parts, all relate to 2015 Neb. Laws, L.B. 268 ("L.B. 268"), a bill passed by the Nebraska

Legislature in May of 2015. The relevant history of L.B. 268, which is necessary for the discussion of Torres's argument here was provided by the Nebraska Supreme Court in *Torres IV* as follows:

> In May 2015, the Nebraska Legislature passed 2015 Neb. Laws, L.B. 268, which abolished the death penalty in Nebraska, and then overrode the Governor's veto of the bill. Within L.B. 268, the Legislature provided that "in any criminal proceeding in which the death penalty has been imposed but not carried out prior to the effective date of this act, such penalty shall be changed to life imprisonment." The Legislature adjourned *sine die* on May 29. Because L.B. 268 did not contain an emergency clause, it was to take effect on August 30.
>
> Following the passage of L.B. 268, opponents of the bill sponsored a referendum petition to repeal it. On August 26, 2015, the opponents filed with the Nebraska Secretary of State signatures of approximately 166,000 Nebraskans in support of the referendum. On October 16, the Secretary of State certified the validity of sufficient signatures. Enough signatures were verified to suspend the operation of L.B. 268 until the referendum was approved or rejected by the electors at the upcoming election. During the November 2016 election, the referendum passed and L.B. 268 was repealed, that is, in the language of the Constitution, the act of the Legislature was " 'reject[ed].' "

(Filing No. 51-1 at 4 (quoting *State v. Mata*, 934 N.W.2d 475, 480 (Neb. 2019)).

Because these claims were presented and addressed on their merits by the Nebraska Supreme Court in *Torres IV*, the Court will consider the merits of each argument here.

### a.      Subpart 4(J)(1)

In Subparts (I) and 4(J)(1), Torres argues that the passage of L.B. 268 and its subsequent repeal resulted in Torres's cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. (Filing No. 28 at 7-21). Specifically, he contends that the sentencing scheme and the Nebraska legislative process allowed him to be sentenced to death, then commuted his death sentence to life in prison following the passage of L.B. 268, and then again reinstated to a death sentence when L.B. 268 was repealed as a "uniquely cruel and unprecedented form of psychological suffering through

alternating periods of relief and terror as he has been told his life would be spared, that the voters would decide if he could be executed, and then told again that he would be executed." (Filing No. 28 at 7, 9).   He further argues that the imposition, recission, and reimposition of his death sentence in this back-and-forth manner is prohibited by the Eighth Amendment as it does not comport with evolving standards of decency.  (Filing No. 1 at 80; Filing No. 28 at 14).

In support, Torres explains that generally courts look to objective indicia of society's standards, as expressed in "pertinent legislative enactments and state practice," counting how many states still permit a particular type of sentencing practice and how many have abolished or never adopted it when considering if a sentencing practice meets the evolving standard of decency standard.  (Filing No. 28 at 14 (citing *Roper v. Simmons*, 543 U.S. 551, 563-66 (2005); *Atkins v. Virginia*, 536 U.S. 304, 312-17 (2002); *Kennedy v. Louisiana*, 554 U.S. 407, 422-26 (2008))).  Torres contends that because no other states have such a sentencing scheme in place, this Court should consider the number of states which have abolished the death penalty, the number of states with the death penalty which have not held an execution in over five years, and the decision of pharmaceutical companies to not allow the use of their products in the execution process as evidence the death penalty itself does not comport with evolving standards of decency and is therefore cruel and unusual punishment.  (Filing No. 69 at 84-85) (citations omitted).

The Nebraska Supreme Court addressed this argument in *Torres IV*, relying on its decision in *Mata* in finding that the circumstances at issue do not rise to an Eighth Amendment violation because Torres's contention that his death sentence was commuted or was otherwise reimposed by the repeal of L.B. 268 was flawed.  (Filing No. 51-2 at 4). Specifically, the court explained that because L.B. 268 was not to go into effect until August 30, 2015, and the filing of the petitions in support of the referendum were filed on August 26, 2015, the death penalty was never repealed, rendering Torres's death sentence unchanged throughout the passage of L.B. 268, the referendum process, and its subsequent

64

repeal. (*Id.*) Because the Court's resolution of this issue relied solely on its interpretation of Nebraska's legislative and referendum process, issues wholly of state law, this Court cannot intercede.

Moreover, Torres's arguments relating to the death penalty generally no longer comporting with evolving standards of decency have recently been rejected by the United States Supreme Court. The Court, after undertaking a historical overview of the Fifth and Eighth Amendments, found that "[t]he Constitution allows capital punishment." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019). The Court further noted that this "doesn't mean the American people must continue to use the death penalty. The same Constitution that permits States to authorize capital punishment also allowed them to outlaw it. But it does mean that the judiciary bears no license to end a debate reserved for the people and their representatives." *Id.* In Torres's case, Nebraska law permits the death penalty, and the Nebraska Supreme Court has repeatedly upheld it. *See State v. Jenkins*, 931 N.W.2d 851, 883-84 (Neb. 2019). Because this federal court "bears no license" to summarily dictate otherwise, especially within the strict confines of habeas review under AEDPA, *see Ellis v. Jeffreys*, No. 8:23CV315, 2026 WL 123276, at *36 (D. Neb. Jan. 9, 2026), Torres's "evolving standards of decency" argument provides him no relief.

Subpart 4(J)(1) and the portion of Subpart 4(I) addressing these same arguments must be denied.

### b.    Subparts 4(J)(2) & (3)

In Subpart 4(J)(2), Torres argues that the reimposition of his death sentence violates the Due Process clause because Torres was not subject to a new sentencing procedure when the death penalty was effectively reinstated upon the repeal of L.B. 268. (Filing No. 28 at 15-21). In Subpart 4(J)(3), Torres argues that the repeal of L.B. 268 was an unconstitutional bill of attainder imposing new death sentences without additional judicial process because it specifies affected persons, inflicts punishment, and lacks a judicial trial. (Filing No. 28 at 21-27). Torres repeats his position that the passage of L.B. 268 overturned

65

the death penalty and resentences Torres to life in prison without parole and the referendum process sentenced Torres to death "anew" through a legislative act instead of a judicial process.[33]  (Filing No. 28 at 21).

The Nebraska Supreme Court dispensed of this argument for the same reason as Torres's Eighth Amendment argument set forth in Subpart 4(J)(1), *see* (Filing No. 51-2 at 5, and this Court must do the same.  Because the state court's finding that Torres's death sentence was never altered relied solely on state law and state legislative process, this Court cannot further address Subparts 4(J)(2) and (3).

### c.      Subpart 4(J)(4)

Finally, in Subpart 4(J)(4), Torres contends that the referendum process violated his Due Process and Equal Protection rights.  (Filing No. 28 at 27).  The totality of Torres's argument is as follows:

> The executive branch exceeded [its] granted powers in participating in the referendum. The State of Nebraska's failure to honor its own separation of powers doctrine denies [Torres] due process and equal protection of the law in a manner that is arbitrary and capricious.  The Governor's use of his office to exercise powers not granted to him is an arbitrary and capricious denial of [Torres's] due process and equal protection rights.

(Filing No. 28 at 27).  The respondent agrees that this Subpart was exhausted but argues this Court lacks jurisdiction to address it as it is purely a matter of state law.  (Filing No. 88 at 15).

The core of Torres's argument is that the Governor did not have the power to veto the Nebraska legislature's repealing of the death penalty in 2015 and that the Governor's involvement in the referendum process was also executive overreach, violating the

---

[33]Torres contends that courts in Nebraska have treated Nebraskan referenda passed by the people as legislative acts.  (Filing No. 28 at 22 (citing Neb. Rev. St. Const. Art III § 1; *State ex rel. Stenberg v. Moore*, 602 N.W.2d 465, 474 (Neb. 1999))).

66

separation of powers principles of the United States Constitution. *See* (Filing No. 1 at 80-81; Filing No. 69 at 87). Specifically, Torres contends that the Governor, after "unsuccessfully exercising all powers granted to him under the Nebraska Constitution," used the power of his office and his personal fortune "to enlist the aid of a group of Nebraska citizens to act on his behalf" in overturning the Nebraska legislature's repeal of the death penalty, effectively granting himself a "second" veto and reimposing Torres's death sentence. (Filing No. 1 at 81; Filing No. 69 at 86-87).

The Nebraska Supreme Court addressed and denied Torres relief, finding that to the extent the actions of the Governor and other executive officers involved in the referendum process were constitutionally improper, the remedy "is not invalidation of the referendum, but instead removal from 'the violating position.'" (Filing No. 51-2 at 5) (citing *Mata*, 934 N.W.2d at 487). However, the constitutional issue referenced by the state court in *Mata* is not the United States Constitution but the Nebraska Constitution. *See Mata*, 934 N.W.2d at 487. As previously discussed, because this Court cannot decide issues of pure state law, this claim must fail. Further, even assuming for the sake of argument that federal separation-of-powers principles apply to the states,[34] Torres did not raise this claim as a federal constitutional issue to the state courts, rendering this claim procedurally defaulted.

Subpart 4(J)(4) and the corresponding portion of Subpart 4(I) are denied in their entirety.

---

[34]Such a claim would not appear to succeed because in the rare instance that the United States Supreme Court has employed the separation of powers doctrine from the United States Constitution to invalidate a state action they have done so when the state body at issue exercises "sufficient federal powers." *See, e.g., Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 269 (1991). Because there is no indication the Nebraska Legislature or the referendum process utilized federal power, there is no need to consider this position further here.

### E.     Claim 5

Claim 5 concerns the admission of "other acts evidence" at Torres's trial. Specifically, in Subpart 5(A), Torres contends the admission of evidence that Torres kidnapped and held Packer at gunpoint during the Packer incident violated his Sixth Amendment rights to a fair trial, and in Subpart 5(B), he contends that the admission of evidence that Torres and his mother attempted to persuade others to fraudulently supply evidence that would be favorable to Torres's case violated those same rights.  (Filing No. 69 at 88-89; Filing No. 102 at 18-19).  The respondent asserts that all of Claim 5 "was raised in the Nebraska Supreme Court in *Torres I* as error assigned under the Nebraska Evidence Rules, not the federal constitution," rendering the constitutional claim now raised as defaulted.  (Filing No. 88 at 16). *See Clark v. Bakewell*, No. 4:07CV166, 2007 WL 2572442, at *4 (D. Neb. 2007) ("'The admissibility of evidence is usually a matter of state law and procedure and does not involve federal constitutional issues.'" (quoting *Davis v. Campbell*, 608 F.2d 317, 319 (8th Cir. 1979))).  Torres disagrees, alleging that while the Nebraska Supreme Court addressed Claim 5 on the merits under state law, its decision included consideration of federal law, rendering it exhausted and ripe for review pursuant to *Oregon v. Guzek*, 546 U.S. 517, 521 (2006).  (Filing No. 102 at 18-19).

In *Guzek*, the Oregon Supreme Court found that Oregon law permitted the introduction of evidence at a new sentencing hearing relevant to the sentence including mitigating evidence relevant to whether the defendant should receive a death sentence. 546 U.S. at 521.  In so finding, the Oregon Supreme Court added that the Oregon law's words "relevant . . . mitigating evidence" refers to evidence "that the *Federal Constitution* grants a defendant the right to present," discussed the law in the context of the Eighth and Fourteenth Amendments, and interpreted United States Supreme Court precedent in making its findings. *Id.* (emphasis in original) (citations omitted).  Because the state court found that state law demanded admissibility of the evidence at issue solely for a federal reason, the United States Supreme Court found that it had jurisdiction to consider the merits of the claim. *See id.*

68

In relation to Subpart 5(A), in his briefing in *Torres I*, Torres argued that the district court erred in admitting evidence of the incident where Torres kidnapped Packer and then held Packer, Cross, and Padilla at gunpoint. *See* (Filing No. 16-8 at 49-69). This evidence was allowed by the trial court to establish motive, intent, and opportunity pursuant to Neb. Rev. Stat. § 27-404(2). (Filing No. 16-2 at 13). The Nebraska Supreme Court found that the trial court erred in allowing entry of this evidence to establish intent and opportunity, but found its admission was appropriate for motive. *See* (Filing No. 16-2 at 13-16). Specifically, the court "agree[d] that motive reasoning requires propensity inferences. But, so long as the evidence is also relevant for reasons not based on the defendant's character, it is admissible under rule 404(2)." (Filing No. 16-2 at 14).

While the court agreed that admission of the evidence at issue was "highly prejudicial," it ultimately found that its probative value was not outweighed by the potential for unfair prejudice. (Filing No. 16-2 at 16-17). The court then turned to assessing whether there was any prejudicial impact arising from the admission of the evidence at issue in Claim 5 or whether the error was "harmless," and in doing so considered whether the evidence at issue "materially influenced the jury to reach a verdict adverse to the substantial rights of Torres," ultimately finding it did not. (Filing No. 102 at 19) (citing Filing No. 16-2 at 17). Of note, the court relied on the case of *State v. Ellis*, 799 N.W.2d 267, in rendering its decision, and, unlike *Guzek*, the court made no reference to federal law, the United States Constitution, or United States Supreme Court precedent in rendering its decision.

In regard to Supbart 5(B), Torres argued to the state courts that the trial court erred in allowing two witnesses to testify regarding Torres's attempts to have them fabricate evidence exonerating him under state law, as he does now. *Compare* (Filing No. 1-1 at 28-30) *with* (Filing No. 69 at 102). However, he also argues here that the admission of this testimony was a violation of his due process rights, *see* (Filing No. 69 at 102), whereas he raised this claim to the state courts under state law only, arguing that the testimony at issue

69

was hearsay and therefore should have been excluded under Neb. Rev. Stat. § 27-801(4)(b)(v). (Filing No. 1-1 at 28-30). The court, again relying solely on Nebraska law, found that the testimony was admissible under state law, never referencing federal law, the United States Constitution, or United States Supreme Court precedent in rendering its decision. *See* (Filing No. 16-2 at 18-19).

Because Torres did not specifically raise any constitutional claims and did not cite any non-state cases in his briefing to the state courts when addressing the issues raised in Claim 5, and because the state courts relied solely on state law when addressing them, the federal issues Torres now raises in Claim 5 were never fairly presented to the state courts and are therefore procedurally defaulted. Because procedural default of Claim 5 cannot be excused under *Martinez* as it is not an ineffective-assistance-of-trial-counsel claim, its merits are beyond the scope of this Court's review.

### F.    Claim 6

In his sixth claim, which contains four subparts, Torres alleges that his counsel was ineffective during his trial's guilt phase for failing to investigate and present evidence. Specifically, in Subpart 6(A), he contends that his trial counsel failed to present available evidence that would have undermined, rebutted, or impeached the credibility of the State's other acts evidence. In Subpart 6(B), he argues that trial counsel failed to call their retained expert to testify regarding the contamination of the DNA evidence, to raise issues about the destruction of evidence, and to contest the State's failure to produce exculpatory evidence. In Subpart 6(C), he alleges that "multiple" failures by counsel undermined confidence in the outcome of his guilty verdict. And in Subpart 6(D), he alleges that trial counsel failed to investigate and present the Gleason evidence that would have contradicted essential points of the State's case against him. (Filing No. 1 at 5; Filing No. 69 at 105).

Torres admits that Subpart 6(D) is procedurally defaulted, but the parties appear to agree that Subparts (A)-(C) were exhausted and reviewable on their merits. Therefore, this

70

Court will first address the procedural default of Subpart (D) before moving on to the merits of Subparts (A)-(C).

### 1.    Procedural Default – Subpart 6(D)

Torres admits he never presented the arguments about the Gleason evidence to the Nebraska state courts due to the alleged ineffectiveness of counsel who never uncovered or presented this evidence.  (Filing No. 69 at 106).  Torres argues that the procedural default of this claim may be excused under *Martinez*.  (Filing No. 69 at 106).  However, as Torres has already been found ineligible to utilize *Martinez* to excuse the procedural default of Subpart 6(D), *see* Filing Nos. 128 and 130 (finding that there was no impediment to Torres's counsel from discovering and presenting the Gleason evidence to the state courts), no cause exists for excusing the procedural default of Subpart 6(D), therefore any relief sought under Subpart 6(D) must be denied.

### 2.    Merits – Subparts 6(A)-(C)
#### a.    Subpart 6(A)

In Subpart 6(A), Torres argues his trial counsel was "ineffective for failing to investigate and present evidence that would have undermined the State's presentation of evidence that [Torres] kidnapped and robbed [Packer]."   (Filing No. 69 at 107). Specifically, he argues his counsel failed to investigate and present available impeachment and exculpatory evidence from three potential witnesses who would have refuted the evidence presented by the State regarding the kidnapping and robbery of Packer.  (Filing No. 69 at 108) (citing *Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005)).

To establish counsel acted unreasonably under *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)).  A decision is not "strategic" unless it is a conscious deliberation between legitimate and

71

rational alternatives, not happenstance, inattention, or neglect. *See Wiggins,* 539 U.S. at 526 (concluding that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *Strickland,* 466 U.S. at 690-91. Therefore, both deficient performance and the absence of strategic determination must be found to establish the deficient performance prong. The appropriate focus when addressing the performance prong has been described as the need to consider the basis supporting defense counsel's decision and not just the decision itself. *See Wiggins*, 539 U.S. at 523.

Here, the state court did just that, finding:

Torres' trial counsel explained that the decision not to focus on the kidnapping of Packer was a matter of trial strategy. He explained that "the less talked about the . . . Packer episode, the better. Because my opinion was that the evidence was clear-cut [that] the kidnapping occurred from just too many witnesses." The trial strategy was to focus on the crimes that Torres was charged with, rather than the kidnapping, which was admissible only as rule 404 evidence. Torres' trial counsel explained that he did not want to shift the focus onto the timeline of who had Packer's cell phone at what time. Torres' counsel was also concerned about what testimony might come out on the witness stand if these witnesses were to testify. He did not believe that it was a good trial strategy to call witnesses that may end up bolstering the testimony about the kidnapping and robbery.

(Filing No. 16-6 at 9).

"Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington*, 562 U.S. at 106 (citation omitted). "Hindsight disagreement with trial strategy or losing tactics must not be confused with true ineffectiveness of counsel." *Jackson v. Potter*, No. 07-CV-293(TJM/RFT), 2010 WL 2773436, at *2 (N.D.N.Y. July 12, 2010) (citation omitted); *see also Love v. United States*, 949 F.3d 406, 410 (8th Cir. 2020) ("We make every effort to eliminate the distorting effects of hindsight and consider performance from counsel's perspective at the time." (internal citation and quotation omitted)).

The fact that Torres contends that other witnesses existed who could have provided testimony contradictory to the state's witnesses is of no help to Torres. As the state court pointed out, those witnesses were considered by trial counsel before deciding to not proceed with them as a matter of trial strategy. Such an informed decision is not deficient performance under *Strickland*. Therefore, Subpart 6(A) fails.

### b.     Subpart 6(B)

In Subpart B, Torres contends his trial counsel was ineffective for failing to call Dr. Pyatt to testify regarding the possibility of DNA contamination, to raise issues about the destruction of evidence due to the Hall residence having burned after the events at issue in Torres's case, and the State's failure to produce exculpatory evidence.[35] (Filing No. 1 at 92). Torres contends that Dr. Pyatt's testimony would have called into question the accuracy of the State's DNA conclusions, and that his counsel's failure to go inside the crime scene before the fire precluded Torres from arguing that methamphetamine was being manufactured at the residence because the evidence of the manufacturing was destroyed in the fire. (Filing No. 1 at 92-93). Torres claims both arguments were addressed in *Torres II* and that the denial of relief represents an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. (Filing No. 69 at 106).

Similar to Subpart 6(A), the state court found that Torres's counsel was not ineffective for failing to offer Dr. Pyatt's testimony on the DNA contamination issue as his counsel testified that they did consider offering Dr. Pyatt's testimony but decided, as a matter of strategy, not to do so. (Filing No. 16-6 at 10). Specifically, the state court found that Torres's counsel's decision that "there was not enough of a difference in opinion

---

[35]The Court notes that in Torre's supplemental briefing, he extracted his argument regarding the state's failure to produce exculpatory evidence from Subpart 6(B) and renamed it Subpart 6(D). Subpart 6(D) has already been addressed by this Court, and it will not be further discussed here.

between Pyatt and the State's expert witness to justify calling Pyatt to testify" was a reasonable strategy. (Filing No. 16-6 at 10).

"Counsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107. Counsel's decision not to spend funds to present expert testimony which they believed would largely mirror the State's expert can hardly be considered ineffective and such a finding is certainly not a misapplication of *Strickland*.

Regarding Torres's argument that his counsel failed to view the crime scene, Torres's counsel testified that he chose not to enter the house because of concerns for his own health and because he believed the photographic and physical evidence taken from the house was sufficient. (Filing No. 16-6 at 10). The state court found that even if such a decision constituted deficient performance, evidence showing methamphetamine was being manufactured at the house was "immaterial to whether Torres murdered Hall and Donohue" because the evidence presented already clearly established Cross was using the home as a base for his drug trafficking. (Filing No. 16-6 at 10).

Even if this Court disagreed with the state court's conclusion that evidence of methamphetamine manufacturing would not have made a difference, Torres's argument regarding his counsel's failure to enter the Hall residence is wholly based on hindsight. Hall's residence burned shortly after the crimes at issue were committed, but Torres's counsel could not have known it would. Therefore, even had his counsel later believed entering the house to obtain methamphetamine manufacturing evidence would have assisted Torres's case, the fact that counsel did not obtain such evidence so early in the case's progression when it was still potentially available is not deficient performance and instead is more akin to unfortunate timing.

Torres is not entitled to relief on Subpart 6(B).

### c.  Subpart 6(C)

In Subpart 6(C), Torres argues trial counsel was ineffective for failing to investigate and challenge "all aspects of the prosecution case for guilt, including failing to investigate evidence that would impeach the prosecution witnesses, failure to investigate the tangible evidence and records admitted as evidence of guilt, and failure to investigate the scientific evidence admitted at trial." (Filing No. 1 at 94). He contends this argument was addressed by the state court in *Torres II*, but the state court's decision to deny this claim was an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. (Filing No. 69 at 106).

In the Eighth Circuit, "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Hall v. Luebbers*, 296 F.3d 685, 692-93 (8th Cir. 2002) (citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996), and *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) (rejecting cumulative error as a basis for habeas relief for ineffective assistance claims because "each habeas claim must stand or fall on its own.")). Therefore, Torres must establish prejudice regarding his individual allegations. Because he has not done so (and does not provide this Court with a basis for doing so on the general ineffectiveness allegations he makes in this Subpart), he is not entitled to relief on Subpart 6(C) even had it been raised to the state courts.

### G.  Claim 7

In Claim 7, Torres argues he was "deprived of his right to an impartial jury due to his trial counsel's ineffective failure to move to strike for cause jurors who had expressed explicit discriminatory feelings towards persons of Latino descent, as well as to strike jurors who acknowledged viewing news coverage about the case." (Filing No. 102 at 22). Specifically, Torres contends that, despite receiving information from jury questionnaires, his trial counsel failed to question multiple jurors about improper bias resulting in a failure to remove jurors who were influenced by media reports and held preformed opinions about Torres' guilt, or who possessed "animosity against Hispanic people." (Filing No. 1 at 95).

75

He further argues he was tried by a "death qualified" jury because his counsel permitted extensive questioning of the jury about the death penalty even though the jury had no role in sentencing, resulting in a conviction-prone jury. (Filing No. 1 at 95).

Torres admits all arguments raised in this claim are procedurally defaulted, but claims their default may be excused under *Martinez* without looking outside the state court record because the claim is based entirely upon juror questionnaires and statements from voir dire. (Filing No. 102 at 23). He asserts his arguments support a substantial-claim finding because "any reasonable jurist would at least debate a constitutionally significant issue of a biased jury." (Filing No. 102 at 23-24). Specifically, he argues he was "tried by a jury comprised of persons who had improperly viewed media on the case, and of a juror who expressed strong discriminatory views against the ethnicity to which the defendant belongs." (Filing No. 102 at 24).

### 1.    Death Qualification

Regardless of whether Claim 7 is procedurally defaulted, Torres's argument regarding death qualification is meritless. It is well-established that death-qualification alone does not violate a defendant's right to a fair and impartial jury. *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1047 (D. Ariz. 2007) ("There is no per se rule that death-qualification of a guilt-phase jury is a constitutional violation."). Having addressed this issue previously, courts in this district have held that "death qualification" of a jury does not violate the right to an impartial jury as an impartial jury consists of nothing more than a jury who will uphold the law and find the facts. *See, e.g., Williams v. Clarke*, 823 F. Supp. 1486, 1504 (D. Neb. 1993) (noting the Supreme Court held that death qualification

76

does not violate the fair-cross-section requirement of the Sixth Amendment, and, furthermore, that the process does not violate the constitutional right to an impartial jury).

### 2.     Racial and Media Bias

In support of his racial-bias arguments in Claim 7, Torres alleges that his counsel was ineffective by: (1) utilizing a peremptory strike to remove potential juror "Ellis" who had indicated racial bias instead of removal for cause, resulting in a failure to preserve "critical peremptory strikes" which could have been used later, and (2) allowing juror "Johnson" to remain on the jury although Johnson's responses to the jury questionnaire reflected discriminatory feelings towards people of Latino descent.  (Filing No. 69 at 120-38; Filing No. 102 at 27-29).

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Criminal defendants also have a Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community.[36]  *See Berghuis v. Smith*, 559 U.S. 314 (2010).  "The Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case."  *Lockhart*, 476 U.S. at 184.  "The bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).

"Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and

---

[36]Torres cites *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992), for the proposition that "Due process requires that jurors undertaking capital *sentencing* must be impartial and indifferent . . . [and a] court's voir dire must be adequate to identify and remove partial jurors." (Filing No. 69 at 126) (emphasis added).  However, *Morgan* is inapplicable here because the panel, not the jurors, undertook sentencing in Torres's case.

to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  While there is no constitutional right to a jury comprised in whole, or in part, of persons of his or her own race, there is a constitutional right to "be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986).

In Torres's case, potential juror Ellis admitted during voir dire that a Hispanic person broke into his son's house and attempted to beat her son to death with a baseball bat.  (Filing No. 16-19 at 180-81).  Ellis stated that, in light of that event, when she looked at Torres she constantly thought of the events that occurred at her son's home but believed she could remain impartial.  (Filing No. 16-19 at 181, 183).  While no challenge to Ellis was made for cause, ultimately Ellis was relieved of her service via peremptory strike.[37] (Filing No. 16-19 at 212-13).  Torres's claim here relies on his argument that his counsel should have moved to strike Ellis for cause based on racial bias, resulting in his having to utilize a peremptory strike to remove Ellis which could have been reserved to remove another juror.

While conscious and informed decisions on trial tactics and strategy generally cannot be the basis for an ineffective assistance of counsel claim, some strategy decisions "are so unreasonable that they can support a claim of ineffective assistance of counsel." *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001) (internal citation omitted); *see also Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." (internal quotation marks and citation omitted)).  Although

---

[37]In Nebraska, when a defendant, through diligence, is able to discover a reason to challenge a juror, the objection to the juror must be made at the time of voir dire.  *State v. Huff*, 905 N.W.2d 59 (Neb. 2017).  And peremptory challenges are not to be exercised until jurors have been passed for cause.  *See Fetty v. State*, 230 N.W. 440 (Neb. 1930).

deference must be afforded to counsel's strategic decisions, *see Strickland,* 466 U.S. at 690-91, for this deference to apply there must be some evidence that the decision was just that: strategic. *See Wiggins*, 539 U.S. at 526; *Strickland,* 466 U.S. at 690-91; *Brewster v. Hetzel*, 913 F.3d 1042, 1057 (11th Cir. 2019). Put another way, when evaluating a strategic decision, a reviewing court's "principal concern is not whether counsel should have" taken a certain course, but whether the reasoning supporting their decision "was *itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). To make such a determination, a court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,'" including "a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time of that conduct.'" *Id.* (quoting *Strickland*, 466 U.S. at 688-89).

The *Strickland* prejudice inquiry begins with the observation that, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. Accordingly, even where counsel's performance was deficient, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of a criminal trial, the prejudice inquiry requires the defendant to show there is a reasonable probability that, absent trial counsel's errors, the jury "would have had a reasonable doubt respecting guilt." *Id.* at 695.

If a juror is questioned regarding potential bias and the court is convinced the juror will be fair and impartial, there is no need for removal. *See United States v. Gibbs*, 125 F. Supp. 2d 700, 709 (E.D. Pa. 2000). Without evidence that the empaneled jury was biased, counsel was not ineffective for failing to strike a biased juror. *See id.* Because Ellis was removed, Torres cannot make such a showing. More importantly here, Torres has failed to show any juror was biased, therefore any ineffective-assistance claim for failure to strike

a biased juror must fail because there cannot be any prejudice flowing from counsel's putative ineffective assistance. *See Brown v. Warden*, *SCI-Retreat*, 104 F. App'x 232, 234 (3d Cir. 2004) (unpublished). The performance of Torres's counsel did not fall below an objective standard of reasonableness, and even if it did, Torres has failed to show there is a reasonable probability that but for counsel's errors, the result of his criminal proceedings would have been different. The best Torres can argue is that perhaps if his counsel had moved to strike Ellis for cause, and the motion had been granted, that he could have utilized another peremptory strike on another unidentified juror who then would have been replaced by yet another juror who may or may not have decided the matter a different way. This is hardly a reasonable probability. The same goes for the remainder of Torres's arguments in support of Claim 7.

Torres's second argument relating to juror Johnson can be reframed as a claim that trial counsel failed to fully explore racial bias during jury selection. Citing *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), Torres asserts, "Federal courts are mandated to voir dire on the issue of racial bias when the defendant and victim are members of different racial or ethnic groups." (Filing No. 69 at 123). He further argues that capital-defense counsel should, "at a minimum, seek to have the Court voir dire jurors on racial prejudice, and seek to strike for cause jurors with blatant racial bias," noting that allowing a racially biased juror to be seated is not a discretionary or strategic decision. (Filing No. 69 at 123 (citing *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001)).

As an initial matter, neither *Pena-Rodriguez* nor *Rosales-Lopez* support the absolute requirements as stated by Torres and both cases address trial-court error not ineffective-assistance-of-counsel claims.[38] Instead, Torres's claim of ineffective assistance of counsel

---

[38]In *Pena-Rodriguez*, two jurors told defense counsel, after the discharge of the jury, that another juror had expressed anti-Hispanic bias against the defendant and his alibi witness after which trial counsel obtained affidavits from several jurors describing several biased statements made by the juror in question, which were submitted to the trial court.

relating to juror Johnson requires establishing Johnson was a biased juror. *See Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995) ("To maintain a claim that a biased juror prejudiced him, however, [a petitioner] must show that the juror was actually biased against him.") (citing *Smith v. Phillips*, 455 U.S. 209, 215 (1982)).

"An attorney's actions during voir dire are considered to be matters of trial strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (citations omitted). Ultimately, courts addressing similar arguments have found that to succeed on such a claim, a habeas petitioner must present proof that racial animus was a significant

---

*See* 580 U.S. at 212-13. The trial court acknowledged the juror's apparent bias but, nonetheless, decided it could not consider the affidavits under Colorado's "no-impeachment rule" prohibiting inquiry into statements made by jurors during deliberations. *Id.* The question before the Supreme Court was whether an exception to the no-impeachment rule was constitutionally required "when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt." *Id.* at 221. Because racial bias was a "familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice," the Supreme Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus *to convict a criminal defendant*, the Sixth Amendment requires that the no-impeachment rule give way in order to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 224-25 (emphasis added). In an effort to ensure that individuals who sit on juries are free of racial bias, the Court in *Pena-Rodriguez* noted that "the Constitution at times demands that defendants be permitted to ask questions about racial bias during *voir dire*." *Id.* at 223 (citing *Ham v. South Carolina*, 409 U.S. 524 (1973); *Rosales-Lopez v. United States*, 451 U.S. 182 (1981); *Turner v. Murray*, 476 U.S. 28 (1986)).

In *Rosales-Lopez*, the Court explained that "courts must make such an inquiry [of jurors] *when requested by a defendant* accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups." 451 U.S. at 192. However, *Rosales-Lopez* did not address an ineffective-assistance claim but instead addressed trial-court error. *Id.*

motivating factor in one or more jurors' finding of guilt. *See Hughes v. Myers*, No. 3:20-CV-00765, 2021 WL 1293874, at *9 (M.D. Tenn. Apr. 7, 2021).

Torres has offered no evidence that any member of the jury convicted him simply because he was accused of killing a white victim. For example, there was no evidence that either Torres, or his white victims, employed any racial epithets, or harbored any racial animus to provoke the altercation between them and their racial differences did not prevent their prior interactions. *See Fink v. Fabian*, No. CIV 06-3908 RHK/RLE, 2007 WL 4209091, at *9 (D. Minn. Nov. 26, 2007). Therefore, Torres's counsel's decision to forego further questioning regarding potential racial bias is well within a reasonable strategic decision in a matter where race "was not the primary issue" in order to avoid alienating jurors. *See Fink*, 2007 WL 4209091, at *8.

Torres also argues that his counsel's failure to eliminate a juror who admitted to learning "extensive details about the crime and discussing it with her coworkers" and failing to strike a juror who admitted she could not likely remain unbiased due to her viewing of news coverage of the crime constituted ineffective assistance. (Filing No. 69 at 120-38; Filing No. 102 at 27-29). Again, Torres fails to establish prejudice as a result of his counsel's alleged failures.

Even when jurors express doubts as to their own impartiality on voir dire, a finding of actual juror bias is not necessarily the result. *See Patton v. Yount*, 467 U.S. 1025, 1029-32 (1984) (finding no manifest trial court error where eight of the fourteen jurors in question, due to pretrial publicity, "admitted that at some time [prior to trial] they had formed an opinion as to [defendant's] guilt" even where one of the impaneled jurors "stated at voir dire that he would have required evidence to change his mind about [defendant's] guilt."). Therefore, Torres needed to do more than simply point to a juror's learning about the case through pre-trial publicity to establish prejudice.

For these reasons, regardless of whether he can excuse the procedural default of Claim 7, Torres is not entitled to relief.

### H.     Claim 8

In his eighth claim, Torres alleges that he was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when the State failed to disclose the existence of the Gleason evidence which he contends was both exculpatory and impeachment evidence in violation of *Brady*.[39]  *See* (Filing No. 124 at 9).  Torres admits this claim is procedurally defaulted, *see* (*id.*), and sought to excuse its procedural default and develop the claim in his Discovery Motion, *see* (Filing No. 70 at 23-26).  However, because the Discovery Motion was denied in its entirety and Torres failed to excuse the procedural default of Claim 8, *see* (Filing No. 128 at 23-24), the merits of this claim are outside the scope of this Court's review, *see* *Coleman*, 501 U.S. at 750.  The claim will be denied.

### I.     Claim 9

Torres alleges his Fifth Amendment right against self-incrimination as discussed in *Miranda v. Arizona*, 384 U.S. 436 (1966), was violated when police officers continued to question him after he had informed the officers that he was "done."  (Filing No. 69 at 153).  Torres contends that the Nebraska Supreme Court's finding that no *Miranda* violation occurred in conjunction with the questioning was an unreasonable application of law in light of the evidence in the record under 28 U.S.C. § 2254(d).  (Filing No. 69 at 155).  Torres raised this claim in his direct appeal, and it is properly before this Court for review on its merits.  *See* (Filing No. 16-8 at 43-48; Filing No. 88 at 21).

The core of Claim 9 is whether Torres's statement to the police that the conversation was over (after he was previously warned of and waived his right against self-incrimination) was an unambiguous and/or unequivocal sign that he had invoked his Fifth

---

[39]Because this claim has been discussed in detail by this Court previously, *see* (Filing No. 121 at 10-11; Filing No. 124 at 23-24), the details supporting the claim are not repeated here.

Amendment right to remain silent.  The Nebraska Supreme Court, considering the evidence of the interaction, found that Torres's comment about ending the conversation and his behavior immediately thereafter did not evidence an unambiguous and/or unequivocal desire to assert his right to remain silent, explaining that:

> Torres waved his hand in front of the interviewing officer, who had been asking a question about telephone calls made by Torres to Cross. At the same time, Torres said to the officer, "End of conversation; we're done." However, immediately after, and with no prompting or questioning by law enforcement, Torres continued the conversation regarding the telephone calls. A review of the interview also shows that Torres subsequently continued to freely engage in the interview and continued to converse with the officers.

(Filing No. 16-2 at 20).

Torres appears to agree that the Nebraska Supreme Court applied the correct legal standard, pointing out that the procedure police must follow once *Miranda* warnings have been given is clear: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," *see* (Filing No. 69 at 154-55) (quoting *Miranda*, 384 U.S. at 473-74), but the invocation of the right to remain silent "must be unambiguous," (Filing No. 69 at 155) (citing *Davis v. United States*, 512, U.S. 452, 459 (1994)).  Therefore, the only issue before this Court is whether the Nebraska Supreme Court's decision that Torres's comment that he was ending the conversation in conjunction with Torres's continued conversation and behavior that followed was ambiguous and therefore did not require the police to cease all questioning was a reasonable determination based on the record.  *See, e.g., United States v. Plummer*, 118 F. Supp. 2d 945, 952-53 (N.D. Iowa 2000) (citing *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995)).

The Eighth Circuit held that a suspect adequately invokes their right to remain silent and effectively cuts off questioning, when they indicate "a clear, consistent expression of a desire to *remain* silent."  *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995)

84

(quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989) (emphasis added)). Courts outside this circuit have found a defendant's nonresponse to several questions, having answered others afterwards, "did not constitute a 'clear[]' request that all further questioning cease." *See*, *e.g.*, *United States v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996).

The record reflects that the Nebraska Supreme Court's findings did not result in an unreasonable application of law in light of the evidence in the record: Torres did not express an unambiguous or unequivocal intent to remain silent, instead appearing to only seek to remain silent as to a certain line of questioning but remaining willing to continue responding to others.  Torres argues that although he initially waived his constitutional rights under *Miranda* at the beginning of the police questioning at issue, he revoked that waiver by saying "end of conversation" and "done."  (Filing No. 69 at 154).   He further submits that while police officers continued to question him about his knowledge and use of firearms and about whether he ever pointed a gun at Packer after he said "done" (which he refused to respond to), he admits he eventually resumed speaking in response to the officers' questions, including answering questions about calls with Cross.  (Filing No. 69 at 154-55).

In Torres's case, the Nebraska Supreme Court found that the utterance of the phrase "I'm done" has never been construed as unequivocally cutting off all further questioning "no matter what the surrounding circumstances."  (Filing No. 16-2 at 20 (citing *State v. Schroeder*, 777 N.W. 2d 793, 809 (Neb. 2010)).  In *Schroeder*, the Nebraska Supreme Court considered similar circumstances and found that a suspect's use of the words "I'm done" when referencing being done with the "conversation" was not an unequivocal implication of the right to remain silent as follows:

> The suspect must articulate the desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.  An officer should not have to guess when a suspect has changed his or her mind and wishes the questioning to end.  In other words, while the suspect does not have to "speak with the discrimination of an Oxford don," ambiguous or

85

equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.  In determining whether there has been a clear invocation, we review the totality of the circumstances surrounding the statement in order to assess the words in context.

As we noted in *Rogers*, where the suspect's reference to silence is qualified by a temporal element like "now" or "at this time," courts generally conclude that the statement is equivocal. In this case, Schroeder told Bergman that it was "the end of this conversation."

But Schroeder relies on the fact that in *Rogers*, we held that an unqualified "I'm done," combined with "I'm not talking no more," was a clear invocation of the right to remain silent. We find Schroeder's statements are distinguishable. As already noted, Schroeder's statement was not unqualified. His statement, "I'm done," cannot be extricated from his statement immediately preceding it.  The prior statement qualified that what he was "done" with was simply "this conversation."  We have never held that any utterance of "I'm done," no matter what the surrounding circumstances or other statements, will be construed as cutting off all further questioning.

And it is of no small import that part of the context of the alleged invocation is Schroeder's prior request for a polygraph.  We conclude that a reasonable police officer faced with a suspect's statement that "this conversation" is done, after the suspect had volunteered to take a polygraph examination as soon as one could be set up, would believe that the suspect wanted only to end the current conversation.  To the extent that a reasonable police officer might believe that "this conversation" referred more broadly to all future discussion of the same topic, the statement is, at the most, ambiguous.

*Schroeder*, 777 N.W.2d at 808-09 (cleaned up).

Upon review, this Court takes no issue with the state court's findings.  Torres's statement that he was "done" was coupled with his reference to the temporal element of the "conversation," was not an unequivocal assertion of his right to remain silent and instead appeared to be an attempt to end that line of questioning, especially as Torres, of his own free will, began discussing other topics of conversation immediately thereafter. Therefore, this Court does not find that the Nebraska Supreme Court's decision addressing

86

Claim 9 involved an unreasonable application of law or finding of fact. Torres is not entitled to relief on Claim 9.

## V.    CERTIFICATE OF APPEALABILITY

AEDPA bars a petitioner from appealing the denial of a § 2254 habeas petition unless he is first granted a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). That showing requires the petitioner demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If claims are denied on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasizing that the "prisoner must demonstrate substantial underlying constitutional claims"). Applying these standards here, the Court will not issue Torres a certificate of appealability as his claims lack merit, are not substantial, and/or are procedurally defaulted without excuse as set forth herein.

## VI.    CONCLUSION

For these reasons, Torres's Petition for Writ of Habeas Corpus (Filing No. 1) is denied. No certificate of appealability will be issued. The Court will enter judgment by a separate document.

IT IS SO ORDERED.

Dated this 10th day of June 2026.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge